Filing # 108550742 E-Filed 06/08/2020 05:07:14 PM

# EXHIBIT "A"

Filing # 107269380 E-Filed 05/08/2020 09:44:17 PM

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
PROBATE DIVISION

IN RE: ESTATE OF
DONALD JOHN JACK
      Deceased.

Case No.  20-004321-ES

_____/

## LETTERS OF ADMINISTRATION

TO ALL WHOM IT MAY CONCERN

    WHEREAS, Donald John Jack, a resident of 12542 82nd Terrace N., Seminole, FL 33776, died on April 21, 2020, owning assets in the State of Florida, and

    WHEREAS, Jessica Gunter has been appointed personal representative of the estate of the decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

    NOW, THEREFORE, I, the undersigned circuit judge, declare Jessica Gunter duly qualified under the laws of the State of Florida to act as personal representative of the estate of Donald John Jack, deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will permit and the law directs; and to make distribution of the estate according to law.

    ORDERED in chambers, Pinellas County, Florida.

05/15/2020 11:03:20 AM

_____
Pamela A. M. Campbell
Circuit Judge

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and
through JESSICA GUNTER, Personal
Representative,

        Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.;
BROOKDALE SENIOR LIVING, INC.; BKD
TWENTY-ONE MANAGEMENT COMPANY,
INC.; AMERICAN RETIREMENT
CORPORATION; LIFE CARE SERVICES, LLC;
and, CYNTHIA AYALA (as to SEMINOLE
PAVILION REHABILITATION AND NURSING
SERVICES),

        Defendants.

CASE NO: 20-002755-CI

---

## DESIGNATION OF EMAIL ADDRESSES PURSUANT
## TO RULE OF JUDICIAL ADMINISTRATION 2.516

COMES NOW the Plaintiff, THE ESTATE OF DONALD J. JACK, by and through
JESSICA GUNTER, Personal Representative, by and through the undersigned attorney, and
pursuant to Florida Rule of Civil Procedure 1.080 and Florida Rule of Judicial Administration
2.516, hereby designates undersigned counsel's primary electronic email address and secondary
electronic email addresses for this matter:

    Primary:     TPABXLStaff@wilkesmchugh.com
    Secondary:  FL@wilkesmchugh.com

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on Defendants with the Complaint in this matter.

/s/ Bennie Lazzara, Jr.

**Bennie Lazzara, Jr., Esquire**
Florida Bar No. 119568
Bennie@wilkesmchugh.com
TPABXLStaff@wilkesmchugh.com
fl@wilkesmchugh.com
**James L. Wilkes, II, Esquire**
Florida Bar No. 405337
jimw@wilkesmchugh.com
dthomason@wilkesmchugh.com
**Jason R. Delgado, Esquire**
Florida Bar No. 591122
jdelgado@wilkesmchugh.com
TPAJRDstaff@wilkesmchugh.com
WILKES & MCHUGH, PA
1 N. Dale Mabry Highway, Suite 700
Tampa, FL 33609
Telephone: (813) 873-0026
Facsimile: (813) 286-8820
*Attorneys for the Plaintiff*



# Notice of Service of Process

**Primary Contact:**    Jamie Curry
Brookdale Senior Living
111 Westwood Pl
Ste 400
Brentwood, TN 37027-5057

**Electronic copy provided to:**    Bahar Azhdari
Marti Downey
Laurel Johnston
Michael Mueller
Jennifer Fitzpatrick
Timothy Cesar

| | |
|---|---|
| **Entity:** | American Retirement Corporation<br>Entity ID Number  1915123 |
| **Entity Served:** | American Retirement Corporation |
| **Title of Action:** | The Estate of Donald J. Jack, by and Through Jessica Gunter vs. CCRC OPCO Freedom Square, LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Wrongful Death |
| **Court/Agency:** | Pinellas County Circuit Court, FL |
| **Case/Reference No:** | 20-002755-CI |
| **Jurisdiction Served:** | Florida |
| **Date Served on CSC:** | 06/19/2020 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Bennie Lazzara Jr.<br>813-873-0026 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Filing # 108550742 E-Filed 06/08/2020 05:07:14 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and through
JESSICA GUNTER, Personal Representative,

     Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.; BROOKDALE
SENIOR LIVING, INC.; BKD TWENTY-ONE
MANAGEMENT COMPANY, INC.; AMERICAN
RETIREMENT CORPORATION; LIFE CARE
SERVICES, LLC; and, CYNTHIA AYALA (as to
SEMINOLE PAVILION REHABILITATION AND
NURSING SERVICES),

     Defendants.

CASE NO:  20-002755-CI

CERTIFIED PROCESS SERVER # 0161
SECOND JUDICIAL CIRCUIT COURT OF FLORIDA
DATE SERVED 6-9-20 TIME 9:55 A



**SUMMONS**

THE STATE OF FLORIDA

TO ALL AND SINGULAR SHERIFFS OF SAID STATE:

GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Complaint and Designation of Email
Addresses in the above styled cause upon the defendant(s):

**AMERICAN RETIREMENT CORPORATION**
**c/o CORPORATION SERVICE COMPANY**
**1201 HAYS STREET**
**TALLAHASSEE, FL 32301**

Each defendant is hereby required to serve written defenses to said Complaint on plaintiff's attorney, whose name and address is:

**BENNIE LAZZARA JR., ESQUIRE**
**WILKES & McHUGH, P.A.**
**TAMPA COMMONS, SUITE 800**
**ONE NORTH DALE MABRY HIGHWAY**
**TAMPA, FL 33609**
**(813) 873-0026**

within twenty (20) days after service of this summons upon that defendant, exclusive of the day of service, and to file the original
of said written defenses with the clerk of said court either before service on plaintiff's attorney or immediately thereafter. If a
defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

                                                  JUN 09 2020
     WITNESS my hand and the seal of said Court on the ____ day of _____, 2020.

KEN BURKE CLERK CIRCUIT COURT
315 Court Street
Clearwater, Pinellas County, FL 33756-5165

           KEN BURKE, CPA
           Clerk of the Circuit Court

           Judith Maslar
           BY/DEPUTY CLERK

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and
through JESSICA GUNTER, Personal
Representative,

        Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.;
BROOKDALE SENIOR LIVING, INC.; BKD
TWENTY-ONE MANAGEMENT COMPANY,
INC.; AMERICAN RETIREMENT
CORPORATION; LIFE CARE SERVICES, LLC;
and, CYNTHIA AYALA (as to SEMINOLE
PAVILION REHABILITATION AND NURSING
SERVICES),

CASE NO.: 20 - 002755 - CI

        Defendants.

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

THE ESTATE OF DONALD J. JACK, by and through JESSICA GUNTER, Personal

Representative, and by and through undersigned counsel, hereby sues Defendants, CCRC OPCO

- FREEDOM SQUARE, LLC; HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a

HEALTHPEAK PROPERTIES, INC.; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-

ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION;

LIFE CARE SERVICES, LLC; and, CYNTHIA AYALA (herein after, the "Defendants"). All of

the allegations contained in this Complaint are based on either known facts or information and

belief. Plaintiff alleges as follows:

## INTRODUCTION

This case concerns the injuries, damages, and untimely death of DONALD J. JACK as a result of Defendants' actions and omissions during his residency at Defendants' skilled nursing facility known as Seminole Pavilion Rehabilitation and Nursing Services (the "Facility"). What was supposed to be merely a short-term rehabilitation admission turned out to be a death sentence for DONALD J. JACK due to Defendants' business practice of placing profits over residents. For years, even before DONALD J. JACK's residency, Defendants chose to place profits over residents and ignore deficiencies in their emergency preparedness plan and in their infection prevention and control program. When Defendants' deficiencies became more pronounced in light of the COVID-19 pandemic, Defendants continued to choose to place profits over residents by refusing to be forthcoming with the authorities, staff, residents, and residents' relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility. Instead, for almost a week after the first COVID-19 death at the Facility, Defendants withheld information regarding the COVID-19 positive death at the Facility and withheld supplies necessary to protect residents and staff. During the time Defendants kept everyone in the dark and withheld necessary supplies, DONALD J. JACK contracted COVID-19. Only after the Facility had become known as the epicenter in Pinellas County for COVID-19 and intervention from the Florida Department of Health, did Defendants transfer all ninety-five (95) residents, including DONALD J. JACK, to local hospitals to get the necessary care and to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff. Unfortunately, by this time DONALD J. JACK had tested positive for COVID-19 and only five days thereafter DONALD J. JACK was dead as a result.

## JURISDICTION, PARTIES AND VENUE ALLEGATIONS

1.  This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00).

2.      On or about April 2, 2020, DONALD J. JACK was admitted to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, located at 10800 Temple Terrace, Seminole, Florida 33772 in Pinellas County, where he remained until approximately April 17, 2020.

3.      Plaintiff, JESSICA GUNTER, is the Personal Representative of THE ESTATE OF DONALD J. JACK. Letters of Administration, dated May 15, 2020, evidencing JESSICA GUNTER's authority to bring this action on behalf of THE ESTATE OF DONALD J. JACK are attached hereto as Exhibit "A."

4.      SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is a fictitious name owned by Defendant CCRC OPCO - FREEDOM SQUARE, LLC.

5.      CCRC OPCO - FREEDOM SQUARE, LLC is the licensee that operated the Facility during DONALD J. JACK's residency.

6.      CCRC OPCO - FREEDOM SQUARE, LLC, is an active Delaware limited liability company, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

7.      CCRC OPCO - FREEDOM SQUARE, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing home facilities, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC

3

OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the courts of the State of Florida.

8.    CCRC OPCO - FREEDOM SQUARE, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the Courts of the State of Florida.

9.    HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC. (hereinafter referred to as "HCP") is the owner of property located at 10800 Temple Terrace, Seminole, Florida 33772, which is the property upon which the SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is situated.

10.    HCP is a Maryland corporation, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

11.    HCP had the authority to and did exercise control over the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

12.    HCP required rents or other compensation from funds it knew were necessary for DONALD J. JACK's support and maintenance. HCP knew that such conduct would deprive the Facility of adequate resources to provide for the wellbeing of the Facility's residents, including DONALD J. JACK.

13.    HCP shared control over the operation of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES through its authority to control the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

14. HCP conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

15. HCP committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

16. BROOKDALE SENIOR LIVING, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

17. BROOKDALE SENIOR LIVING, INC. is the parent company and operator of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

18. BROOKDALE SENIOR LIVING, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

19.     BROOKDALE SENIOR LIVING, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

20.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

21.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

22.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

23.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

24. AMERICAN RETIREMENT CORPORATION is a Tennessee corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

25. AMERICAN RETIREMENT CORPORATION conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

26. AMERICAN RETIREMENT CORPORATION committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

27. AMERICAN RETIREMENT CORPORATION is an entity that operated, managed, controlled and oversaw SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

28. LIFE CARE SERVICES, LLC is an active Iowa limited liability company, with its principal place of business at 400 Locust Street, Suite 820, Des Moines, Iowa 50309, which is registered to do business in Florida and is doing business in Florida.

29. LIFE CARE SERVICES, LLC served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

7

30.     LIFE CARE SERVICES, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

31.     LIFE CARE SERVICES, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

32.     CYNTHIA AYALA was at all material times hereto a resident of the State of Florida and the Administrator at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

33.     CYNTHIA AYALA conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed herself of the privileges of the State of Florida, through her management of, operation of, control of, and/or consultation with SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

34.     CYNTHIA AYALA committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly,

8

pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

## FACTUAL ALLEGATIONS

35.     In December 2019, the government in Wuhan, China, confirmed that health authorities were treating clusters of cases of suspected pneumonia that appeared to be viral in origin.

36.     On or about January 30, 2020, the World Health Organization declared a Public Health Emergency of International Concern after the outbreak of the 2019 coronavirus disease.

37.     On February 11, 2020, the World Health Organization announced an official name for the new disease – coronavirus disease 2019, abbreviated as COVID-19.

38.     COVID-19 is an infectious virus that attacks the respiratory system of its human host. The elderly, medically fragile, and those with compromised immune systems are particularly susceptible to fatality due to COVID-19.

39.     On or about February 29, 2020, the Centers for Disease Control and Prevention ("CDC") released a statement regarding the first confirmed death in the United States from the coronavirus. In addition to the first confirmed death, the CDC reported that the public health officials in the state of Washington had also reported two additional hospitalized patients – two of which were from a long-term care facility where one was a health care worker – who had tested presumptive-positive for the virus that causes COVID-19. In addition, the CDC reported that additional residents and staff of the long-term care facility had not yet been tested but were either ill with respiratory symptoms or hospitalized with pneumonia of unknown cause.

40.     On or about March 1, 2020, in response to positive cases of COVID-19 in Florida, Governor Ron DeSantis issued Executive Order 20-51, directing the Florida Department of Health to declare a Public Health Emergency.

9

41.     On or about March 4, 2020, Defendants, via various websites, represented to the staff, residents, and relatives that Defendants were taking action to address COVID-19 concerns such as:

   a)  Providing consistent updates and communication to those who live and work in the community.

   b)  Following evidence-based precautions that align with guidelines provided by the CDC.

   c)  Reviewing response measures to ensure the community is organized and ready if the virus impacts the community or the surrounding area.

42.     On or about March 9, 2020, the Governor of Florida declared a state of emergency existed in Florida.

43.     On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.

44.     On or about March 13, 2020, the Governor of Florida ordered all Florida nursing home facilities to lock down and implemented a visitation ban in an effort to mitigate the risk to Florida's most vulnerable population to COVID-19, which is Florida's elderly population (i.e. over the age of sixty-five (65)) and particularly those who have underlying medical conditions such as cancer, chronic lung disease, moderate-to-severe asthma, serious heart conditions, immunocompromised status, diabetes, severe obesity, renal failure and liver disease.

45.     On or about March 15, 2020, Defendants, via their shared website, represented to the staff, residents, and relatives that Defendants were continuing to take action to address COVID-19 concerns such as:

   a)  Continuing to follow the guidance from both the CDC and local health authorities.

b) Increasing the frequency and rigor of cleaning and sanitizing common community areas.

c) Reviewing emergency preparedness and response program.

d) Coordinating best practices and across their large partner network.

e) Providing all residents and their families with the most up-to-date guidance from the CDC.

f) Staying in communication with local health officials.

46.     Despite Defendants' representations to the staff, residents, and relatives, Defendants failed to adequately take action to address COVID-19 concerns and failed to comply with their own procedures by, among other things:

a) Failing to supply or require staff to wear Personal Protective Equipment ("PPE");

b) Allowing asymptomatic staff who had been exposed to COVID-19 to continue working at the Facility;

c) Failing to provide staff, residents, and their families with consistent updates and communication regarding the risk of COVID-19 and of COVID-19 positive cases at the Facility; and,

d) Failing to implement an adequate emergency preparedness and response program.

47.     On or about April 2, 2020, at the age of seventy-five (75), DONALD J. JACK admitted himself to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES (the "Facility") for short-term rehabilitation for generalized weakness as he merely needed to gain strength to receive chemotherapy for his recent diagnosis of Hodgkin's Lymphoma.

48.     Upon admission, Defendants documented that DONALD J. JACK had various diagnoses including, but not limited to, Hodgkin's Lymphoma, Type II diabetes, and abnormality of albumin.

49.     Due to his age and underlying medical conditions, Defendants knew DONALD J. JACK was one of the residents most vulnerable to COVID-19.

50.     Although Defendants were on high-alert for COVID-19 since January 2020 and of the residents' vulnerability, Defendants, consistent with their business practice of placing profits over residents, disregarded the safety of DONALD J. JACK and the other residents by failing to implement adequate protocols to minimize the risk and spread of COVID-19 and by failing to implement adequate care, services and infection control at the Facility.

51.     Defendants' acts and omissions included, but were not limited to:

a.     Failing to properly use residents' funds;

b.     Failing to have an adequate emergency preparedness plan in place to keep residents safe from emerging infectious diseases like COVID-19;

c.     Failing to implement adequate protocols to minimize the risk and spread of COVID-19;

d.     Failing to implement an adequate system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents and staff;

e.     Failing to immediately notify the authorities, staff, residents, and relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility;

f.     Forcing staff to reuse PPE;

12

g. Failing to supply proper masks and gowns for weeks causing many staff members to resort to providing their own homemade facial coverings not medically graded to protect against the virus;

h. Failing to follow and/or adhere to the standards and protocols set out by the CDC and other state and local authorities related to infection control and prevention;

i. Failing to communicate the outbreak to the authorities and avail themselves of the available PPE;

j. Failing to implement safety protocols, such as disinfecting many common areas, to minimize the spread of the virus;

k. Failing to provide adequate staff in number and training;

l. Failing to be forthcoming and adequately share information regarding the outbreak at the Facility with employees, residents and their relatives.

m. Reducing basic cleaning practices for which the residents paid for;

n. Permitting widespread safety failures, such as inadequate staff and equipment, increasing the risk of injury or death during an emergency such as the pandemic;

o. Failing to have adequate management oversight; and,

p. Permitting asymptomatic staff who had been exposed to COVID-19 to continue to work at the Facility and interact with residents.

52. As a result of Defendants' acts and omissions and total disregard for the residents, the Facility experienced systemic failure and became the center of the COVID-19 outbreak in Pinellas County.

53.    To date, at least 25 deaths of residents and staff resulting from COVID-19 are linked to this single Facility.

54.    The Facility's first confirmed case of a resident with COVID-19 was a male resident that was hospitalized on April 5, 2020, and tested positive on April 9, 2020, for COVID-19. The resident then died on April 10, 2020.

55.    Although the Facility had its first confirmed case of COVID-19 on April 9, 2020 – approximately seven days after DONALD J. JACK was admitted to the Facility – and first confirmed death on April 10, 2020, Defendants failed to be forthcoming in sharing this information with employees, residents, their relatives, and the public.

56.    Rather, despite having difficulty managing the rapid outbreak, Defendants waited approximately a week to disclose to the public the first confirmed COVID-19 case. Defendants' delay in reporting delayed assistance with the much need PPE available through the county.

57.    Defendants' staff were kept in the dark by Defendants and did not know about the gravity of the outbreak until the media reported the transfer of residents on or about April 15, 2020.

58.    Likewise, family members and advocates have sounded alarms about the delays in residents and the public being informed about the outbreak as families are learning more about the outbreak from the media than from Defendants who are keeping everyone in the dark.

59.    Despite the gravity of the outbreak, Defendants failed for weeks to provide adequate gowns and masks for staff.

60.    Defendants' staff feared for their safety because protocols were not in place to minimize virus spread such as providing proper PPE and disinfecting common areas. As a result, staff began quitting and resident care deteriorated even further as staff quit and supplies shrank.

61.     On or about April 16, 2020, the Facility received laboratory results confirming DONALD J. JACK was positive for COVID-19.

62.     By April 16, 2020, approximately 30 residents and staff members at the community had tested positive for COVID-19 and by April 17, 2020, two additional residents had died.

63.     Defendants were reluctant to transfer residents to hospitals, but began to transfer mass amounts of residents on or about April 16, 2020, when they became overwhelmed by the outbreak.

64.     On or about April 17, 2020, after intervention from the Florida Department of Health and after nearly 60 residents were transferred to area hospitals who had either tested positive (or were presumed positive) for COVID-19, Defendants transferred all remaining residents at the Facility, including DONALD J. JACK, to local hospitals to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff.

65.     In a span of eight days, from the first confirmed diagnoses to the mass evacuation on April 17, 2020, a total of 95 residents were removed from the Facility and three had died.

66.     On April 21, 2020, only five days after being diagnosed, DONALD J. JACK passed away as a result of COVID-19, which he contracted at the Facility due to Defendants' acts and omissions.

67.     Based upon the acts and omissions described above, as well as numerous reports from Defendants' own staff, Defendants, who were focused on their own self-interests and putting profits over the well-being of the Facility's residents in reckless disregard for the residents' safety and well-being, were ill-prepared to protect the residents, including DONALD J. JACK, from emerging infectious diseases like COVID-19.

68.     In fact, Defendants have a history of insufficient infection control practices and have been on notice of this problem since at least February 9, 2018, when the Facility was cited by the Department of Health for failing to have a program in place to prevent the development and transmission of communicable diseases and infections.

69.     The Department of Health cited the Facility again on March 15, 2019, for failing to provide and implement an infection prevention and control program to help prevent the development and transmission of communicable diseases and infections. Notably, the Department of Health found that the staff members failed to use PPE when providing care to a resident on contact isolation precautions.

70.     Defendants' acts and omissions, with knowledge of their history of failing to provide and implement an adequate infection prevention and control program and in the face of the grave danger faced by DONALD J. JACK and the other residents of contracting COVID-19, were so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety or rights of by DONALD J. JACK and the other residents exposed to Defendants' conduct.

## CORPORATE BACKGROUND

71.     BROOKDALE SENIOR LIVING, INC. was formed in June 2005 for the purpose of combining two leading senior living companies, Brookdale Senior Living Communities, Inc. and Alterra Healthcare Corporation. Both companies had been operating independently since the 1980's.

72.     Approximately one year after its formation, BROOKDALE SENIOR LIVING, INC. acquired another senior living community operator, AMERICAN RETIREMENT CORPORATION, which had been independently operating since 1978. The acquisition of

AMERICAN RETIREMENT CORPORATION made BROOKDALE SENIOR LIVING, INC. the largest operator of senior living facilities in the United States.

73.     On or about July 20, 2007, BROOKDALE SENIOR LIVING, INC., through AMERICAN RETIREMENT CORPORATION, purchased SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

74.     BROOKDALE SENIOR LIVING, INC. is the parent company and long term care operator of hundreds of various senior living housing and service alternatives including retirement centers, assisted living facilities, skilled nursing facilities and continuing care retirement communities also known as CCRCs throughout the country including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

75.     BROOKDALE SENIOR LIVING, INC. owns, operates, and manages its facilities using the same officers and directors to control and operate all of its agents and subsidiaries. BROOKDALE SENIOR LIVING, INC. operates its facilities by centralizing its management and oversight of operations from a "national platform."

76.     SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is part of a larger CCRC, known as Freedom Square of Seminole ("Freedom Square"), which offers a full continuum of care. The Freedom Square campus includes independent living accommodations, an assisted living facility, and two skilled nursing facilities, one being SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Freedom Square offers both rental and what is known as "Life Care" programs. The rental program operates on a monthly rental fee basis, with no entry fee. The Life Care program is secured with an entry fee purchase to cover the cost of future accommodations and health care services.

77. BROOKDALE SENIOR LIVING, INC. advertised that the CCRCs allow a resident to "age in place" as it offered a retirement community with opportunities for independent living, assisted living and nursing home care. In theory, a person could spend the rest of his or her life in a CCRC, moving between levels of care as needed. In reality, CCRCs require hefty buy-ins, which could include the price of one's home, potentially committing that individual to the CCRC regardless of the quality care they receive. In 2015, CCRCs were responsible for almost 20% of BROOKDALE SENIOR LIVING, INC.'s total senior living capacity.

78. In 2014, in an effort to grow revenue, BROOKDALE SENIOR LIVING, INC. entered into an agreement with a real estate investment trust ("REIT"), HCP, to create a new business model for certain preexisting facilities. Together, the companies restructured these facilities with the intent to make a profit by releasing equity, increasing occupancy, increasing monthly service fees, and controlling operating expenses. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES was included in this restructure.

79. The new business model, in part, involved the restructuring of currently owned facilities by creating new companies for no legitimate purpose other than to avoid liability for shoddy risk management. In effect, Defendants took a legitimately named company; broke it into pieces; saddled it with tremendous liabilities; and sucked out all the cash. This restructuring involved the ostensible separation of the real estate on which the facilities sit from the operator of the facility itself. This model, known as the "Propco-Opco" structure, required the formation of two new entities to take over the pre-existing one: the real estate company, or the so-called landlord ("Propco"), and the facility operator, or the so-called master tenant ("Opco"). At the closing, the "Opco" entity engaged an affiliate of BROOKDALE SENIOR LIVING, INC. to manage the owned and leased community pursuant to a management agreement.

80. On or about August 29, 2014, at or about the same time that BROOKDALE SENIOR LIVING, INC. and HCP partnered to increase revenues and created the Propco/Opco entities, BROOKDALE SENIOR LIVING, INC. filed a change of ownership application with the State of Florida.

81. After the change in ownership, a new company, Defendant CCRC OPCO - FREEDOM SQUARE, LLC, the "Opco" or operating entity, was also created. CCRC OPCO - FREEDOM SQUARE, LLC became the new licensee of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the entity saddled with liabilities.

82. BROOKDALE SENIOR LIVING, INC. and HCP jointly own CCRC OPCO Ventures, LLC, which owns one hundred percent of CCRC OPCO-FREEDOM SQUARE, LLC.

83. CCRC OPCO-FREEDOM SQUARE, LLC entered into a management agreement with another BROOKDALE SENIOR LIVING, INC. subsidiary, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., to own, operate, manage and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and other nursing home facilities in Florida.

84. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. assumed certain duties and obligations towards residents to manage the day-to-day operations of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. The centralized corporate functions include financing, accounting, human resources, marketing, training, regulatory, affairs, purchasing food and supplies, asset management, extensive policy and procedure manuals and extensive quality control programs.

85. BROOKDALE SENIOR LIVING, INC.'s and HCP's quality control measures include community inspections conducted by corporate staff on a regular basis. BROOKDALE

19

SENIOR LIVING, INC. and HCP focus on increasing occupancy and increasing revenues to attempt to generate a profit to support the expansion of their brands through the acquisition of additional facilities.

86. Upon information and belief, on or about January 31, 2020, HCP acquired BROOKDALE SENIOR LIVING, INC.'s interest in SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and transitioned management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to LIFE CARE SERVICES, LLC. However, documents reflecting the change of ownership and/or management have not been filed with and/or made available by the State of Florida.

## CORPORATE CONDUCT AND JOINT VENTURE

87. Based upon information and belief and the allegations stated above, at all relevant times, CCRC OPCO-FREEDOM SQUARE, LLC, BROOKDALE SENIOR LIVING, INC., AMERICAN RETIREMENT CORPORATION, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., HCP, and LIFE CARE SERVICES, LLC, engaged in a joint venture to own, operate, and manage nursing homes including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Each can bind the other and each has the authority to participate in the other's profits and the obligation to share in each other's losses.

88. Money paid by and on behalf of the nursing home residents was the sole source of revenue for the multiple layers of companies created by Defendants to distribute and share the revenues generated at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the other nursing homes in Florida.

89. Defendants managed themselves, governed and controlled the care and services provided to DONALD J. JACK, and, by virtue of their management and control, each of them,

voluntarily and intentionally assumed responsibility for and provided supervisory and custodial services to DONALD J. JACK while he was a resident of the Facility.

90. At all relevant times, Defendants held themselves out as being competent, capable, and qualified to provide necessary services to their residents, including DONALD J. JACK, and to protect and keep all residents, including DONALD J. JACK, safe from harm, including from the spread of infectious diseases.

91. At all relevant times, Defendants owned, operated, and/or managed SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and furthermore participated in, authorized, and/or directed the conduct of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and its respective agents and employees. Defendants are therefore directly liable for their own negligence, recklessness, and other tortious conduct, in the hiring and management of their agents and employees.

92. Defendants, through their managers, directors, presidents, vice-presidents, executive officers, and other agents, directly oversaw, managed, and/or controlled all aspects of the operation and management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, including budgeting, staffing, training, policy and procedures manual(s), licensing, accounts payable, accounts receivable, general accounting, cash management, capitalization, and profit and loss margins.

93. Defendants employed all of those persons who attended to and provided care and services to DONALD J. JACK while he was a resident at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and employed those persons in management and supervisory positions who directed the operations of the Facility, all of whom were acting within the course and scope of their employment.

21

94. Defendants, through their administrators, directors, and managing agents, condoned and ratified all the conduct at the Facility.

95. At all relevant times, Defendants were the knowing agents and/or alter-egos of one another, and are therefore vicariously liable for the acts and/or omissions of each other, their agents and employees, as is more fully alleged herein. Moreover, at all relevant times, Defendants were acting within the course and scope of their employment and/or agency relationship.

96. Defendants' acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result: maximize profits at the Facility, despite the result being that the Facility was underfunded and understaffed.

97. Defendants, by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other.

98. Defendants were responsible for the organization and administration of the Facility, and had duties to, inter alia, ensure the Facility complied with applicable statutes and regulations, and adopt policies and procedures for the Facility.

99. Each Defendant knowingly disregarded their respective duties and obligations owed to DONALD J. JACK and the other residents through both acts and omissions. Those duties to reasonably operate, manage, own and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES included: the duty to ensure the facility had sufficient staff who were trained to meet DONALD J. JACK's needs and the needs of the other residents; the duty to seek out and correct deficiencies or lapses in the care provided to DONALD J. JACK and other residents; the duty to provide a safe environment for DONALD J. JACK and the other residents;

the duty to investigate the cause of preventable incidents that occurred at SEMINOLE PAVILION, REHABILITATION AND NURSING SERVICES; the duty to sufficiently staff SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to ensure DONALD J. JACK's needs and the needs of the other residents were met; and the duty to not divert funds from the Facility when the funds are intended for the care and maintenance of the residents, including DONALD J. JACK.

100. Defendants did not meet their duties and obligations. Although investigations and surveys by various agencies found deficiencies in the provision of care provided to the residents of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, each Defendant failed or refused to correct or address these issues addressed in the investigations and surveys.

101. Defendants required or encouraged the admission of residents with higher acuity levels without providing the staff necessary to care for the residents. The staff was lacking in supervision, number, and skill.

102. Further, in their efforts to maximize profits, Defendants intentionally and/or recklessly mismanaged staffing levels and supply levels below the levels necessary to provide adequate care and services to the residents and implemented practices in disregard to the safety of the patients.

103. Defendants each have extensive experience in the nursing home industry. This experience provided each Defendant the knowledge and experience to know that additional staff and more skilled staff were necessary to meet the needs of residents. Even with this knowledge, Defendants failed or refused to ensure that the residents received adequate and appropriate care while in their nursing home.

104.    Defendants, pursuant to their scheme to place "profits over residents" at the Facility, ratified the conduct of each Defendant in that they mandated, were aware of, and/or accepted inadequate staffing, inadequate training, inadequate supplies and inadequate practices at the Facility, and were aware that such inadequate staffing, inadequate training, inadequate supplies, and inadequate practices could lead to injuries and damages for the residents.

105.    In conceiving of, implementing and carrying out their profits over residents scheme, Defendants willfully, knowingly, recklessly and with conscious disregard for DONALD J. JACK's health, safety and welfare, acted in a manner that was malicious, reckless and oppressive.

106.    Further, Defendants implemented and carried out the profits over residents scheme with knowledge that such a scheme was designed to exploit elderly/senior citizens, a class expressly deemed by the Legislature of the State of Florida as a vulnerable segment of the population who require a heightened level of protection.

107.    As a result of Defendants' scheme and acts and omissions, DONALD J. JACK was victimized by Defendants and suffered damages as alleged herein.

## COUNT I: BREACH OF FIDUCIARY DUTY
### As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA

108.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

109.    This is a claim that presents a theory of recovery based upon the presence of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

110.    This is a claim that does not arise out of negligence or a violation of DONALD J. JACK's nursing home resident rights.

24

111. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed DONALD J. JACK a duty to act for or to advise him on matters within the scope of their specialized relationship.

112. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA and DONALD J. JACK had a developed a special relationship of trust and confidence.

113. That trust and confidence started when DONALD J. JACK was admitted to the Facility because he was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. Specifically, DONALD J. JACK needed assistance with multiple Activities of Daily Living ("ADLs") and twenty-four hour skilled nursing care.

114. As a result of his varying infirmities and advanced age, at all times material, DONALD J. JACK was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being; and DONALD J. JACK was incapable of dealing with Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on equal terms, and was incapable of engaging in any arm's length relationships with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

115. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA directly solicited DONALD J. JACK's confidence and trust in attempts to convince him to reside and remain at the Facility, and further represented through the words and acts of its employees and agents that it would undertake to provide all of the necessary care and treatment to attain and maintain the highest practicable physical, mental, and psychosocial well-being for DONALD J. JACK.

25

116.     Additionally, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA specifically undertook the non-delegable duty of protecting DONALD J. JACK's residents' rights vested in him by virtue of Florida law, including the right to be treated courteously, fairly, and with the fullest measure of dignity and the right to privacy. *See NME Properties, Inc. v. Rudich*, 840 So. 2d 309 (Fla. 4th DCA 2003).

117.     As a result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's solicitation of DONALD J. JACK's trust and confidence, DONALD J. JACK placed a special confidence and trust in CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. And DONALD J. JACK relied on CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide such care and services.

118.     DONALD J. JACK further placed special confidence and trust in Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to protect and provide for his individual rights as established in section 400.022, Florida Statutes, and to further act as a trustee for all of his personal property that he possessed on the premises of the Facility as well as his personal funds and income, which on information and belief, he placed in an account maintained by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on his behalf and for his benefit.

119.     Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA undertook to act as trustees to protect and preserve DONALD J. JACK's personal property, including his clothing and other valuable personal property, as well as to maintain and manage his personal funds and income in a trust account for DONALD J. JACK's benefit. Correspondingly

CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed non-delegable duties to provide DONALD J. JACK quarterly accounting of any and all transactions made utilizing funds from his trust account, to maintain and safeguard the funds therein and to only utilize said funds for authorized transactions, and to avoid commingling of his funds with the funds of any other person or those of CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

120. Furthermore, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knowingly and voluntary entered into a highly confidential relationship with DONALD J. JACK. CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed extensive legal duties to comply with all of the confidentiality requirements enumerated in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regarding DONALD J. JACK, a confidentiality similar in scope and duration to that attendant to attorney-client and doctor-patient relationships.

121. Moreover, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA assumed duties to protect and preserve DONALD J. JACK's Federal and State privacy rights, including those privacy rights enshrined in Article I, Section 23 of the Florida Constitution.

122. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA accepted the special confidence and trust placed upon them by DONALD J. JACK by admitting him into the Facility and by, among other things: explicitly assuming, through words and actions, the various duties described in the preceding paragraphs regarding protecting his confidentiality, protecting his privacy, protecting his individual liberties, and managing and safeguarding his personal finances; assuming responsibility and control over every aspect of DONALD J. JACK's

day-to-day life; and voluntarily undertaking responsibility for the specific level of care, protection, supplies and services that would be provided to DONALD J. JACK.

123.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA individually and collectively controlled, oversaw and orchestrated every single aspect of DONALD J. JACK's existence, from the mundane (such as the clothing worn) to the vital (such as determining when and how healthcare would be provided, as well as how much food and water DONALD J. JACK could consume).

124.    DONALD J. JACK was solely and particularly dependent upon the employees, officers, directors, and agents of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for his daily care, protection, services, supplies and personal and intimate needs.

125.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA developed a special relationship with DONALD J. JACK by virtue of: the nature of the care and services provided; the trustee-beneficiary relationship they maintained toward him regarding his personal property and finances; the Federal and State confidentiality and privacy laws CCRC OPCO - FREEDOM SQUARE, LLC undertook to comply with DONALD J. JACK; the superior knowledge, skill and abilities of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA; the enormous disparity of power and unequal bargaining Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA enjoyed DONALD J. JACK; and his inability to care for and provide for himself.

126.    This special confidential relationship allowed Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, to occupy a position of confidence toward DONALD J. JACK, which required fidelity, loyalty, good faith, and fair dealing by CCRC OPCO

28

- FREEDOM SQUARE, LLC and CYNTHIA AYALA. Additionally, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA had a duty to refrain from engaging in self-dealing.

127. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA were each a fiduciary of DONALD J. JACK based on the special relationship between the parties.

128. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed fiduciary duties to DONALD J. JACK. *See Greenfield v. Manor Care, Inc.*, 705 So. 2d 926 (Fla. 4th DCA 1997).

129. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted and failed to act in material breach of their fiduciary duties owed to DONALD J. JACK. Instead Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted in ways to promote their own interests and in contravention of the interests of DONALD J. JACK.

130. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA breached and violated its relationship of trust, special confidence, and its fiduciary obligations and duties owed to DONALD J. JACK by:

    a) Failing to take adequate action to address COVID-19 concerns at the Facility as Defendants represented they would through their various websites as alleged in paragraphs 41 and 45;

    b) Failing to take adequate action to minimize the risk and spread of COVID-19 and implement adequate care, services, and infection control at the Facility as alleged in paragraphs 46, 50 and 51; and

    c) Knowingly and recklessly engaging in the profits over residents scheme described herein in an effort to increase the profitability of the Facility, for the

29

benefit of Defendants and their joint venture, and at the expense of and to the direct detriment of DONALD J. JACK.

131. In violating their fiduciary obligations and duties to DONALD J. JACK, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knew that DONALD J. JACK would suffer harm, including but not limited to the daily injuries resulting from the daily invasion of rights vested in DONALD J. JACK, as well as economic harm.

132. Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK were the legal cause of the loss, injury and damages suffered by DONALD J. JACK. As the direct and proximate result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK, DONALD J. JACK contracted COVID-19 and subsequently died from this infection.

WHEREFORE, Plaintiff demands judgment against Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

### COUNT II: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

133. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 132.

134. This is a claim that presents a theory of recovery based upon the presence and breach of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, aided and abetted by Defendants, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

135. As set forth in Count I above, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed and breached fiduciary duties owed to DONALD J. JACK.

136. Defendants are related entities within a single enterprise or joint venture.

137. Defendants had actual knowledge of DONALD J. JACK's fiduciary relationship with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA by virtue of its close corporate relationship to CCRC OPCO - FREEDOM SQUARE, LLC.

138. By reason of their shared and/or common ownership, directors, officers and managers and/or contractual relationships, Defendants knew of the fiduciary duties CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed to DONALD J. JACK and knew of CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of those duties as described in Count I.

139. Defendants knew that the residents at the Facility, including DONALD J. JACK, were incapable of independently providing their own necessary care and were solely and specifically dependent upon the employees, officers, directors, and agents to provide for their basic daily care, protection, services, supplies, and personal and intimate needs.

140. Defendants knowingly participated and provided substantial assistance and encouragement to CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in connection with their breach of fiduciary duties to DONALD J. JACK, as set forth in detail within Count I above.

141. In addition to this knowledge, Defendants aided and abetted Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in their breach of fiduciary duties and rendered substantial assistance and encouragement for the same, by, among other things:

    a) Engaging in the conduct set forth in detail within Count I above;

b) Exercising dominance and control over CCRC OPCO - FREEDOM SQUARE, LLC's revenues by regularly and repeatedly sweeping virtually all of the Facility's revenues into an account controlled by the joint venture or enterprise, and/or their designee;

c) Knowingly and intentionally taking, creating and accepting inter-company fees and transfers, comprised of revenues obtained from the residents and designed to improperly and unjustly enrich Defendants instead of allowing the Facility to utilize said resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including DONALD J. JACK, as required;

d) Structuring and approving contracts between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC, which Defendants knew or should have known would result in the diversion of Facility revenues necessary to provide the care and services to its residents, DONALD J. JACK;

e) Overseeing and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's acceptance of monies from residents, including DONALD J. JACK, knowing the Facility could not provide full value of the care and services to meet the care and safety needs of the residents;

f) Directly or indirectly misrepresenting the nature of the relationship between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, in which Defendants by virtue of the common owners, officers and managers, controlled the business operations and working

capital of the Facility and inappropriately commingled its revenues by making intra-company transfers to related facilities;

g) Structuring the managing and operating business model for the Facility in a way that constrained its ability to provide the level of care and services to residents, including DONALD J. JACK, while simultaneously benefitting Defendants and other upstream corporate entities; and,

h) Influencing, advocating, and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's improper payments to Defendants, which Defendants knew exceeded amounts a prudent and cost conscious buyer would pay, and which Defendants also knew would cause the monies intended for the provision of care and services to the residents, including DONALD J. JACK, to be depleted.

142.    The conduct of Defendants as alleged, constitutes aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of fiduciary duties and subjects Defendants to liability for the harm suffered by DONALD J. JACK.

143.    In aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in violating fiduciary obligations and duties to DONALD J. JACK as referenced herein, Defendants knew that DONALD J. JACK would suffer harm and injuries, including the daily injuries flowing from the repeated breaches of fiduciary duties in which Defendants aided and abetted.

144.    As a result of Defendants' aiding and abetting in the breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, Defendants were improperly and unjustly enriched, the Facility was left without the necessary resources to function

in the residents' best interests, and DONALD J. JACK suffered both the injuries set forth herein as well as economic harm.

145.    Furthermore, as the direct and proximate result of Defendants' aiding and abetting breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, DONALD J. JACK contracted COVID-19 and subsequently died.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

## COUNT III: VIOLATIONS OF FLORIDA STATUTES §415.1111
### As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC

146.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 3, 9, 10, 12, 15, 16, 19, 20, 23, 24, 26, 28, and 31 above.

147.    For the purposes of this count and only this count, it is not alleged that Defendants are a licensee or entity that established, controlled, conducted, managed or operated the Facility.

148.    DONALD J. JACK was at all relevant times a vulnerable adult with a long-term disability. He was seventy-five (75) years of age and was unable to perform the normal activities of daily living or to provide for his own care or protection due to his disability.

149.    Defendants' acts or omissions constitute exploitation of a vulnerable adult in violation of Section 415.1111, Florida Statutes.

150.    Defendants knew or should have known that DONALD J. JACK lacked the capacity to consent, but Defendants obtained or used, or endeavored to obtain or use DONALD J.

34

JACK's funds, assets or property, including Medicare and Medicaid benefits, with the intent to temporarily or permanently deprive DONALD J. JACK of the use, benefit or possession of the funds, assets, or property for the benefit of someone other than DONALD J. JACK.

151. The compensation Defendants received was derived from the private funds of vulnerable adults, including DONALD J. JACK, or from Medicaid and/or Medicare funds that were beneficiaries' assets, including DONALD J. JACK, which were paid to Defendants for the sole purpose of providing for the support and maintenance of the Facility's residents, including DONALD J. JACK.

152. Defendants received compensation that they should have known would deprive the Facility of adequate resources to provide for the necessities of DONALD J. JACK's support and maintenance, which should have been used to, inter alia, implement a sufficient infection control program at the Facility and to secure sufficient PPE and supplies to prevent the spread of COVID-19 at the Facility.

153. Defendants failed or refused to effectively use DONALD J. JACK's income or assets for the necessities required for his support and maintenance.

154. Defendants' failure or refusal to effectively use DONALD J. JACK's income or assets as set forth herein, was the proximate cause of the losses he suffered including, but not limited to the use, benefit, or possession of the funds, assets or property for his benefit.

155. As a direct and proximate result of Defendants' acts and omissions, DONALD J. JACK was deprived of the use, benefit or possession of the funds, assets or property.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for

35

disgorgement of profits, consequential damages, attorneys' fees and costs, pre-judgment interest, trial by jury of all matters so triable, and such other relief this Court deems appropriate.

## COUNT IV: VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, § 501.201 *ET SEQ.*
**As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC; HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

156.  Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

157.  Plaintiff brings this Count pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201 *et seq.*, Florida Statutes (hereinafter "FDUTPA").

158.  Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Fla. Stat. § 501.204 (1).

159.  By engaging in the above described conduct and the additional conduct described below, Defendants engaged in unconscionable, unfair and deceptive acts and practices in violation of FDUTPA in connection with their advertising, soliciting, providing, and offering services at the Facility, which acts and practices ultimately victimized DONALD J. JACK, a senior citizen.

160.  At all relevant times, Defendants, their officers, directors, and managers were engaged in trade and commerce in Florida within the meaning of FDUTPA as Defendants advertised, solicited, provided, and offered services to consumers and senior citizens.

161.  At all relevant times, DONALD J. JACK was a "consumer" and "senior citizen" within the meaning FDUTPA as he was an individual over the age of sixty (60).

162.  Defendants, their officers, directors, and managers marketed and advertised service at the Facility directly to senior citizen consumers, including DONALD J. JACK, by disseminating

36

brochures, web sites, videos, advertisements, and other information, which were prepared in part, by the Facility's related corporate entities.

163. Defendants, their officers, directors, and managers made unfair, deceptive and misleading representations in their advertising materials distributed to senior citizen consumers, including DONALD J. JACK, regarding the level of services they provided to vulnerable senior citizens and nursing home residents.

164. Defendants, their officers, directors, and managers advertised and offered their nursing facilities by promising to meet residents' needs, to keep them clean, comfortable and safe, and to provide food, water, care, and services as needed. These statements were false, deceptive, and misleading.

165. Defendants advertising materials omitted information that was material to consumers, including DONALD J. JACK, by failing to disclose that DONALD J. JACK would experience long delays in the delivery of care and services and that he would often be deprived of the care and services he required and bargained for.

166. Defendants, their officers, directors, and managers engaged in deceptive, misleading, and unfair practices by representing that certain care and services were or would be provided to DONALD J. JACK, as documented in his care plans and assessments, when in fact that care and services were never provided.

167. Defendants, their officers, directors and managers further promised to provide a clean, safe, and sanitary living environment throughout DONALD J. JACK's residency at their facilities, for which Defendants were handsomely paid.

168. Defendants affirmatively concealed material facts from DONALD J. JACK regarding the existence and effect of the COVID-19 outbreak at the Facility, and led DONALD J.

37

JACK to believe that the Facility was a safe environment, when in fact the Facility was contaminated with COVID-19.

169. Defendants, their officers, directors and managers failed to appropriately manage the real property at the Facility and failed to maintain a clean, safe, and habitable living environment for their residents.

170. Defendants, their officers, directors and managers, through their deceptive, unconscionable, and unfair acts and omissions, misled DONALD J. JACK into believing that their facilities were properly managed, maintained, and equipped to meet his basic needs, when it was not.

171. Defendants, their officers, directors and managers failed to provide DONALD J. JACK with a living environment and premises that reciprocated the rents and other charges they were paid for his residency.

172. Defendants, their officers, directors and managers caused the Facility to enter into a lease agreement so onerous that it left Defendants without the ability to provide an adequate, safe, decent, and clean living environment, despite promising DONALD J. JACK that he would receive the same in exchange for the monies he paid.

173. Defendants' failure to provide basic care and services to DONALD J. JACK not only violated the FDUTPA, but also degraded DONALD J. JACK, increased his risk of serious negative health consequences, and caused him to suffer medical expenses, serious injury, and death.

174. In addition to these deceptive, unconscionable, and unfair acts and omissions, Defendants misled consumers, including DONALD J. JACK, by failing to disclose that the Facility's related corporate entities exercised control over the Facility, by among other things: (a)

restricting the ability of the Facility's managers and administrators to increase staffing levels; (b) supervising, and in some case, overriding the personnel decisions of the Facility; (c) creating and implementing company-wide policies and incentive programs; and (d) entering into agreements, including onerous lease and management agreements.

175.    Defendants, their officers, directors and managers failed to provide DONALD J. JACK with the basic care and services he required and bargained for with respect to his use of the Facility's premises.

176.    Defendants' deceptive, unconscionable, and unfair statements and practices were in violation of FDUTPA.

177.    Defendants' deceptive, unconscionable, and unfair representations, omissions, and practices were of the type that would likely mislead Florida consumers acting reasonably in the circumstances, to the consumers' detriment, and were particularly misleading and detrimental to the senior citizens and infirm residents at their Facility, including DONALD J. JACK.

178.    DONALD J. JACK could not have detected the existence and effect of the COVID-19 at the Facility or the existence of the onerous agreements, the corporate entities control over the Facility that led to the lack of care, services, and sanitary living environment at the Facility.

179.    DONALD J. JACK admitted himself to the Facility and had therefore been aggrieved by Defendants unconscionable, unfair and deceptive practices in violation of FDUTPA.

180.    DONALD J. JACK sustained damages as a direct and proximate result of Defendants' violations of FDUTPA.

181.    DONALD J. JACK did not receive the benefit of the bargain, overpaid for the services, and suffered actual damages.

39

182.    The damages suffered by DONALD J. JACK were directly and proximately caused by the unconscionable, deceptive, misleading, and unfair practices of Defendants.

183.    Defendants' violations were willful as Defendants knew or should have known that their conduct was unfair or deceptive or prohibited by FDUTPA.

184.    Defendants' violations are made even more reprehensible because of Defendants' attempt to exploit senior citizens during a global pandemic for profit, while posing a serious and direct threat to the health and safety of senior citizens such as DONALD J. JACK.

WHEREFORE, Plaintiff demands judgment against Defendants for damages pursuant to section 501.211(2), Florida Statutes, in an amount to be proven at trial, pre-judgment interest, post-judgment interest, attorney's fees and court costs as provided in section 501.2105, Florida Statutes, and further demands a trial by jury, together with such other and further relief as this Court deems appropriate.

*/s/ Bennie Lazzara, Jr.*
**Bennie Lazzara, Jr., Esquire**
Florida Bar No. 119568
Bennie@wilkesmchugh.com
TPABXLStaff@wilkesmchugh.com
fl@wilkesmchugh.com
**James L. Wilkes, II, Esquire**
Florida Bar No. 405337
jimw@wilkesmchugh.com
dthomason@wilkesmchugh.com
**Jason R. Delgado, Esquire**
Florida Bar No. 591122
jdelgado@wilkesmchugh.com
TPAJRDstaff@wilkesmchugh.com
WILKES & MCHUGH, PA
1 N. Dale Mabry Highway, Suite 700
Tampa, FL 33609
Telephone: (813) 873-0026
Facsimile: (813) 286-8820
*Attorneys for the Plaintiff*

# EXHIBIT "A"

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
PROBATE DIVISION

**IN RE: ESTATE OF**                  Case No. 20-004321-ES
**DONALD JOHN JACK**
    Deceased.

_____/

## LETTERS OF ADMINISTRATION

TO ALL WHOM IT MAY CONCERN

    WHEREAS, Donald John Jack, a resident of 12542 82nd Terrace N., Seminole, FL 33776, died on April 21, 2020, owning assets in the State of Florida, and

    WHEREAS, Jessica Gunter has been appointed personal representative of the estate of the decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate;

    NOW, THEREFORE, I, the undersigned circuit judge, declare Jessica Gunter duly qualified under the laws of the State of Florida to act as personal representative of the estate of Donald John Jack, deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will permit and the law directs; and to make distribution of the estate according to law.

    ORDERED in chambers, Pinellas County, Florida.

05/15/2020 11:03:20 AM

_____
Pamela A. M. Campbell
Circuit Judge



# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Jamie Curry<br>Brookdale Senior Living<br>111 Westwood Pl<br>Ste 400<br>Brentwood, TN 37027-5057 |
| **Electronic copy provided to:** | Jennifer Fitzpatrick<br>Timothy Cesar<br>Bahar Azhdari<br>Michael Mueller<br>Marti Downey<br>Laurel Johnston |

| | |
|---|---|
| **Entity:** | BKD Twenty-One Management Company, Inc.<br>Entity ID Number  3623759 |
| **Entity Served:** | Bkd Twenty-One Management  Company, Inc. |
| **Title of Action:** | The Estate of Donald J. Jack, by and Through Jessica Gunter, Personal Representative vs. CCRC Opco - Freedom Square, LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Personal Injury |
| **Court/Agency:** | Pinellas County Circuit Court, FL |
| **Case/Reference No:** | 20-002755-CI |
| **Jurisdiction Served:** | Florida |
| **Date Served on CSC:** | 06/19/2020 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Bennie Lazzara<br>813-873-0026 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Filing # 108550742 E-Filed 06/08/2020 05:07:14 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and through
JESSICA GUNTER, Personal Representative,

      Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.; BROOKDALE
SENIOR LIVING, INC.; BKD TWENTY-ONE
MANAGEMENT COMPANY, INC.; AMERICAN
RETIREMENT CORPORATION; LIFE CARE
SERVICES, LLC; and, CYNTHIA AYALA (as to
SEMINOLE PAVILION REHABILITATION AND
NURSING SERVICES),

CASE NO:  20-002755-CI

      Defendants.

CERTIFIED PROCESS SERVER # 0161
SECOND JUDICIAL CIRCUIT COURT OF FLORIDA
DATE SERVED 0.17.20 TIME 9:55



## SUMMONS

THE STATE OF FLORIDA

TO ALL AND SINGULAR SHERIFFS OF SAID STATE:

GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Complaint and Designation of Email Addresses in the above styled cause upon the defendant(s):

**BKD TWENTY-ONE MANAGEMENT COMPANY, INC.**
**c/o CORPORATION SERVICE COMPANY**
**1201 HAYS STREET**
**TALLAHASSEE, FL 32301**

Each defendant is hereby required to serve written defenses to said Complaint on plaintiff's attorney, whose name and address is:

**BENNIE LAZZARA JR., ESQUIRE**
**WILKES & McHUGH, P.A.**
**TAMPA COMMONS, SUITE 800**
**ONE NORTH DALE MABRY HIGHWAY**
**TAMPA, FL 33609**
**(813) 873-0026**

within twenty (20) days after service of this summons upon that defendant, exclusive of the day of service, and to file the original of said written defenses with the clerk of said court either before service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so a default will be entered against that defendant for the relief demanded in the complaint or petition.

      WITNESS my hand and the seal of said Court on the ____ day of JUN 09 2020 _____, 2020.

KEN BURKE CLERK CIRCUIT COURT
315 Court Street
Clearwater, Pinellas County, FL 33756-5165

KEN BURKE, CPA
Clerk of the Circuit Court

Judith Marlar
BY: DEPUTY CLERK

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and
through JESSICA GUNTER, Personal
Representative,

        Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.;
BROOKDALE SENIOR LIVING, INC.; BKD
TWENTY-ONE MANAGEMENT COMPANY,
INC.; AMERICAN RETIREMENT
CORPORATION; LIFE CARE SERVICES, LLC;
and, CYNTHIA AYALA (as to SEMINOLE
PAVILION REHABILITATION AND NURSING
SERVICES),

        Defendants.

CASE NO.: 20- 002755- CI

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

THE ESTATE OF DONALD J. JACK, by and through JESSICA GUNTER, Personal

Representative, and by and through undersigned counsel, hereby sues Defendants, CCRC OPCO

- FREEDOM SQUARE, LLC; HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a

HEALTHPEAK PROPERTIES, INC.; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-

ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION;

LIFE CARE SERVICES, LLC; and, CYNTHIA AYALA (herein after, the "Defendants"). All of

the allegations contained in this Complaint are based on either known facts or information and

belief. Plaintiff alleges as follows:

## INTRODUCTION

This case concerns the injuries, damages, and untimely death of DONALD J. JACK as a result of Defendants' actions and omissions during his residency at Defendants' skilled nursing facility known as Seminole Pavilion Rehabilitation and Nursing Services (the "Facility"). What was supposed to be merely a short-term rehabilitation admission turned out to be a death sentence for DONALD J. JACK due to Defendants' business practice of placing profits over residents. For years, even before DONALD J. JACK's residency, Defendants chose to place profits over residents and ignore deficiencies in their emergency preparedness plan and in their infection prevention and control program. When Defendants' deficiencies became more pronounced in light of the COVID-19 pandemic, Defendants continued to choose to place profits over residents by refusing to be forthcoming with the authorities, staff, residents, and residents' relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility. Instead, for almost a week after the first COVID-19 death at the Facility, Defendants withheld information regarding the COVID-19 positive death at the Facility and withheld supplies necessary to protect residents and staff. During the time Defendants kept everyone in the dark and withheld necessary supplies, DONALD J. JACK contracted COVID-19. Only after the Facility had become known as the epicenter in Pinellas County for COVID-19 and intervention from the Florida Department of Health, did Defendants transfer all ninety-five (95) residents, including DONALD J. JACK, to local hospitals to get the necessary care and to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff. Unfortunately, by this time DONALD J. JACK had tested positive for COVID-19 and only five days thereafter DONALD J. JACK was dead as a result.

## JURISDICTION, PARTIES AND VENUE ALLEGATIONS

1. This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00).

2. On or about April 2, 2020, DONALD J. JACK was admitted to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, located at 10800 Temple Terrace, Seminole, Florida 33772 in Pinellas County, where he remained until approximately April 17, 2020.

3. Plaintiff, JESSICA GUNTER, is the Personal Representative of THE ESTATE OF DONALD J. JACK. Letters of Administration, dated May 15, 2020, evidencing JESSICA GUNTER's authority to bring this action on behalf of THE ESTATE OF DONALD J. JACK are attached hereto as Exhibit "A."

4. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is a fictitious name owned by Defendant CCRC OPCO - FREEDOM SQUARE, LLC.

5. CCRC OPCO - FREEDOM SQUARE, LLC is the licensee that operated the Facility during DONALD J. JACK's residency.

6. CCRC OPCO - FREEDOM SQUARE, LLC, is an active Delaware limited liability company, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

7. CCRC OPCO - FREEDOM SQUARE, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing home facilities, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC

OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the courts of the State of Florida.

8.    CCRC OPCO - FREEDOM SQUARE, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the Courts of the State of Florida.

9.    HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC. (hereinafter referred to as "HCP") is the owner of property located at 10800 Temple Terrace, Seminole, Florida 33772, which is the property upon which the SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is situated.

10.    HCP is a Maryland corporation, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

11.    HCP had the authority to and did exercise control over the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

12.    HCP required rents or other compensation from funds it knew were necessary for DONALD J. JACK's support and maintenance. HCP knew that such conduct would deprive the Facility of adequate resources to provide for the wellbeing of the Facility's residents, including DONALD J. JACK.

13.    HCP shared control over the operation of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES through its authority to control the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

4

14.    HCP conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

15.    HCP committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

16.    BROOKDALE SENIOR LIVING, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

17.    BROOKDALE SENIOR LIVING, INC. is the parent company and operator of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

18.    BROOKDALE SENIOR LIVING, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

19.     BROOKDALE SENIOR LIVING, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

20.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

21.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

22.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

23.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

24.     AMERICAN RETIREMENT CORPORATION is a Tennessee corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

25.     AMERICAN RETIREMENT CORPORATION conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

26.     AMERICAN RETIREMENT CORPORATION committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

27.     AMERICAN RETIREMENT CORPORATION is an entity that operated, managed, controlled and oversaw SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

28.     LIFE CARE SERVICES, LLC is an active Iowa limited liability company, with its principal place of business at 400 Locust Street, Suite 820, Des Moines, Iowa 50309, which is registered to do business in Florida and is doing business in Florida.

29.     LIFE CARE SERVICES, LLC served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

30.     LIFE CARE SERVICES, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

31.     LIFE CARE SERVICES, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

32.     CYNTHIA AYALA was at all material times hereto a resident of the State of Florida and the Administrator at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

33.     CYNTHIA AYALA conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed herself of the privileges of the State of Florida, through her management of, operation of, control of, and/or consultation with SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

34.     CYNTHIA AYALA committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly,

8

pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

## FACTUAL ALLEGATIONS

35.    In December 2019, the government in Wuhan, China, confirmed that health authorities were treating clusters of cases of suspected pneumonia that appeared to be viral in origin.

36.    On or about January 30, 2020, the World Health Organization declared a Public Health Emergency of International Concern after the outbreak of the 2019 coronavirus disease.

37.    On February 11, 2020, the World Health Organization announced an official name for the new disease – coronavirus disease 2019, abbreviated as COVID-19.

38.    COVID-19 is an infectious virus that attacks the respiratory system of its human host. The elderly, medically fragile, and those with compromised immune systems are particularly susceptible to fatality due to COVID-19.

39.    On or about February 29, 2020, the Centers for Disease Control and Prevention ("CDC") released a statement regarding the first confirmed death in the United States from the coronavirus. In addition to the first confirmed death, the CDC reported that the public health officials in the state of Washington had also reported two additional hospitalized patients – two of which were from a long-term care facility where one was a health care worker – who had tested presumptive-positive for the virus that causes COVID-19. In addition, the CDC reported that additional residents and staff of the long-term care facility had not yet been tested but were either ill with respiratory symptoms or hospitalized with pneumonia of unknown cause.

40.    On or about March 1, 2020, in response to positive cases of COVID-19 in Florida, Governor Ron DeSantis issued Executive Order 20-51, directing the Florida Department of Health to declare a Public Health Emergency.

9

41.    On or about March 4, 2020, Defendants, via various websites, represented to the staff, residents, and relatives that Defendants were taking action to address COVID-19 concerns such as:

    a)  Providing consistent updates and communication to those who live and work in the community.

    b)  Following evidence-based precautions that align with guidelines provided by the CDC.

    c)  Reviewing response measures to ensure the community is organized and ready if the virus impacts the community or the surrounding area.

42.    On or about March 9, 2020, the Governor of Florida declared a state of emergency existed in Florida.

43.    On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.

44.    On or about March 13, 2020, the Governor of Florida ordered all Florida nursing home facilities to lock down and implemented a visitation ban in an effort to mitigate the risk to Florida's most vulnerable population to COVID-19, which is Florida's elderly population (i.e. over the age of sixty-five (65)) and particularly those who have underlying medical conditions such as cancer, chronic lung disease, moderate-to-severe asthma, serious heart conditions, immunocompromised status, diabetes, severe obesity, renal failure and liver disease.

45.    On or about March 15, 2020, Defendants, via their shared website, represented to the staff, residents, and relatives that Defendants were continuing to take action to address COVID-19 concerns such as:

    a)  Continuing to follow the guidance from both the CDC and local health authorities.

10

b) Increasing the frequency and rigor of cleaning and sanitizing common community areas.

c) Reviewing emergency preparedness and response program.

d) Coordinating best practices and across their large partner network.

e) Providing all residents and their families with the most up-to-date guidance from the CDC.

f) Staying in communication with local health officials.

46.     Despite Defendants' representations to the staff, residents, and relatives, Defendants failed to adequately take action to address COVID-19 concerns and failed to comply with their own procedures by, among other things:

a) Failing to supply or require staff to wear Personal Protective Equipment ("PPE");

b) Allowing asymptomatic staff who had been exposed to COVID-19 to continue working at the Facility;

c) Failing to provide staff, residents, and their families with consistent updates and communication regarding the risk of COVID-19 and of COVID-19 positive cases at the Facility; and,

d) Failing to implement an adequate emergency preparedness and response program.

47.     On or about April 2, 2020, at the age of seventy-five (75), DONALD J. JACK admitted himself to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES (the "Facility") for short-term rehabilitation for generalized weakness as he merely needed to gain strength to receive chemotherapy for his recent diagnosis of Hodgkin's Lymphoma.

48.     Upon admission, Defendants documented that DONALD J. JACK had various diagnoses including, but not limited to, Hodgkin's Lymphoma, Type II diabetes, and abnormality of albumin.

49.     Due to his age and underlying medical conditions, Defendants knew DONALD J. JACK was one of the residents most vulnerable to COVID-19.

50.     Although Defendants were on high-alert for COVID-19 since January 2020 and of the residents' vulnerability, Defendants, consistent with their business practice of placing profits over residents, disregarded the safety of DONALD J. JACK and the other residents by failing to implement adequate protocols to minimize the risk and spread of COVID-19 and by failing to implement adequate care, services and infection control at the Facility.

51.     Defendants' acts and omissions included, but were not limited to:

     a.     Failing to properly use residents' funds;

     b.     Failing to have an adequate emergency preparedness plan in place to keep residents safe from emerging infectious diseases like COVID-19;

     c.     Failing to implement adequate protocols to minimize the risk and spread of COVID-19;

     d.     Failing to implement an adequate system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents and staff;

     e.     Failing to immediately notify the authorities, staff, residents, and relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility;

     f.     Forcing staff to reuse PPE;

12

g. Failing to supply proper masks and gowns for weeks causing many staff members to resort to providing their own homemade facial coverings not medically graded to protect against the virus;

h. Failing to follow and/or adhere to the standards and protocols set out by the CDC and other state and local authorities related to infection control and prevention;

i. Failing to communicate the outbreak to the authorities and avail themselves of the available PPE;

j. Failing to implement safety protocols, such as disinfecting many common areas, to minimize the spread of the virus;

k. Failing to provide adequate staff in number and training;

l. Failing to be forthcoming and adequately share information regarding the outbreak at the Facility with employees, residents and their relatives.

m. Reducing basic cleaning practices for which the residents paid for;

n. Permitting widespread safety failures, such as inadequate staff and equipment, increasing the risk of injury or death during an emergency such as the pandemic;

o. Failing to have adequate management oversight; and,

p. Permitting asymptomatic staff who had been exposed to COVID-19 to continue to work at the Facility and interact with residents.

52. As a result of Defendants' acts and omissions and total disregard for the residents, the Facility experienced systemic failure and became the center of the COVID-19 outbreak in Pinellas County.

53.     To date, at least 25 deaths of residents and staff resulting from COVID-19 are linked to this single Facility.

54.     The Facility's first confirmed case of a resident with COVID-19 was a male resident that was hospitalized on April 5, 2020, and tested positive on April 9, 2020, for COVID-19. The resident then died on April 10, 2020.

55. .     Although the Facility had its first confirmed case of COVID-19 on April 9, 2020 – approximately seven days after DONALD J. JACK was admitted to the Facility – and first confirmed death on April 10, 2020, Defendants failed to be forthcoming in sharing this information with employees, residents, their relatives, and the public.

56.     Rather, despite having difficulty managing the rapid outbreak, Defendants waited approximately a week to disclose to the public the first confirmed COVID-19 case. Defendants' delay in reporting delayed assistance with the much need PPE available through the county.

57.     Defendants' staff were kept in the dark by Defendants and did not know about the gravity of the outbreak until the media reported the transfer of residents on or about April 15, 2020.

58.     Likewise, family members and advocates have sounded alarms about the delays in residents and the public being informed about the outbreak as families are learning more about the outbreak from the media than from Defendants who are keeping everyone in the dark.

59.     Despite the gravity of the outbreak, Defendants failed for weeks to provide adequate gowns and masks for staff.

60.     Defendants' staff feared for their safety because protocols were not in place to minimize virus spread such as providing proper PPE and disinfecting common areas. As a result, staff began quitting and resident care deteriorated even further as staff quit and supplies shrank.

61. On or about April 16, 2020, the Facility received laboratory results confirming DONALD J. JACK was positive for COVID-19.

62. By April 16, 2020, approximately 30 residents and staff members at the community had tested positive for COVID-19 and by April 17, 2020, two additional residents had died.

63. Defendants were reluctant to transfer residents to hospitals, but began to transfer mass amounts of residents on or about April 16, 2020, when they became overwhelmed by the outbreak.

64. On or about April 17, 2020, after intervention from the Florida Department of Health and after nearly 60 residents were transferred to area hospitals who had either tested positive (or were presumed positive) for COVID-19, Defendants transferred all remaining residents at the Facility, including DONALD J. JACK, to local hospitals to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff.

65. In a span of eight days, from the first confirmed diagnoses to the mass evacuation on April 17, 2020, a total of 95 residents were removed from the Facility and three had died.

66. On April 21, 2020, only five days after being diagnosed, DONALD J. JACK passed away as a result of COVID-19, which he contracted at the Facility due to Defendants' acts and omissions.

67. Based upon the acts and omissions described above, as well as numerous reports from Defendants' own staff, Defendants, who were focused on their own self-interests and putting profits over the well-being of the Facility's residents in reckless disregard for the residents' safety and well-being, were ill-prepared to protect the residents, including DONALD J. JACK, from emerging infectious diseases like COVID-19.

68.    In fact, Defendants have a history of insufficient infection control practices and have been on notice of this problem since at least February 9, 2018, when the Facility was cited by the Department of Health for failing to have a program in place to prevent the development and transmission of communicable diseases and infections.

69.    The Department of Health cited the Facility again on March 15, 2019, for failing to provide and implement an infection prevention and control program to help prevent the development and transmission of communicable diseases and infections. Notably, the Department of Health found that the staff members failed to use PPE when providing care to a resident on contact isolation precautions.

70.    Defendants' acts and omissions, with knowledge of their history of failing to provide and implement an adequate infection prevention and control program and in the face of the grave danger faced by DONALD J. JACK and the other residents of contracting COVID-19, were so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety or rights of by DONALD J. JACK and the other residents exposed to Defendants' conduct.

## CORPORATE BACKGROUND

71.    BROOKDALE SENIOR LIVING, INC. was formed in June 2005 for the purpose of combining two leading senior living companies, Brookdale Senior Living Communities, Inc. and Alterra Healthcare Corporation. Both companies had been operating independently since the 1980's.

72.    Approximately one year after its formation, BROOKDALE SENIOR LIVING, INC. acquired another senior living community operator, AMERICAN RETIREMENT CORPORATION, which had been independently operating since 1978. The acquisition of

16

AMERICAN RETIREMENT CORPORATION made BROOKDALE SENIOR LIVING, INC. the largest operator of senior living facilities in the United States.

73.     On or about July 20, 2007, BROOKDALE SENIOR LIVING, INC., through AMERICAN RETIREMENT CORPORATION, purchased SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

74.     BROOKDALE SENIOR LIVING, INC. is the parent company and long term care operator of hundreds of various senior living housing and service alternatives including retirement centers, assisted living facilities, skilled nursing facilities and continuing care retirement communities also known as CCRCs throughout the country including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

75.     BROOKDALE SENIOR LIVING, INC. owns, operates, and manages its facilities using the same officers and directors to control and operate all of its agents and subsidiaries. BROOKDALE SENIOR LIVING, INC. operates its facilities by centralizing its management and oversight of operations from a "national platform."

76.     SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is part of a larger CCRC, known as Freedom Square of Seminole ("Freedom Square"), which offers a full continuum of care. The Freedom Square campus includes independent living accommodations, an assisted living facility, and two skilled nursing facilities, one being SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Freedom Square offers both rental and what is known as "Life Care" programs. The rental program operates on a monthly rental fee basis, with no entry fee. The Life Care program is secured with an entry fee purchase to cover the cost of future accommodations and health care services.

77.    BROOKDALE SENIOR LIVING, INC. advertised that the CCRCs allow a resident to "age in place" as it offered a retirement community with opportunities for independent living, assisted living and nursing home care.  In theory, a person could spend the rest of his or her life in a CCRC, moving between levels of care as needed. In reality, CCRCs require hefty buy-ins, which could include the price of one's home, potentially committing that individual to the CCRC regardless of the quality care they receive.  In 2015, CCRCs were responsible for almost 20% of BROOKDALE SENIOR LIVING, INC.'s total senior living capacity.

78.    In 2014, in an effort to grow revenue, BROOKDALE SENIOR LIVING, INC. entered into an agreement with a real estate investment trust ("REIT"), HCP, to create a new business model for certain preexisting facilities. Together, the companies restructured these facilities with the intent to make a profit by releasing equity, increasing occupancy, increasing monthly service fees, and controlling operating expenses.  SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES was included in this restructure.

79.    The new business model, in part, involved the restructuring of currently owned facilities by creating new companies for no legitimate purpose other than to avoid liability for shoddy risk management. In effect, Defendants took a legitimately named company; broke it into pieces; saddled it with tremendous liabilities; and sucked out all the cash. This restructuring involved the ostensible separation of the real estate on which the facilities sit from the operator of the facility itself.  This model, known as the "Propco-Opco" structure, required the formation of two new entities to take over the pre-existing one: the real estate company, or the so-called landlord ("Propco"), and the facility operator, or the so-called master tenant ("Opco"). At the closing, the "Opco" entity engaged an affiliate of BROOKDALE SENIOR LIVING, INC. to manage the owned and leased community pursuant to a management agreement.

80. On or about August 29, 2014, at or about the same time that BROOKDALE SENIOR LIVING, INC. and HCP partnered to increase revenues and created the Propco/Opco entities, BROOKDALE SENIOR LIVING, INC. filed a change of ownership application with the State of Florida.

81. After the change in ownership, a new company, Defendant CCRC OPCO - FREEDOM SQUARE, LLC, the "Opco" or operating entity, was also created. CCRC OPCO - FREEDOM SQUARE, LLC became the new licensee of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the entity saddled with liabilities.

82. BROOKDALE SENIOR LIVING, INC. and HCP jointly own CCRC OPCO Ventures, LLC, which owns one hundred percent of CCRC OPCO-FREEDOM SQUARE, LLC.

83. CCRC OPCO-FREEDOM SQUARE, LLC entered into a management agreement with another BROOKDALE SENIOR LIVING, INC. subsidiary, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., to own, operate, manage and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and other nursing home facilities in Florida.

84. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. assumed certain duties and obligations towards residents to manage the day-to-day operations of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. The centralized corporate functions include financing, accounting, human resources, marketing, training, regulatory, affairs, purchasing food and supplies, asset management, extensive policy and procedure manuals and extensive quality control programs.

85. BROOKDALE SENIOR LIVING, INC.'s and HCP's quality control measures include community inspections conducted by corporate staff on a regular basis. BROOKDALE

SENIOR LIVING, INC. and HCP focus on increasing occupancy and increasing revenues to attempt to generate a profit to support the expansion of their brands through the acquisition of additional facilities.

86.     Upon information and belief, on or about January 31, 2020, HCP acquired BROOKDALE SENIOR LIVING, INC.'s interest in SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and transitioned management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to LIFE CARE SERVICES, LLC. However, documents reflecting the change of ownership and/or management have not been filed with and/or made available by the State of Florida.

## CORPORATE CONDUCT AND JOINT VENTURE

87.     Based upon information and belief and the allegations stated above, at all relevant times, CCRC OPCO-FREEDOM SQUARE, LLC, BROOKDALE SENIOR LIVING, INC., AMERICAN RETIREMENT CORPORATION, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., HCP, and LIFE CARE SERVICES, LLC, engaged in a joint venture to own, operate, and manage nursing homes including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Each can bind the other and each has the authority to participate in the other's profits and the obligation to share in each other's losses.

88. Money paid by and on behalf of the nursing home residents was the sole source of revenue for the multiple layers of companies created by Defendants to distribute and share the revenues generated at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the other nursing homes in Florida.

89. Defendants managed themselves, governed and controlled the care and services provided to DONALD J. JACK, and, by virtue of their management and control, each of them,

voluntarily and intentionally assumed responsibility for and provided supervisory and custodial services to DONALD J. JACK while he was a resident of the Facility.

90. At all relevant times, Defendants held themselves out as being competent, capable, and qualified to provide necessary services to their residents, including DONALD J. JACK, and to protect and keep all residents, including DONALD J. JACK, safe from harm, including from the spread of infectious diseases.

91. At all relevant times, Defendants owned, operated, and/or managed SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and furthermore participated in, authorized, and/or directed the conduct of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and its respective agents and employees. Defendants are therefore directly liable for their own negligence, recklessness, and other tortious conduct, in the hiring and management of their agents and employees.

92. Defendants, through their managers, directors, presidents, vice-presidents, executive officers, and other agents, directly oversaw, managed, and/or controlled all aspects of the operation and management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, including budgeting, staffing, training, policy and procedures manual(s), licensing, accounts payable, accounts receivable, general accounting, cash management, capitalization, and profit and loss margins.

93. Defendants employed all of those persons who attended to and provided care and services to DONALD J. JACK while he was a resident at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and employed those persons in management and supervisory positions who directed the operations of the Facility, all of whom were acting within the course and scope of their employment.

94. Defendants, through their administrators, directors, and managing agents, condoned and ratified all the conduct at the Facility.

95. At all relevant times, Defendants were the knowing agents and/or alter-egos of one another, and are therefore vicariously liable for the acts and/or omissions of each other, their agents and employees, as is more fully alleged herein. Moreover, at all relevant times, Defendants were acting within the course and scope of their employment and/or agency relationship.

96. Defendants' acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result: maximize profits at the Facility, despite the result being that the Facility was underfunded and understaffed.

97. Defendants, by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other.

98. Defendants were responsible for the organization and administration of the Facility, and had duties to, inter alia, ensure the Facility complied with applicable statutes and regulations, and adopt policies and procedures for the Facility.

99. Each Defendant knowingly disregarded their respective duties and obligations owed to DONALD J. JACK and the other residents through both acts and omissions. Those duties to reasonably operate, manage, own and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES included: the duty to ensure the facility had sufficient staff who were trained to meet DONALD J. JACK's needs and the needs of the other residents; the duty to seek out and correct deficiencies or lapses in the care provided to DONALD J. JACK and other residents; the duty to provide a safe environment for DONALD J. JACK and the other residents;

the duty to investigate the cause of preventable incidents that occurred at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES; the duty to sufficiently staff SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to ensure DONALD J. JACK's needs and the needs of the other residents were met; and the duty to not divert funds from the Facility when the funds are intended for the care and maintenance of the residents, including DONALD J. JACK.

100. Defendants did not meet their duties and obligations. Although investigations and surveys by various agencies found deficiencies in the provision of care provided to the residents of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, each Defendant failed or refused to correct or address these issues addressed in the investigations and surveys.

101. Defendants required or encouraged the admission of residents with higher acuity levels without providing the staff necessary to care for the residents. The staff was lacking in supervision, number, and skill.

102. Further, in their efforts to maximize profits, Defendants intentionally and/or recklessly mismanaged staffing levels and supply levels below the levels necessary to provide adequate care and services to the residents and implemented practices in disregard to the safety of the patients.

103. Defendants each have extensive experience in the nursing home industry. This experience provided each Defendant the knowledge and experience to know that additional staff and more skilled staff were necessary to meet the needs of residents. Even with this knowledge, Defendants failed or refused to ensure that the residents received adequate and appropriate care while in their nursing home.

104. Defendants, pursuant to their scheme to place "profits over residents" at the Facility, ratified the conduct of each Defendant in that they mandated, were aware of, and/or accepted inadequate staffing, inadequate training, inadequate supplies and inadequate practices at the Facility, and were aware that such inadequate staffing, inadequate training, inadequate supplies, and inadequate practices could lead to injuries and damages for the residents.

105. In conceiving of, implementing and carrying out their profits over residents scheme, Defendants willfully, knowingly, recklessly and with conscious disregard for DONALD J. JACK's health, safety and welfare, acted in a manner that was malicious, reckless and oppressive.

106. Further, Defendants implemented and carried out the profits over residents scheme with knowledge that such a scheme was designed to exploit elderly/senior citizens, a class expressly deemed by the Legislature of the State of Florida as a vulnerable segment of the population who require a heightened level of protection.

107. As a result of Defendants' scheme and acts and omissions, DONALD J. JACK was victimized by Defendants and suffered damages as alleged herein.

## COUNT I: BREACH OF FIDUCIARY DUTY
### As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA

108. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

109. This is a claim that presents a theory of recovery based upon the presence of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

110. This is a claim that does not arise out of negligence or a violation of DONALD J. JACK's nursing home resident rights.

24

111. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed DONALD J. JACK a duty to act for or to advise him on matters within the scope of their specialized relationship.

112. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA and DONALD J. JACK had a developed a special relationship of trust and confidence.

113. That trust and confidence started when DONALD J. JACK was admitted to the Facility because he was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. Specifically, DONALD J. JACK needed assistance with multiple Activities of Daily Living ("ADLs") and twenty-four hour skilled nursing care.

114. As a result of his varying infirmities and advanced age, at all times material, DONALD J. JACK was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being; and DONALD J. JACK was incapable of dealing with Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on equal terms, and was incapable of engaging in any arm's length relationships with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

115. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA directly solicited DONALD J. JACK's confidence and trust in attempts to convince him to reside and remain at the Facility, and further represented through the words and acts of its employees and agents that it would undertake to provide all of the necessary care and treatment to attain and maintain the highest practicable physical, mental, and psychosocial well-being for DONALD J. JACK.

116. Additionally, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA specifically undertook the non-delegable duty of protecting DONALD J. JACK's residents' rights vested in him by virtue of Florida law, including the right to be treated courteously, fairly, and with the fullest measure of dignity and the right to privacy. *See NME Properties, Inc. v. Rudich*, 840 So. 2d 309 (Fla. 4th DCA 2003).

117. As a result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's solicitation of DONALD J. JACK's trust and confidence, DONALD J. JACK placed a special confidence and trust in CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. And DONALD J. JACK relied on CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide such care and services.

118. DONALD J. JACK further placed special confidence and trust in Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to protect and provide for his individual rights as established in section 400.022, Florida Statutes, and to further act as a trustee for all of his personal property that he possessed on the premises of the Facility as well as his personal funds and income, which on information and belief, he placed in an account maintained by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on his behalf and for his benefit.

119. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA undertook to act as trustees to protect and preserve DONALD J. JACK's personal property, including his clothing and other valuable personal property, as well as to maintain and manage his personal funds and income in a trust account for DONALD J. JACK's benefit. Correspondingly

CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed non-delegable duties to provide DONALD J. JACK quarterly accounting of any and all transactions made utilizing funds from his trust account, to maintain and safeguard the funds therein and to only utilize said funds for authorized transactions, and to avoid commingling of his funds with the funds of any other person or those of CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

120. Furthermore, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knowingly and voluntary entered into a highly confidential relationship with DONALD J. JACK. CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed extensive legal duties to comply with all of the confidentiality requirements enumerated in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regarding DONALD J. JACK, a confidentiality similar in scope and duration to that attendant to attorney-client and doctor-patient relationships.

121. Moreover, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA assumed duties to protect and preserve DONALD J. JACK's Federal and State privacy rights, including those privacy rights enshrined in Article I, Section 23 of the Florida Constitution.

122. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA accepted the special confidence and trust placed upon them by DONALD J. JACK by admitting him into the Facility and by, among other things: explicitly assuming, through words and actions, the various duties described in the preceding paragraphs regarding protecting his confidentiality, protecting his privacy, protecting his individual liberties, and managing and safeguarding his personal finances; assuming responsibility and control over every aspect of DONALD J. JACK's

day-to-day life; and voluntarily undertaking responsibility for the specific level of care, protection, supplies and services that would be provided to DONALD J. JACK.

123. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA individually and collectively controlled, oversaw and orchestrated every single aspect of DONALD J. JACK's existence, from the mundane (such as the clothing worn) to the vital (such as determining when and how healthcare would be provided, as well as how much food and water DONALD J. JACK could consume).

124. DONALD J. JACK was solely and particularly dependent upon the employees, officers, directors, and agents of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for his daily care, protection, services, supplies and personal and intimate needs.

125. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA developed a special relationship with DONALD J. JACK by virtue of: the nature of the care and services provided; the trustee-beneficiary relationship they maintained toward him regarding his personal property and finances; the Federal and State confidentiality and privacy laws CCRC OPCO - FREEDOM SQUARE, LLC undertook to comply with DONALD J. JACK; the superior knowledge, skill and abilities of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA; the enormous disparity of power and unequal bargaining Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA enjoyed DONALD J. JACK; and his inability to care for and provide for himself.

126. This special confidential relationship allowed Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, to occupy a position of confidence toward DONALD J. JACK, which required fidelity, loyalty, good faith, and fair dealing by CCRC OPCO

- FREEDOM SQUARE, LLC and CYNTHIA AYALA. Additionally, CCRC OPCO - FREEDOM

SQUARE, LLC and CYNTHIA AYALA had a duty to refrain from engaging in self-dealing.

127. At all times material to this action, Defendants CCRC OPCO - FREEDOM

SQUARE, LLC and CYNTHIA AYALA were each a fiduciary of DONALD J. JACK based on

the special relationship between the parties.

128. At all times material to this action, Defendants CCRC OPCO - FREEDOM

SQUARE, LLC and CYNTHIA AYALA owed fiduciary duties to DONALD J. JACK. *See*

*Greenfield v. Manor Care, Inc.*, 705 So. 2d 926 (Fla. 4th DCA 1997).

129. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA

acted and failed to act in material breach of their fiduciary duties owed to DONALD J. JACK.

Instead Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted in

ways to promote their own interests and in contravention of the interests of DONALD J. JACK.

130. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA

breached and violated its relationship of trust, special confidence, and its fiduciary obligations and

duties owed to DONALD J. JACK by:

a) Failing to take adequate action to address COVID-19 concerns at the Facility

as Defendants represented they would through their various websites as alleged

in paragraphs 41 and 45;

b) Failing to take adequate action to minimize the risk and spread of COVID-19

and implement adequate care, services, and infection control at the Facility as

alleged in paragraphs 46, 50 and 51; and

c) Knowingly and recklessly engaging in the profits over residents scheme

described herein in an effort to increase the profitability of the Facility, for the

benefit of Defendants and their joint venture, and at the expense of and to the direct detriment of DONALD J. JACK.

131.   In violating their fiduciary obligations and duties to DONALD J. JACK, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knew that DONALD J. JACK would suffer harm, including but not limited to the daily injuries resulting from the daily invasion of rights vested in DONALD J. JACK, as well as economic harm.

132.   Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK were the legal cause of the loss, injury and damages suffered by DONALD J. JACK. As the direct and proximate result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK, DONALD J. JACK contracted COVID-19 and subsequently died from this infection.

WHEREFORE, Plaintiff demands judgment against Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

## COUNT II: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

133.   Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 132.

134.   This is a claim that presents a theory of recovery based upon the presence and breach of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, aided and abetted by Defendants, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

30

135.     As set forth in Count I above, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed and breached fiduciary duties owed to DONALD J. JACK.

136.     Defendants are related entities within a single enterprise or joint venture.

137.     Defendants had actual knowledge of DONALD J. JACK's fiduciary relationship with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA by virtue of its close corporate relationship to CCRC OPCO - FREEDOM SQUARE, LLC.

138.     By reason of their shared and/or common ownership, directors, officers and managers and/or contractual relationships, Defendants knew of the fiduciary duties CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed to DONALD J. JACK and knew of CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of those duties as described in Count I.

139.     Defendants knew that the residents at the Facility, including DONALD J. JACK, were incapable of independently providing their own necessary care and were solely and specifically dependent upon the employees, officers, directors, and agents to provide for their basic daily care, protection, services, supplies, and personal and intimate needs.

140.     Defendants knowingly participated and provided substantial assistance and encouragement to CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in connection with their breach of fiduciary duties to DONALD J. JACK, as set forth in detail within Count I above.

141.     In addition to this knowledge, Defendants aided and abetted Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in their breach of fiduciary duties and rendered substantial assistance and encouragement for the same, by, among other things:

a)     Engaging in the conduct set forth in detail within Count I above;

b) Exercising dominance and control over CCRC OPCO - FREEDOM SQUARE, LLC's revenues by regularly and repeatedly sweeping virtually all of the Facility's revenues into an account controlled by the joint venture or enterprise, and/or their designee;

c) Knowingly and intentionally taking, creating and accepting inter-company fees and transfers, comprised of revenues obtained from the residents and designed to improperly and unjustly enrich Defendants instead of allowing the Facility to utilize said resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including DONALD J. JACK, as required;

d) Structuring and approving contracts between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC, which Defendants knew or should have known would result in the diversion of Facility revenues necessary to provide the care and services to its residents, DONALD J. JACK;

e) Overseeing and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's acceptance of monies from residents, including DONALD J. JACK, knowing the Facility could not provide full value of the care and services to meet the care and safety needs of the residents;

f) Directly or indirectly misrepresenting the nature of the relationship between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, in which Defendants by virtue of the common owners, officers and managers, controlled the business operations and working

capital of the Facility and inappropriately commingled its revenues by making intra-company transfers to related facilities;

g) Structuring the managing and operating business model for the Facility in a way that constrained its ability to provide the level of care and services to residents, including DONALD J. JACK, while simultaneously benefitting Defendants and other upstream corporate entities; and,

h) Influencing, advocating, and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's improper payments to Defendants, which Defendants knew exceeded amounts a prudent and cost conscious buyer would pay, and which Defendants also knew would cause the monies intended for the provision of care and services to the residents, including DONALD J. JACK, to be depleted.

142. The conduct of Defendants as alleged, constitutes aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of fiduciary duties and subjects Defendants to liability for the harm suffered by DONALD J. JACK.

143. In aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in violating fiduciary obligations and duties to DONALD J. JACK as referenced herein, Defendants knew that DONALD J. JACK would suffer harm and injuries, including the daily injuries flowing from the repeated breaches of fiduciary duties in which Defendants aided and abetted.

144. As a result of Defendants' aiding and abetting in the breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, Defendants were improperly and unjustly enriched, the Facility was left without the necessary resources to function

33

in the residents' best interests, and DONALD J. JACK suffered both the injuries set forth herein as well as economic harm.

145.    Furthermore, as the direct and proximate result of Defendants' aiding and abetting breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, DONALD J. JACK contracted COVID-19 and subsequently died.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

## COUNT III: VIOLATIONS OF FLORIDA STATUTES §415.1111
### As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC

146.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 3, 9, 10, 12, 15, 16, 19, 20, 23, 24, 26, 28, and 31 above.

147.    For the purposes of this count and only this count, it is not alleged that Defendants are a licensee or entity that established, controlled, conducted, managed or operated the Facility.

148.    DONALD J. JACK was at all relevant times a vulnerable adult with a long-term disability. He was seventy-five (75) years of age and was unable to perform the normal activities of daily living or to provide for his own care or protection due to his disability.

149.    Defendants' acts or omissions constitute exploitation of a vulnerable adult in violation of Section 415.1111, Florida Statutes.

150.    Defendants knew or should have known that DONALD J. JACK lacked the capacity to consent, but Defendants obtained or used, or endeavored to obtain or use DONALD J.

JACK's funds, assets or property, including Medicare and Medicaid benefits, with the intent to temporarily or permanently deprive DONALD J. JACK of the use, benefit or possession of the funds, assets, or property for the benefit of someone other than DONALD J. JACK.

151. The compensation Defendants received was derived from the private funds of vulnerable adults, including DONALD J. JACK, or from Medicaid and/or Medicare funds that were beneficiaries' assets, including DONALD J. JACK, which were paid to Defendants for the sole purpose of providing for the support and maintenance of the Facility's residents, including DONALD J. JACK.

152. Defendants received compensation that they should have known would deprive the Facility of adequate resources to provide for the necessities of DONALD J. JACK's support and maintenance, which should have been used to, inter alia, implement a sufficient infection control program at the Facility and to secure sufficient PPE and supplies to prevent the spread of COVID-19 at the Facility.

153. Defendants failed or refused to effectively use DONALD J. JACK's income or assets for the necessities required for his support and maintenance.

154. Defendants' failure or refusal to effectively use DONALD J. JACK's income or assets as set forth herein, was the proximate cause of the losses he suffered including, but not limited to the use, benefit, or possession of the funds, assets or property for his benefit.

155. As a direct and proximate result of Defendants' acts and omissions, DONALD J. JACK was deprived of the use, benefit or possession of the funds, assets or property.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for

disgorgement of profits, consequential damages, attorneys' fees and costs, pre-judgment interest,

trial by jury of all matters so triable, and such other relief this Court deems appropriate.

## COUNT IV: VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, § 501.201 *ET SEQ.*

**As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC; HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

156.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107

above.

157.    Plaintiff brings this Count pursuant to the Florida Deceptive and Unfair Trade

Practices Act, section 501.201 *et seq.*, Florida Statutes (hereinafter "FDUTPA").

158.    Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are

unlawful. Fla. Stat. § 501.204 (1).

159.    By engaging in the above described conduct and the additional conduct described

below, Defendants engaged in unconscionable, unfair and deceptive acts and practices in violation

of FDUTPA in connection with their advertising, soliciting, providing, and offering services at the

Facility, which acts and practices ultimately victimized DONALD J. JACK, a senior citizen.

160.    At all relevant times, Defendants, their officers, directors, and managers were

engaged in trade and commerce in Florida within the meaning of FDUTPA as Defendants

advertised, solicited, provided, and offered services to consumers and senior citizens.

161.    At all relevant times, DONALD J. JACK was a "consumer" and "senior citizen"

within the meaning FDUTPA as he was an individual over the age of sixty (60).

162.    Defendants, their officers, directors, and managers marketed and advertised service

at the Facility directly to senior citizen consumers, including DONALD J. JACK, by disseminating

brochures, web sites, videos, advertisements, and other information, which were prepared in part, by the Facility's related corporate entities.

163.  Defendants, their officers, directors, and managers made unfair, deceptive and misleading representations in their advertising materials distributed to senior citizen consumers, including DONALD J. JACK, regarding the level of services they provided to vulnerable senior citizens and nursing home residents.

164.  Defendants, their officers, directors, and managers advertised and offered their nursing facilities by promising to meet residents' needs, to keep them clean, comfortable and safe, and to provide food, water, care, and services as needed. These statements were false, deceptive, and misleading.

165.  Defendants advertising materials omitted information that was material to consumers, including DONALD J. JACK, by failing to disclose that DONALD J. JACK would experience long delays in the delivery of care and services and that he would often be deprived of the care and services he required and bargained for.

166.  Defendants, their officers, directors, and managers engaged in deceptive, misleading, and unfair practices by representing that certain care and services were or would be provided to DONALD J. JACK, as documented in his care plans and assessments, when in fact that care and services were never provided.

167.  Defendants, their officers, directors and managers further promised to provide a clean, safe, and sanitary living environment throughout DONALD J. JACK's residency at their facilities, for which Defendants were handsomely paid.

168.  Defendants affirmatively concealed material facts from DONALD J. JACK regarding the existence and effect of the COVID-19 outbreak at the Facility, and led DONALD J.

JACK to believe that the Facility was a safe environment, when in fact the Facility was contaminated with COVID-19.

169. Defendants, their officers, directors and managers failed to appropriately manage the real property at the Facility and failed to maintain a clean, safe, and habitable living environment for their residents.

170. Defendants, their officers, directors and managers, through their deceptive, unconscionable, and unfair acts and omissions, misled DONALD J. JACK into believing that their facilities were properly managed, maintained, and equipped to meet his basic needs, when it was not.

171. Defendants, their officers, directors and managers failed to provide DONALD J. JACK with a living environment and premises that reciprocated the rents and other charges they were paid for his residency.

172. Defendants, their officers, directors and managers caused the Facility to enter into a lease agreement so onerous that it left Defendants without the ability to provide an adequate, safe, decent, and clean living environment, despite promising DONALD J. JACK that he would receive the same in exchange for the monies he paid.

173. Defendants' failure to provide basic care and services to DONALD J. JACK not only violated the FDUTPA, but also degraded DONALD J. JACK, increased his risk of serious negative health consequences, and caused him to suffer medical expenses, serious injury, and death.

174. In addition to these deceptive, unconscionable, and unfair acts and omissions, Defendants misled consumers, including DONALD J. JACK, by failing to disclose that the Facility's related corporate entities exercised control over the Facility, by among other things: (a)

restricting the ability of the Facility's managers and administrators to increase staffing levels; (b) supervising, and in some case, overriding the personnel decisions of the Facility; (c) creating and implementing company-wide policies and incentive programs; and (d) entering into agreements, including onerous lease and management agreements.

175.    Defendants, their officers, directors and managers failed to provide DONALD J. JACK with the basic care and services he required and bargained for with respect to his use of the Facility's premises.

176.    Defendants' deceptive, unconscionable, and unfair statements and practices were in violation of FDUTPA.

177.    Defendants' deceptive, unconscionable, and unfair representations, omissions, and practices were of the type that would likely mislead Florida consumers acting reasonably in the circumstances, to the consumers' detriment, and were particularly misleading and detrimental to the senior citizens and infirm residents at their Facility, including DONALD J. JACK.

178.    DONALD J. JACK could not have detected the existence and effect of the COVID-19 at the Facility or the existence of the onerous agreements, the corporate entities control over the Facility that led to the lack of care, services, and sanitary living environment at the Facility.

179.    DONALD J. JACK admitted himself to the Facility and had therefore been aggrieved by Defendants unconscionable, unfair and deceptive practices in violation of FDUTPA.

180.    DONALD J. JACK sustained damages as a direct and proximate result of Defendants' violations of FDUTPA.

181.    DONALD J. JACK did not receive the benefit of the bargain, overpaid for the services, and suffered actual damages.

182. The damages suffered by DONALD J. JACK were directly and proximately caused by the unconscionable, deceptive, misleading, and unfair practices of Defendants.

183. Defendants' violations were willful as Defendants knew or should have known that their conduct was unfair or deceptive or prohibited by FDUTPA.

184. Defendants' violations are made even more reprehensible because of Defendants' attempt to exploit senior citizens during a global pandemic for profit, while posing a serious and direct threat to the health and safety of senior citizens such as DONALD J. JACK.

WHEREFORE, Plaintiff demands judgment against Defendants for damages pursuant to section 501.211(2), Florida Statutes, in an amount to be proven at trial, pre-judgment interest, post-judgment interest, attorney's fees and court costs as provided in section 501.2105, Florida Statutes, and further demands a trial by jury, together with such other and further relief as this Court deems appropriate.

/s/ Bennie Lazzara, Jr.
**Bennie Lazzara, Jr., Esquire**
Florida Bar No. 119568
Bennie@wilkesmchugh.com
TPABXLStaff@wilkesmchugh.com
fl@wilkesmchugh.com
**James L. Wilkes, II, Esquire**
Florida Bar No. 405337
jimw@wilkesmchugh.com
dthomason@wilkesmchugh.com
**Jason R. Delgado, Esquire**
Florida Bar No. 591122
jdelgado@wilkesmchugh.com
TPAJRDstaff@wilkesmchugh.com
WILKES & MCHUGH, PA
1 N. Dale Mabry Highway, Suite 700
Tampa, FL 33609
Telephone: (813) 873-0026
Facsimile: (813) 286-8820
*Attorneys for the Plaintiff*

# EXHIBIT "A"

Filing # 107269380 E-Filed 05/08/2020 09:44:17 PM

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
PROBATE DIVISION

IN RE: ESTATE OF                                          Case No.  20-004321-ES
DONALD JOHN JACK
      Deceased.

_____/

### LETTERS OF ADMINISTRATION

TO ALL WHOM IT MAY CONCERN

      WHEREAS, Donald John Jack, a resident of 12542 82nd Terrace N., Seminole, FL 33776, died on April 21, 2020, owning assets in the State of Florida, and

      WHEREAS, Jessica Gunter has been appointed personal representative of the estate of the decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

      NOW, THEREFORE, I, the undersigned circuit judge, declare Jessica Gunter duly qualified under the laws of the State of Florida to act as personal representative of the estate of Donald John Jack, deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will permit and the law directs; and to make distribution of the estate according to law.

      ORDERED in chambers, Pinellas County, Florida.

05/15/2020 11:03:20 AM

Pamela A. M. Campbell
Circuit Judge



# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Jamie Curry<br>Brookdale Senior Living<br>111 Westwood Pl<br>Ste 400<br>Brentwood, TN 37027-5057 |
| **Electronic copy provided to:** | Bahar Azhdari<br>Timothy Cesar<br>Marti Downey<br>Laurel Johnston<br>Michael Mueller<br>Jennifer Fitzpatrick |

| | |
|---|---|
| **Entity:** | Brookdale Senior Living Inc.<br>Entity ID Number  2383068 |
| **Entity Served:** | Brookdale Senior Living, Inc. |
| **Title of Action:** | The Estate of Donald J. Jack, by and Through Jessica Gunter, Personal Representative vs. CCRC Opco - Freedom Square, LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Wrongful Death |
| **Court/Agency:** | Pinellas County Circuit Court, FL |
| **Case/Reference No:** | 20-002755-CI |
| **Jurisdiction Served:** | Florida |
| **Date Served on CSC:** | 06/19/2020 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Bennie Lazzara, Jr.<br>813-873-0026 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Filing # 108550742 E-Filed 06/08/2020 05:07:14 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and through
JESSICA GUNTER, Personal Representative,

      Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.; BROOKDALE
SENIOR LIVING, INC.; BKD TWENTY-ONE
MANAGEMENT COMPANY, INC.; AMERICAN
RETIREMENT CORPORATION; LIFE CARE
SERVICES, LLC; and, CYNTHIA AYALA (as to
SEMINOLE PAVILION REHABILITATION AND
NURSING SERVICES),

CASE NO:

      Defendants.

CERTIFIED PROCESS SERVER # 067
SECOND JUDICIAL CIRCUIT COURT OF FLORIDA
DATE SERVED 6-9-20 TIME 9:55



**SUMMONS**

THE STATE OF FLORIDA

TO ALL AND SINGULAR SHERIFFS OF SAID STATE:

GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Complaint and Designation of Email
Addresses in the above styled cause upon the defendant(s):

**BROOKDALE SENIOR LIVING, INC.**
**c/o CORPORATION SERVICE COMPANY**
**1201 HAYS STREET**
**TALLAHASSEE, FL 32301**

Each defendant is hereby required to serve written defenses to said Complaint on plaintiff's attorney, whose name and address is:

**BENNIE LAZZARA JR., ESQUIRE**
**WILKES & McHUGH, P.A.**
**TAMPA COMMONS, SUITE 800**
**ONE NORTH DALE MABRY HIGHWAY**
**TAMPA, FL 33609**
**(813) 873-0026**

within twenty (20) days after service of this summons upon that defendant, exclusive of the day of service, and to file the original
of said written defenses with the clerk of said court either before service on plaintiff's attorney or immediately thereafter. If a
defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

      WITNESS my hand and the seal of said Court on the ____ day of _____ JUN 09 2020 _____, 2020.

KEN BURKE CLERK CIRCUIT COURT
315 Court Street
Clearwater, Pinellas County, FL 33756-5165

KEN BURKE, CPA
Clerk of the Circuit Court

BY: DEPUTY CLERK

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and
through JESSICA GUNTER, Personal
Representative,

      Plaintiff,

    v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.;
BROOKDALE SENIOR LIVING, INC.; BKD
TWENTY-ONE MANAGEMENT COMPANY,
INC.; AMERICAN RETIREMENT
CORPORATION; LIFE CARE SERVICES, LLC;
and, CYNTHIA AYALA (as to SEMINOLE
PAVILION REHABILITATION AND NURSING
SERVICES),

      Defendants.

CASE NO.: 20-002755- CI

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

THE ESTATE OF DONALD J. JACK, by and through JESSICA GUNTER, Personal

Representative, and by and through undersigned counsel, hereby sues Defendants, CCRC OPCO

- FREEDOM SQUARE, LLC; HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a

HEALTHPEAK PROPERTIES, INC.; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-

ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION;

LIFE CARE SERVICES, LLC; and, CYNTHIA AYALA (herein after, the "Defendants"). All of

the allegations contained in this Complaint are based on either known facts or information and

belief. Plaintiff alleges as follows:

## INTRODUCTION

This case concerns the injuries, damages, and untimely death of DONALD J. JACK as a result of Defendants' actions and omissions during his residency at Defendants' skilled nursing facility known as Seminole Pavilion Rehabilitation and Nursing Services (the "Facility"). What was supposed to be merely a short-term rehabilitation admission turned out to be a death sentence for DONALD J. JACK due to Defendants' business practice of placing profits over residents. For years, even before DONALD J. JACK's residency, Defendants chose to place profits over residents and ignore deficiencies in their emergency preparedness plan and in their infection prevention and control program. When Defendants' deficiencies became more pronounced in light of the COVID-19 pandemic, Defendants continued to choose to place profits over residents by refusing to be forthcoming with the authorities, staff, residents, and residents' relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility. Instead, for almost a week after the first COVID-19 death at the Facility, Defendants withheld information regarding the COVID-19 positive death at the Facility and withheld supplies necessary to protect residents and staff. During the time Defendants kept everyone in the dark and withheld necessary supplies, DONALD J. JACK contracted COVID-19. Only after the Facility had become known as the epicenter in Pinellas County for COVID-19 and intervention from the Florida Department of Health, did Defendants transfer all ninety-five (95) residents, including DONALD J. JACK, to local hospitals to get the necessary care and to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff. Unfortunately, by this time DONALD J. JACK had tested positive for COVID-19 and only five days thereafter DONALD J. JACK was dead as a result.

## JURISDICTION, PARTIES AND VENUE ALLEGATIONS

1.      This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00).

2

2. On or about April 2, 2020, DONALD J. JACK was admitted to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, located at 10800 Temple Terrace, Seminole, Florida 33772 in Pinellas County, where he remained until approximately April 17, 2020.

3. Plaintiff, JESSICA GUNTER, is the Personal Representative of THE ESTATE OF DONALD J. JACK. Letters of Administration, dated May 15, 2020, evidencing JESSICA GUNTER's authority to bring this action on behalf of THE ESTATE OF DONALD J. JACK are attached hereto as Exhibit "A."

4. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is a fictitious name owned by Defendant CCRC OPCO - FREEDOM SQUARE, LLC.

5. CCRC OPCO - FREEDOM SQUARE, LLC is the licensee that operated the Facility during DONALD J. JACK's residency.

6. CCRC OPCO - FREEDOM SQUARE, LLC, is an active Delaware limited liability company, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

7. CCRC OPCO - FREEDOM SQUARE, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing home facilities, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC

OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the courts of the State of Florida.

8.　　CCRC OPCO - FREEDOM SQUARE, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the Courts of the State of Florida.

9.　　HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC. (hereinafter referred to as "HCP") is the owner of property located at 10800 Temple Terrace, Seminole, Florida 33772, which is the property upon which the SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is situated.

10.　　HCP is a Maryland corporation, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

11.　　HCP had the authority to and did exercise control over the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

12.　　HCP required rents or other compensation from funds it knew were necessary for DONALD J. JACK's support and maintenance. HCP knew that such conduct would deprive the Facility of adequate resources to provide for the wellbeing of the Facility's residents, including DONALD J. JACK.

13.　　HCP shared control over the operation of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES through its authority to control the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

4

14.     HCP conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

15.     HCP committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

16.     BROOKDALE SENIOR LIVING, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

17.     BROOKDALE SENIOR LIVING, INC. is the parent company and operator of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

18.     BROOKDALE SENIOR LIVING, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

19.     BROOKDALE SENIOR LIVING, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

20.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

21.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

22.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

23.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

6

24.     AMERICAN RETIREMENT CORPORATION is a Tennessee corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

25.     AMERICAN RETIREMENT CORPORATION conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

26.     AMERICAN RETIREMENT CORPORATION committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

27.     AMERICAN RETIREMENT CORPORATION is an entity that operated, managed, controlled and oversaw SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

28.     LIFE CARE SERVICES, LLC is an active Iowa limited liability company, with its principal place of business at 400 Locust Street, Suite 820, Des Moines, Iowa 50309, which is registered to do business in Florida and is doing business in Florida.

29.     LIFE CARE SERVICES, LLC served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

7

30.     LIFE CARE SERVICES, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

31.     LIFE CARE SERVICES, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

32.     CYNTHIA AYALA was at all material times hereto a resident of the State of Florida and the Administrator at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

33.     CYNTHIA AYALA conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed herself of the privileges of the State of Florida, through her management of, operation of, control of, and/or consultation with SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

34.     CYNTHIA AYALA committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly,

pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

## FACTUAL ALLEGATIONS

35.    In December 2019, the government in Wuhan, China, confirmed that health authorities were treating clusters of cases of suspected pneumonia that appeared to be viral in origin.

36.    On or about January 30, 2020, the World Health Organization declared a Public Health Emergency of International Concern after the outbreak of the 2019 coronavirus disease.

37.    On February 11, 2020, the World Health Organization announced an official name for the new disease – coronavirus disease 2019, abbreviated as COVID-19.

38.    COVID-19 is an infectious virus that attacks the respiratory system of its human host. The elderly, medically fragile, and those with compromised immune systems are particularly susceptible to fatality due to COVID-19.

39.    On or about February 29, 2020, the Centers for Disease Control and Prevention ("CDC") released a statement regarding the first confirmed death in the United States from the coronavirus. In addition to the first confirmed death, the CDC reported that the public health officials in the state of Washington had also reported two additional hospitalized patients – two of which were from a long-term care facility where one was a health care worker – who had tested presumptive-positive for the virus that causes COVID-19. In addition, the CDC reported that additional residents and staff of the long-term care facility had not yet been tested but were either ill with respiratory symptoms or hospitalized with pneumonia of unknown cause.

40.    On or about March 1, 2020, in response to positive cases of COVID-19 in Florida, Governor Ron DeSantis issued Executive Order 20-51, directing the Florida Department of Health to declare a Public Health Emergency.

41. On or about March 4, 2020, Defendants, via various websites, represented to the staff, residents, and relatives that Defendants were taking action to address COVID-19 concerns such as:

a) Providing consistent updates and communication to those who live and work in the community.

b) Following evidence-based precautions that align with guidelines provided by the CDC.

c) Reviewing response measures to ensure the community is organized and ready if the virus impacts the community or the surrounding area.

42. On or about March 9, 2020, the Governor of Florida declared a state of emergency existed in Florida.

43. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.

44. On or about March 13, 2020, the Governor of Florida ordered all Florida nursing home facilities to lock down and implemented a visitation ban in an effort to mitigate the risk to Florida's most vulnerable population to COVID-19, which is Florida's elderly population (i.e. over the age of sixty-five (65)) and particularly those who have underlying medical conditions such as cancer, chronic lung disease, moderate-to-severe asthma, serious heart conditions, immunocompromised status, diabetes, severe obesity, renal failure and liver disease.

45. On or about March 15, 2020, Defendants, via their shared website, represented to the staff, residents, and relatives that Defendants were continuing to take action to address COVID-19 concerns such as:

a) Continuing to follow the guidance from both the CDC and local health authorities.

b) Increasing the frequency and rigor of cleaning and sanitizing common community areas.

c) Reviewing emergency preparedness and response program.

d) Coordinating best practices and across their large partner network.

e) Providing all residents and their families with the most up-to-date guidance from the CDC.

f) Staying in communication with local health officials.

46. Despite Defendants' representations to the staff, residents, and relatives, Defendants failed to adequately take action to address COVID-19 concerns and failed to comply with their own procedures by, among other things:

a) Failing to supply or require staff to wear Personal Protective Equipment ("PPE");

b) Allowing asymptomatic staff who had been exposed to COVID-19 to continue working at the Facility;

c) Failing to provide staff, residents, and their families with consistent updates and communication regarding the risk of COVID-19 and of COVID-19 positive cases at the Facility; and,

d) Failing to implement an adequate emergency preparedness and response program.

47. On or about April 2, 2020, at the age of seventy-five (75), DONALD J. JACK admitted himself to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES (the "Facility") for short-term rehabilitation for generalized weakness as he merely needed to gain strength to receive chemotherapy for his recent diagnosis of Hodgkin's Lymphoma.

48.     Upon admission, Defendants documented that DONALD J. JACK had various diagnoses including, but not limited to, Hodgkin's Lymphoma, Type II diabetes, and abnormality of albumin.

49.     Due to his age and underlying medical conditions, Defendants knew DONALD J. JACK was one of the residents most vulnerable to COVID-19.

50.     Although Defendants were on high-alert for COVID-19 since January 2020 and of the residents' vulnerability, Defendants, consistent with their business practice of placing profits over residents, disregarded the safety of DONALD J. JACK and the other residents by failing to implement adequate protocols to minimize the risk and spread of COVID-19 and by failing to implement adequate care, services and infection control at the Facility.

51.     Defendants' acts and omissions included, but were not limited to:

    a.     Failing to properly use residents' funds;

    b.     Failing to have an adequate emergency preparedness plan in place to keep residents safe from emerging infectious diseases like COVID-19;

    c.     Failing to implement adequate protocols to minimize the risk and spread of COVID-19;

    d.     Failing to implement an adequate system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents and staff;

    e.     Failing to immediately notify the authorities, staff, residents, and relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility;

    f.     Forcing staff to reuse PPE;

12

g.    Failing to supply proper masks and gowns for weeks causing many staff members to resort to providing their own homemade facial coverings not medically graded to protect against the virus;

h.    Failing to follow and/or adhere to the standards and protocols set out by the CDC and other state and local authorities related to infection control and prevention;

i.    Failing to communicate the outbreak to the authorities and avail themselves of the available PPE;

j.    Failing to implement safety protocols, such as disinfecting many common areas, to minimize the spread of the virus;

k.    Failing to provide adequate staff in number and training;

l.    Failing to be forthcoming and adequately share information regarding the outbreak at the Facility with employees, residents and their relatives.

m.    Reducing basic cleaning practices for which the residents paid for;

n.    Permitting widespread safety failures, such as inadequate staff and equipment, increasing the risk of injury or death during an emergency such as the pandemic;

o.    Failing to have adequate management oversight; and,

p.    Permitting asymptomatic staff who had been exposed to COVID-19 to continue to work at the Facility and interact with residents.

52.    As a result of Defendants' acts and omissions and total disregard for the residents, the Facility experienced systemic failure and became the center of the COVID-19 outbreak in Pinellas County.

53.     To date, at least 25 deaths of residents and staff resulting from COVID-19 are linked to this single Facility.

54.     The Facility's first confirmed case of a resident with COVID-19 was a male resident that was hospitalized on April 5, 2020, and tested positive on April 9, 2020, for COVID-19. The resident then died on April 10, 2020.

55.     Although the Facility had its first confirmed case of COVID-19 on April 9, 2020 – approximately seven days after DONALD J. JACK was admitted to the Facility – and first confirmed death on April 10, 2020, Defendants failed to be forthcoming in sharing this information with employees, residents, their relatives, and the public.

56.     Rather, despite having difficulty managing the rapid outbreak, Defendants waited approximately a week to disclose to the public the first confirmed COVID-19 case. Defendants' delay in reporting delayed assistance with the much need PPE available through the county.

57.     Defendants' staff were kept in the dark by Defendants and did not know about the gravity of the outbreak until the media reported the transfer of residents on or about April 15, 2020.

58.     Likewise, family members and advocates have sounded alarms about the delays in residents and the public being informed about the outbreak as families are learning more about the outbreak from the media than from Defendants who are keeping everyone in the dark.

59.     Despite the gravity of the outbreak, Defendants failed for weeks to provide adequate gowns and masks for staff.

60.     Defendants' staff feared for their safety because protocols were not in place to minimize virus spread such as providing proper PPE and disinfecting common areas. As a result, staff began quitting and resident care deteriorated even further as staff quit and supplies shrank.

61.     On or about April 16, 2020, the Facility received laboratory results confirming DONALD J. JACK was positive for COVID-19.

62.     By April 16, 2020, approximately 30 residents and staff members at the community had tested positive for COVID-19 and by April 17, 2020, two additional residents had died.

63.     Defendants were reluctant to transfer residents to hospitals, but began to transfer mass amounts of residents on or about April 16, 2020, when they became overwhelmed by the outbreak.

64.     On or about April 17, 2020, after intervention from the Florida Department of Health and after nearly 60 residents were transferred to area hospitals who had either tested positive (or were presumed positive) for COVID-19, Defendants transferred all remaining residents at the Facility, including DONALD J. JACK, to local hospitals to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff.

65.     In a span of eight days, from the first confirmed diagnoses to the mass evacuation on April 17, 2020, a total of 95 residents were removed from the Facility and three had died.

66.     On April 21, 2020, only five days after being diagnosed, DONALD J. JACK passed away as a result of COVID-19, which he contracted at the Facility due to Defendants' acts and omissions.

67.     Based upon the acts and omissions described above, as well as numerous reports from Defendants' own staff, Defendants, who were focused on their own self-interests and putting profits over the well-being of the Facility's residents in reckless disregard for the residents' safety and well-being, were ill-prepared to protect the residents, including DONALD J. JACK, from emerging infectious diseases like COVID-19.

15

68. In fact, Defendants have a history of insufficient infection control practices and have been on notice of this problem since at least February 9, 2018, when the Facility was cited by the Department of Health for failing to have a program in place to prevent the development and transmission of communicable diseases and infections.

69. The Department of Health cited the Facility again on March 15, 2019, for failing to provide and implement an infection prevention and control program to help prevent the development and transmission of communicable diseases and infections. Notably, the Department of Health found that the staff members failed to use PPE when providing care to a resident on contact isolation precautions.

70. Defendants' acts and omissions, with knowledge of their history of failing to provide and implement an adequate infection prevention and control program and in the face of the grave danger faced by DONALD J. JACK and the other residents of contracting COVID-19, were so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety or rights of by DONALD J. JACK and the other residents exposed to Defendants' conduct.

## CORPORATE BACKGROUND

71. BROOKDALE SENIOR LIVING, INC. was formed in June 2005 for the purpose of combining two leading senior living companies, Brookdale Senior Living Communities, Inc. and Alterra Healthcare Corporation. Both companies had been operating independently since the 1980's.

72. Approximately one year after its formation, BROOKDALE SENIOR LIVING, INC. acquired another senior living community operator, AMERICAN RETIREMENT CORPORATION, which had been independently operating since 1978. The acquisition of

16

AMERICAN RETIREMENT CORPORATION made BROOKDALE SENIOR LIVING, INC. the largest operator of senior living facilities in the United States.

73.	On or about July 20, 2007, BROOKDALE SENIOR LIVING, INC., through AMERICAN RETIREMENT CORPORATION, purchased SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

74.	BROOKDALE SENIOR LIVING, INC. is the parent company and long term care operator of hundreds of various senior living housing and service alternatives including retirement centers, assisted living facilities, skilled nursing facilities and continuing care retirement communities also known as CCRCs throughout the country including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

75.	BROOKDALE SENIOR LIVING, INC. owns, operates, and manages its facilities using the same officers and directors to control and operate all of its agents and subsidiaries. BROOKDALE SENIOR LIVING, INC. operates its facilities by centralizing its management and oversight of operations from a "national platform."

76.	SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is part of a larger CCRC, known as Freedom Square of Seminole ("Freedom Square"), which offers a full continuum of care. The Freedom Square campus includes independent living accommodations, an assisted living facility, and two skilled nursing facilities, one being SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Freedom Square offers both rental and what is known as "Life Care" programs. The rental program operates on a monthly rental fee basis, with no entry fee. The Life Care program is secured with an entry fee purchase to cover the cost of future accommodations and health care services.

77.    BROOKDALE SENIOR LIVING, INC. advertised that the CCRCs allow a resident to "age in place" as it offered a retirement community with opportunities for independent living, assisted living and nursing home care. In theory, a person could spend the rest of his or her life in a CCRC, moving between levels of care as needed. In reality, CCRCs require hefty buy-ins, which could include the price of one's home, potentially committing that individual to the CCRC regardless of the quality care they receive. In 2015, CCRCs were responsible for almost 20% of BROOKDALE SENIOR LIVING, INC.'s total senior living capacity.

78.    In 2014, in an effort to grow revenue, BROOKDALE SENIOR LIVING, INC. entered into an agreement with a real estate investment trust ("REIT"), HCP, to create a new business model for certain preexisting facilities. Together, the companies restructured these facilities with the intent to make a profit by releasing equity, increasing occupancy, increasing monthly service fees, and controlling operating expenses. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES was included in this restructure.

79.    The new business model, in part, involved the restructuring of currently owned facilities by creating new companies for no legitimate purpose other than to avoid liability for shoddy risk management. In effect, Defendants took a legitimately named company; broke it into pieces; saddled it with tremendous liabilities; and sucked out all the cash. This restructuring involved the ostensible separation of the real estate on which the facilities sit from the operator of the facility itself. This model, known as the "Propco-Opco" structure, required the formation of two new entities to take over the pre-existing one: the real estate company, or the so-called landlord ("Propco"), and the facility operator, or the so-called master tenant ("Opco"). At the closing, the "Opco" entity engaged an affiliate of BROOKDALE SENIOR LIVING, INC. to manage the owned and leased community pursuant to a management agreement.

80.     On or about August 29, 2014, at or about the same time that BROOKDALE SENIOR LIVING, INC. and HCP partnered to increase revenues and created the Propco/Opco entities, BROOKDALE SENIOR LIVING, INC. filed a change of ownership application with the State of Florida.

81.     After the change in ownership, a new company, Defendant CCRC OPCO - FREEDOM SQUARE, LLC, the "Opco" or operating entity, was also created. CCRC OPCO - FREEDOM SQUARE, LLC became the new licensee of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the entity saddled with liabilities.

82.     BROOKDALE SENIOR LIVING, INC. and HCP jointly own CCRC OPCO Ventures, LLC, which owns one hundred percent of CCRC OPCO-FREEDOM SQUARE, LLC.

83.     CCRC OPCO-FREEDOM SQUARE, LLC entered into a management agreement with another BROOKDALE SENIOR LIVING, INC. subsidiary, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., to own, operate, manage and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and other nursing home facilities in Florida.

84.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. assumed certain duties and obligations towards residents to manage the day-to-day operations of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. The centralized corporate functions include financing, accounting, human resources, marketing, training, regulatory affairs, purchasing food and supplies, asset management, extensive policy and procedure manuals and extensive quality control programs.

85.     BROOKDALE SENIOR LIVING, INC.'s and HCP's quality control measures include community inspections conducted by corporate staff on a regular basis. BROOKDALE

SENIOR LIVING, INC. and HCP focus on increasing occupancy and increasing revenues to attempt to generate a profit to support the expansion of their brands through the acquisition of additional facilities.

86.    Upon information and belief, on or about January 31, 2020, HCP acquired BROOKDALE SENIOR LIVING, INC.'s interest in SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and transitioned management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to LIFE CARE SERVICES, LLC. However, documents reflecting the change of ownership and/or management have not been filed with and/or made available by the State of Florida.

## CORPORATE CONDUCT AND JOINT VENTURE

87.    Based upon information and belief and the allegations stated above, at all relevant times, CCRC OPCO-FREEDOM SQUARE, LLC, BROOKDALE SENIOR LIVING, INC., AMERICAN RETIREMENT CORPORATION, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., HCP, and LIFE CARE SERVICES, LLC, engaged in a joint venture to own, operate, and manage nursing homes including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Each can bind the other and each has the authority to participate in the other's profits and the obligation to share in each other's losses.

88. Money paid by and on behalf of the nursing home residents was the sole source of revenue for the multiple layers of companies created by Defendants to distribute and share the revenues generated at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the other nursing homes in Florida.

89. Defendants managed themselves, governed and controlled the care and services provided to DONALD J. JACK, and, by virtue of their management and control, each of them,

voluntarily and intentionally assumed responsibility for and provided supervisory and custodial services to DONALD J. JACK while he was a resident of the Facility.

90. At all relevant times, Defendants held themselves out as being competent, capable, and qualified to provide necessary services to their residents, including DONALD J. JACK, and to protect and keep all residents, including DONALD J. JACK, safe from harm, including from the spread of infectious diseases.

91. At all relevant times, Defendants owned, operated, and/or managed SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and furthermore participated in, authorized, and/or directed the conduct of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and its respective agents and employees. Defendants are therefore directly liable for their own negligence, recklessness, and other tortious conduct, in the hiring and management of their agents and employees.

92. Defendants, through their managers, directors, presidents, vice-presidents, executive officers, and other agents, directly oversaw, managed, and/or controlled all aspects of the operation and management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, including budgeting, staffing, training, policy and procedures manual(s), licensing, accounts payable, accounts receivable, general accounting, cash management, capitalization, and profit and loss margins.

93. Defendants employed all of those persons who attended to and provided care and services to DONALD J. JACK while he was a resident at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and employed those persons in management and supervisory positions who directed the operations of the Facility, all of whom were acting within the course and scope of their employment.

94. Defendants, through their administrators, directors, and managing agents, condoned and ratified all the conduct at the Facility.

95. At all relevant times, Defendants were the knowing agents and/or alter-egos of one another, and are therefore vicariously liable for the acts and/or omissions of each other, their agents and employees, as is more fully alleged herein. Moreover, at all relevant times, Defendants were acting within the course and scope of their employment and/or agency relationship.

96. Defendants' acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result: maximize profits at the Facility, despite the result being that the Facility was underfunded and understaffed.

97. Defendants, by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other.

98. Defendants were responsible for the organization and administration of the Facility, and had duties to, inter alia, ensure the Facility complied with applicable statutes and regulations, and adopt policies and procedures for the Facility.

99. Each Defendant knowingly disregarded their respective duties and obligations owed to DONALD J. JACK and the other residents through both acts and omissions. Those duties to reasonably operate, manage, own and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES included: the duty to ensure the facility had sufficient staff who were trained to meet DONALD J. JACK's needs and the needs of the other residents; the duty to seek out and correct deficiencies or lapses in the care provided to DONALD J. JACK and other residents; the duty to provide a safe environment for DONALD J. JACK and the other residents;

the duty to investigate the cause of preventable incidents that occurred at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES; the duty to sufficiently staff SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to ensure DONALD J. JACK's needs and the needs of the other residents were met; and the duty to not divert funds from the Facility when the funds are intended for the care and maintenance of the residents, including DONALD J. JACK.

100. Defendants did not meet their duties and obligations. Although investigations and surveys by various agencies found deficiencies in the provision of care provided to the residents of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, each Defendant failed or refused to correct or address these issues addressed in the investigations and surveys.

101. Defendants required or encouraged the admission of residents with higher acuity levels without providing the staff necessary to care for the residents. The staff was lacking in supervision, number, and skill.

102. Further, in their efforts to maximize profits, Defendants intentionally and/or recklessly mismanaged staffing levels and supply levels below the levels necessary to provide adequate care and services to the residents and implemented practices in disregard to the safety of the patients.

103. Defendants each have extensive experience in the nursing home industry. This experience provided each Defendant the knowledge and experience to know that additional staff and more skilled staff were necessary to meet the needs of residents. Even with this knowledge, Defendants failed or refused to ensure that the residents received adequate and appropriate care while in their nursing home.

104. Defendants, pursuant to their scheme to place "profits over residents" at the Facility, ratified the conduct of each Defendant in that they mandated, were aware of, and/or accepted inadequate staffing, inadequate training, inadequate supplies and inadequate practices at the Facility, and were aware that such inadequate staffing, inadequate training, inadequate supplies, and inadequate practices could lead to injuries and damages for the residents.

105. In conceiving of, implementing and carrying out their profits over residents scheme, Defendants willfully, knowingly, recklessly and with conscious disregard for DONALD J. JACK's health, safety and welfare, acted in a manner that was malicious, reckless and oppressive.

106. Further, Defendants implemented and carried out the profits over residents scheme with knowledge that such a scheme was designed to exploit elderly/senior citizens, a class expressly deemed by the Legislature of the State of Florida as a vulnerable segment of the population who require a heightened level of protection.

107. As a result of Defendants' scheme and acts and omissions, DONALD J. JACK was victimized by Defendants and suffered damages as alleged herein.

## COUNT I: BREACH OF FIDUCIARY DUTY
### As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA

108. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

109. This is a claim that presents a theory of recovery based upon the presence of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

110. This is a claim that does not arise out of negligence or a violation of DONALD J. JACK's nursing home resident rights.

24

111. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed DONALD J. JACK a duty to act for or to advise him on matters within the scope of their specialized relationship.

112. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA and DONALD J. JACK had a developed a special relationship of trust and confidence.

113. That trust and confidence started when DONALD J. JACK was admitted to the Facility because he was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. Specifically, DONALD J. JACK needed assistance with multiple Activities of Daily Living ("ADLs") and twenty-four hour skilled nursing care.

114. As a result of his varying infirmities and advanced age, at all times material, DONALD J. JACK was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being; and DONALD J. JACK was incapable of dealing with Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on equal terms, and was incapable of engaging in any arm's length relationships with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

115. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA directly solicited DONALD J. JACK's confidence and trust in attempts to convince him to reside and remain at the Facility, and further represented through the words and acts of its employees and agents that it would undertake to provide all of the necessary care and treatment to attain and maintain the highest practicable physical, mental, and psychosocial well-being for DONALD J. JACK.

116. Additionally, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA specifically undertook the non-delegable duty of protecting DONALD J. JACK's residents' rights vested in him by virtue of Florida law, including the right to be treated courteously, fairly, and with the fullest measure of dignity and the right to privacy. *See NME Properties, Inc. v. Rudich*, 840 So. 2d 309 (Fla. 4th DCA 2003).

117. As a result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's solicitation of DONALD J. JACK's trust and confidence, DONALD J. JACK placed a special confidence and trust in CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. And DONALD J. JACK relied on CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide such care and services.

118. DONALD J. JACK further placed special confidence and trust in Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to protect and provide for his individual rights as established in section 400.022, Florida Statutes, and to further act as a trustee for all of his personal property that he possessed on the premises of the Facility as well as his personal funds and income, which on information and belief, he placed in an account maintained by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on his behalf and for his benefit.

119. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA undertook to act as trustees to protect and preserve DONALD J. JACK's personal property, including his clothing and other valuable personal property, as well as to maintain and manage his personal funds and income in a trust account for DONALD J. JACK's benefit. Correspondingly

CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed non-delegable duties to provide DONALD J. JACK quarterly accounting of any and all transactions made utilizing funds from his trust account, to maintain and safeguard the funds therein and to only utilize said funds for authorized transactions, and to avoid commingling of his funds with the funds of any other person or those of CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

120.    Furthermore, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knowingly and voluntary entered into a highly confidential relationship with DONALD J. JACK. CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed extensive legal duties to comply with all of the confidentiality requirements enumerated in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regarding DONALD J. JACK, a confidentiality similar in scope and duration to that attendant to attorney-client and doctor-patient relationships.

121.    Moreover, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA assumed duties to protect and preserve DONALD J. JACK's Federal and State privacy rights, including those privacy rights enshrined in Article I, Section 23 of the Florida Constitution.

122.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA accepted the special confidence and trust placed upon them by DONALD J. JACK by admitting him into the Facility and by, among other things: explicitly assuming, through words and actions, the various duties described in the preceding paragraphs regarding protecting his confidentiality, protecting his privacy, protecting his individual liberties, and managing and safeguarding his personal finances; assuming responsibility and control over every aspect of DONALD J. JACK's

day-to-day life; and voluntarily undertaking responsibility for the specific level of care, protection, supplies and services that would be provided to DONALD J. JACK.

123. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA individually and collectively controlled, oversaw and orchestrated every single aspect of DONALD J. JACK's existence, from the mundane (such as the clothing worn) to the vital (such as determining when and how healthcare would be provided, as well as how much food and water DONALD J. JACK could consume).

124. DONALD J. JACK was solely and particularly dependent upon the employees, officers, directors, and agents of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for his daily care, protection, services, supplies and personal and intimate needs.

125. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA developed a special relationship with DONALD J. JACK by virtue of: the nature of the care and services provided; the trustee-beneficiary relationship they maintained toward him regarding his personal property and finances; the Federal and State confidentiality and privacy laws CCRC OPCO - FREEDOM SQUARE, LLC undertook to comply with DONALD J. JACK; the superior knowledge, skill and abilities of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA; the enormous disparity of power and unequal bargaining Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA enjoyed DONALD J. JACK; and his inability to care for and provide for himself.

126. This special confidential relationship allowed Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, to occupy a position of confidence toward DONALD J. JACK, which required fidelity, loyalty, good faith, and fair dealing by CCRC OPCO

- FREEDOM SQUARE, LLC and CYNTHIA AYALA. Additionally, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA had a duty to refrain from engaging in self-dealing.

127. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA were each a fiduciary of DONALD J. JACK based on the special relationship between the parties.

128. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed fiduciary duties to DONALD J. JACK. *See Greenfield v. Manor Care, Inc.*, 705 So. 2d 926 (Fla. 4th DCA 1997).

129. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted and failed to act in material breach of their fiduciary duties owed to DONALD J. JACK. Instead Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted in ways to promote their own interests and in contravention of the interests of DONALD J. JACK.

130. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA breached and violated its relationship of trust, special confidence, and its fiduciary obligations and duties owed to DONALD J. JACK by:

    a) Failing to take adequate action to address COVID-19 concerns at the Facility as Defendants represented they would through their various websites as alleged in paragraphs 41 and 45;

    b) Failing to take adequate action to minimize the risk and spread of COVID-19 and implement adequate care, services, and infection control at the Facility as alleged in paragraphs 46, 50 and 51; and

    c) Knowingly and recklessly engaging in the profits over residents scheme described herein in an effort to increase the profitability of the Facility, for the

benefit of Defendants and their joint venture, and at the expense of and to the direct detriment of DONALD J. JACK.

131. In violating their fiduciary obligations and duties to DONALD J. JACK, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knew that DONALD J. JACK would suffer harm, including but not limited to the daily injuries resulting from the daily invasion of rights vested in DONALD J. JACK, as well as economic harm.

132. Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK were the legal cause of the loss, injury and damages suffered by DONALD J. JACK. As the direct and proximate result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK, DONALD J. JACK contracted COVID-19 and subsequently died from this infection.

WHEREFORE, Plaintiff demands judgment against Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

## COUNT II: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC

133. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 132.

134. This is a claim that presents a theory of recovery based upon the presence and breach of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, aided and abetted by Defendants, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

30

135. As set forth in Count I above, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed and breached fiduciary duties owed to DONALD J. JACK.

136. Defendants are related entities within a single enterprise or joint venture.

137. Defendants had actual knowledge of DONALD J. JACK's fiduciary relationship with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA by virtue of its close corporate relationship to CCRC OPCO - FREEDOM SQUARE, LLC.

138. By reason of their shared and/or common ownership, directors, officers and managers and/or contractual relationships, Defendants knew of the fiduciary duties CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed to DONALD J. JACK and knew of CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of those duties as described in Count I.

139. Defendants knew that the residents at the Facility, including DONALD J. JACK, were incapable of independently providing their own necessary care and were solely and specifically dependent upon the employees, officers, directors, and agents to provide for their basic daily care, protection, services, supplies, and personal and intimate needs.

140. Defendants knowingly participated and provided substantial assistance and encouragement to CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in connection with their breach of fiduciary duties to DONALD J. JACK, as set forth in detail within Count I above.

141. In addition to this knowledge, Defendants aided and abetted Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in their breach of fiduciary duties and rendered substantial assistance and encouragement for the same, by, among other things:

a) Engaging in the conduct set forth in detail within Count I above;

31

b) Exercising dominance and control over CCRC OPCO - FREEDOM SQUARE, LLC's revenues by regularly and repeatedly sweeping virtually all of the Facility's revenues into an account controlled by the joint venture or enterprise, and/or their designee;

c) Knowingly and intentionally taking, creating and accepting inter-company fees and transfers, comprised of revenues obtained from the residents and designed to improperly and unjustly enrich Defendants instead of allowing the Facility to utilize said resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including DONALD J. JACK, as required;

d) Structuring and approving contracts between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC, which Defendants knew or should have known would result in the diversion of Facility revenues necessary to provide the care and services to its residents, DONALD J. JACK;

e) Overseeing and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's acceptance of monies from residents, including DONALD J. JACK, knowing the Facility could not provide full value of the care and services to meet the care and safety needs of the residents;

f) Directly or indirectly misrepresenting the nature of the relationship between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, in which Defendants by virtue of the common owners, officers and managers, controlled the business operations and working

capital of the Facility and inappropriately commingled its revenues by making intra-company transfers to related facilities;

g) Structuring the managing and operating business model for the Facility in a way that constrained its ability to provide the level of care and services to residents, including DONALD J. JACK, while simultaneously benefitting Defendants and other upstream corporate entities; and,

h) Influencing, advocating, and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's improper payments to Defendants, which Defendants knew exceeded amounts a prudent and cost conscious buyer would pay, and which Defendants also knew would cause the monies intended for the provision of care and services to the residents, including DONALD J. JACK, to be depleted.

142. The conduct of Defendants as alleged, constitutes aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of fiduciary duties and subjects Defendants to liability for the harm suffered by DONALD J. JACK.

143. In aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in violating fiduciary obligations and duties to DONALD J. JACK as referenced herein, Defendants knew that DONALD J. JACK would suffer harm and injuries, including the daily injuries flowing from the repeated breaches of fiduciary duties in which Defendants aided and abetted.

144. As a result of Defendants' aiding and abetting in the breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, Defendants were improperly and unjustly enriched, the Facility was left without the necessary resources to function

in the residents' best interests, and DONALD J. JACK suffered both the injuries set forth herein as well as economic harm.

145.　Furthermore, as the direct and proximate result of Defendants' aiding and abetting breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, DONALD J. JACK contracted COVID-19 and subsequently died.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

## COUNT III: VIOLATIONS OF FLORIDA STATUTES §415.1111
### As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC

146.　Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 3, 9, 10, 12, 15, 16, 19, 20, 23, 24, 26, 28, and 31 above.

147.　For the purposes of this count and only this count, it is not alleged that Defendants are a licensee or entity that established, controlled, conducted, managed or operated the Facility.

148.　DONALD J. JACK was at all relevant times a vulnerable adult with a long-term disability. He was seventy-five (75) years of age and was unable to perform the normal activities of daily living or to provide for his own care or protection due to his disability.

149.　Defendants' acts or omissions constitute exploitation of a vulnerable adult in violation of Section 415.1111, Florida Statutes.

150.　Defendants knew or should have known that DONALD J. JACK lacked the capacity to consent, but Defendants obtained or used, or endeavored to obtain or use DONALD J.

34

JACK's funds, assets or property, including Medicare and Medicaid benefits, with the intent to temporarily or permanently deprive DONALD J. JACK of the use, benefit or possession of the funds, assets, or property for the benefit of someone other than DONALD J. JACK.

151. The compensation Defendants received was derived from the private funds of vulnerable adults, including DONALD J. JACK, or from Medicaid and/or Medicare funds that were beneficiaries' assets, including DONALD J. JACK, which were paid to Defendants for the sole purpose of providing for the support and maintenance of the Facility's residents, including DONALD J. JACK.

152. Defendants received compensation that they should have known would deprive the Facility of adequate resources to provide for the necessities of DONALD J. JACK's support and maintenance, which should have been used to, inter alia, implement a sufficient infection control program at the Facility and to secure sufficient PPE and supplies to prevent the spread of COVID-19 at the Facility.

153. Defendants failed or refused to effectively use DONALD J. JACK's income or assets for the necessities required for his support and maintenance.

154. Defendants' failure or refusal to effectively use DONALD J. JACK's income or assets as set forth herein, was the proximate cause of the losses he suffered including, but not limited to the use, benefit, or possession of the funds, assets or property for his benefit.

155. As a direct and proximate result of Defendants' acts and omissions, DONALD J. JACK was deprived of the use, benefit or possession of the funds, assets or property.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for

disgorgement of profits, consequential damages, attorneys' fees and costs, pre-judgment interest, trial by jury of all matters so triable, and such other relief this Court deems appropriate.

**COUNT IV: VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, § 501.201 *ET SEQ.***
**As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC; HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

156.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

157.    Plaintiff brings this Count pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201 *et seq.*, Florida Statutes (hereinafter "FDUTPA").

158.    Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Fla. Stat. § 501.204 (1).

159.    By engaging in the above described conduct and the additional conduct described below, Defendants engaged in unconscionable, unfair and deceptive acts and practices in violation of FDUTPA in connection with their advertising, soliciting, providing, and offering services at the Facility, which acts and practices ultimately victimized DONALD J. JACK, a senior citizen.

160.    At all relevant times, Defendants, their officers, directors, and managers were engaged in trade and commerce in Florida within the meaning of FDUTPA as Defendants advertised, solicited, provided, and offered services to consumers and senior citizens.

161.    At all relevant times, DONALD J. JACK was a "consumer" and "senior citizen" within the meaning FDUTPA as he was an individual over the age of sixty (60).

162.    Defendants, their officers, directors, and managers marketed and advertised service at the Facility directly to senior citizen consumers, including DONALD J. JACK, by disseminating

brochures, web sites, videos, advertisements, and other information, which were prepared in part, by the Facility's related corporate entities.

163. Defendants, their officers, directors, and managers made unfair, deceptive and misleading representations in their advertising materials distributed to senior citizen consumers, including DONALD J. JACK, regarding the level of services they provided to vulnerable senior citizens and nursing home residents.

164. Defendants, their officers, directors, and managers advertised and offered their nursing facilities by promising to meet residents' needs, to keep them clean, comfortable and safe, and to provide food, water, care, and services as needed. These statements were false, deceptive, and misleading.

165. Defendants advertising materials omitted information that was material to consumers, including DONALD J. JACK, by failing to disclose that DONALD J. JACK would experience long delays in the delivery of care and services and that he would often be deprived of the care and services he required and bargained for.

166. Defendants, their officers, directors, and managers engaged in deceptive, misleading, and unfair practices by representing that certain care and services were or would be provided to DONALD J. JACK, as documented in his care plans and assessments, when in fact that care and services were never provided.

167. Defendants, their officers, directors and managers further promised to provide a clean, safe, and sanitary living environment throughout DONALD J. JACK's residency at their facilities, for which Defendants were handsomely paid.

168. Defendants affirmatively concealed material facts from DONALD J. JACK regarding the existence and effect of the COVID-19 outbreak at the Facility, and led DONALD J.

JACK to believe that the Facility was a safe environment, when in fact the Facility was contaminated with COVID-19.

169. Defendants, their officers, directors and managers failed to appropriately manage the real property at the Facility and failed to maintain a clean, safe, and habitable living environment for their residents.

170. Defendants, their officers, directors and managers, through their deceptive, unconscionable, and unfair acts and omissions, misled DONALD J. JACK into believing that their facilities were properly managed, maintained, and equipped to meet his basic needs, when it was not.

171. Defendants, their officers, directors and managers failed to provide DONALD J. JACK with a living environment and premises that reciprocated the rents and other charges they were paid for his residency.

172. Defendants, their officers, directors and managers caused the Facility to enter into a lease agreement so onerous that it left Defendants without the ability to provide an adequate, safe, decent, and clean living environment, despite promising DONALD J. JACK that he would receive the same in exchange for the monies he paid.

173. Defendants' failure to provide basic care and services to DONALD J. JACK not only violated the FDUTPA, but also degraded DONALD J. JACK, increased his risk of serious negative health consequences, and caused him to suffer medical expenses, serious injury, and death.

174. In addition to these deceptive, unconscionable, and unfair acts and omissions, Defendants misled consumers, including DONALD J. JACK, by failing to disclose that the Facility's related corporate entities exercised control over the Facility, by among other things: (a)

restricting the ability of the Facility's managers and administrators to increase staffing levels; (b)

supervising, and in some case, overriding the personnel decisions of the Facility; (c) creating and

implementing company-wide policies and incentive programs; and (d) entering into agreements,

including onerous lease and management agreements.

175.    Defendants, their officers, directors and managers failed to provide DONALD J.

JACK with the basic care and services he required and bargained for with respect to his use of the

Facility's premises.

176.    Defendants' deceptive, unconscionable, and unfair statements and practices were

in violation of FDUTPA.

177.    Defendants' deceptive, unconscionable, and unfair representations, omissions, and

practices were of the type that would likely mislead Florida consumers acting reasonably in the

circumstances, to the consumers' detriment, and were particularly misleading and detrimental to

the senior citizens and infirm residents at their Facility, including DONALD J. JACK.

178.    DONALD J. JACK could not have detected the existence and effect of the COVID-

19 at the Facility or the existence of the onerous agreements, the corporate entities control over

the Facility that led to the lack of care, services, and sanitary living environment at the Facility.

179.    DONALD J. JACK admitted himself to the Facility and had therefore been

aggrieved by Defendants unconscionable, unfair and deceptive practices in violation of FDUTPA.

180.    DONALD J. JACK sustained damages as a direct and proximate result of

Defendants' violations of FDUTPA.

181.    DONALD J. JACK did not receive the benefit of the bargain, overpaid for the

services, and suffered actual damages.

182. The damages suffered by DONALD J. JACK were directly and proximately caused by the unconscionable, deceptive, misleading, and unfair practices of Defendants.

183. Defendants' violations were willful as Defendants knew or should have known that their conduct was unfair or deceptive or prohibited by FDUTPA.

184. Defendants' violations are made even more reprehensible because of Defendants' attempt to exploit senior citizens during a global pandemic for profit, while posing a serious and direct threat to the health and safety of senior citizens such as DONALD J. JACK.

WHEREFORE, Plaintiff demands judgment against Defendants for damages pursuant to section 501.211(2), Florida Statutes, in an amount to be proven at trial, pre-judgment interest, post-judgment interest, attorney's fees and court costs as provided in section 501.2105, Florida Statutes, and further demands a trial by jury, together with such other and further relief as this Court deems appropriate.

/s/ Bennie Lazzara, Jr.

**Bennie Lazzara, Jr., Esquire**
Florida Bar No. 119568
Bennie@wilkesmchugh.com
TPABXLStaff@wilkesmchugh.com
fl@wilkesmchugh.com
**James L. Wilkes, II, Esquire**
Florida Bar No. 405337
jimw@wilkesmchugh.com
dthomason@wilkesmchugh.com
**Jason R. Delgado, Esquire**
Florida Bar No. 591122
jdelgado@wilkesmchugh.com
TPAJRDstaff@wilkesmchugh.com
WILKES & MCHUGH, PA
1 N. Dale Mabry Highway, Suite 700
Tampa, FL 33609
Telephone: (813) 873-0026
Facsimile: (813) 286-8820
*Attorneys for the Plaintiff*

# EXHIBIT "A"

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
PROBATE DIVISION

IN RE: ESTATE OF                                        Case No. 20-004321-ES
DONALD JOHN JACK
Deceased.

_____/

## LETTERS OF ADMINISTRATION

TO ALL WHOM IT MAY CONCERN

WHEREAS, Donald John Jack, a resident of 12542 82nd Terrace N., Seminole, FL 33776, died

on April 21, 2020, owning assets in the State of Florida, and

WHEREAS, Jessica Gunter has been appointed personal representative of the estate of the

decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

NOW, THEREFORE, I, the undersigned circuit judge, declare Jessica Gunter duly qualified

under the laws of the State of Florida to act as personal representative of the estate of Donald John Jack,

deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and

receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will

permit and the law directs; and to make distribution of the estate according to law.

ORDERED in chambers, Pinellas County, Florida.

05/15/2020 11:03:20 AM

Pamela A. M. Campbell
Circuit Judge

Filing # 108550742 E-Filed 06/08/2020 05:07:14 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and through
JESSICA GUNTER, Personal Representative,

      Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.; BROOKDALE
SENIOR LIVING, INC.; BKD TWENTY-ONE
MANAGEMENT COMPANY, INC.; AMERICAN
RETIREMENT CORPORATION; LIFE CARE
SERVICES, LLC; and, CYNTHIA AYALA (as to
SEMINOLE PAVILION REHABILITATION AND
NURSING SERVICES),

CASE NO:  20-002755-CI

      Defendants.
_____

CERTIFIED PROCESS SERVER # O6
SECOND JUDICIAL CIRCUIT COURT OF FLORIDA
DATE SERVED 6.8.20 TIME 9:18 A

**SUMMONS**



THE STATE OF FLORIDA

TO ALL AND SINGULAR SHERIFFS OF SAID STATE:

GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Complaint and Designation of Email Addresses in the above styled cause upon the defendant(s):

**LIFE CARE SERVICES, LLC**
**c/o COGENCY GLOBAL INC.**
**115 NORTH CALHOUN STREET SUITE 4**
**TALLAHASSEE, FL 32301**

Each defendant is hereby required to serve written defenses to said Complaint on plaintiff's attorney, whose name and address is:

**BENNIE LAZZARA JR., ESQUIRE**
**WILKES & McHUGH, P.A.**
**TAMPA COMMONS, SUITE 800**
**ONE NORTH DALE MABRY HIGHWAY**
**TAMPA, FL 33609**
**(813) 873-0026**

within twenty (20) days after service of this summons upon that defendant, exclusive of the day of service, and to file the original of said written defenses with the clerk of said court either before service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

      WITNESS my hand and the seal of said Court on the ____ day of JUN 09 2020 , 2020.

KEN BURKE CLERK CIRCUIT COURT
315 Court Street
Clearwater, Pinellas County, FL 33756-5165

KEN BURKE, CPA
Clerk of the Circuit Court

Judee Maslar
BY DEPUTY CLERK

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and through JESSICA GUNTER, Personal Representative,

        Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC.; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; LIFE CARE SERVICES, LLC; and, CYNTHIA AYALA (as to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES),

        Defendants.

CASE NO.: 20 - 002755 - CI

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

THE ESTATE OF DONALD J. JACK, by and through JESSICA GUNTER, Personal Representative, and by and through undersigned counsel, hereby sues Defendants, CCRC OPCO - FREEDOM SQUARE, LLC; HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC.; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; LIFE CARE SERVICES, LLC; and, CYNTHIA AYALA (herein after, the "Defendants"). All of the allegations contained in this Complaint are based on either known facts or information and belief. Plaintiff alleges as follows:

## INTRODUCTION

This case concerns the injuries, damages, and untimely death of DONALD J. JACK as a result of Defendants' actions and omissions during his residency at Defendants' skilled nursing facility known as Seminole Pavilion Rehabilitation and Nursing Services (the "Facility"). What was supposed to be merely a short-term rehabilitation admission turned out to be a death sentence for DONALD J. JACK due to Defendants' business practice of placing profits over residents. For years, even before DONALD J. JACK's residency, Defendants chose to place profits over residents and ignore deficiencies in their emergency preparedness plan and in their infection prevention and control program. When Defendants' deficiencies became more pronounced in light of the COVID-19 pandemic, Defendants continued to choose to place profits over residents by refusing to be forthcoming with the authorities, staff, residents, and residents' relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility. Instead, for almost a week after the first COVID-19 death at the Facility, Defendants withheld information regarding the COVID-19 positive death at the Facility and withheld supplies necessary to protect residents and staff. During the time Defendants kept everyone in the dark and withheld necessary supplies, DONALD J. JACK contracted COVID-19. Only after the Facility had become known as the epicenter in Pinellas County for COVID-19 and intervention from the Florida Department of Health, did Defendants transfer all ninety-five (95) residents, including DONALD J. JACK, to local hospitals to get the necessary care and to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff. Unfortunately, by this time DONALD J. JACK had tested positive for COVID-19 and only five days thereafter DONALD J. JACK was dead as a result.

## JURISDICTION, PARTIES AND VENUE ALLEGATIONS

1.  This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00).

2

2. On or about April 2, 2020, DONALD J. JACK was admitted to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, located at 10800 Temple Terrace, Seminole, Florida 33772 in Pinellas County, where he remained until approximately April 17, 2020.

3. Plaintiff, JESSICA GUNTER, is the Personal Representative of THE ESTATE OF DONALD J. JACK. Letters of Administration, dated May 15, 2020, evidencing JESSICA GUNTER's authority to bring this action on behalf of THE ESTATE OF DONALD J. JACK are attached hereto as Exhibit "A."

4. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is a fictitious name owned by Defendant CCRC OPCO - FREEDOM SQUARE, LLC.

5. CCRC OPCO - FREEDOM SQUARE, LLC is the licensee that operated the Facility during DONALD J. JACK's residency.

6. CCRC OPCO - FREEDOM SQUARE, LLC, is an active Delaware limited liability company, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

7. CCRC OPCO - FREEDOM SQUARE, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing home facilities, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC

3

OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the courts of the State of Florida.

8.    CCRC OPCO - FREEDOM SQUARE, LLC committed tortious acts against DONALD J. JACK in the State of Florida.  Each tortious act is specifically alleged in the subsequent counts.  Accordingly, pursuant to section 48.193, Florida Statutes, CCRC OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the Courts of the State of Florida.

9.    HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC. (hereinafter referred to as "HCP") is the owner of property located at 10800 Temple Terrace, Seminole, Florida 33772, which is the property upon which the SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is situated.

10.    HCP is a Maryland corporation, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

11.    HCP had the authority to and did exercise control over the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

12.    HCP required rents or other compensation from funds it knew were necessary for DONALD J. JACK's support and maintenance.  HCP knew that such conduct would deprive the Facility of adequate resources to provide for the wellbeing of the Facility's residents, including DONALD J. JACK.

13.    HCP shared control over the operation of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES through its authority to control the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

4

14.     HCP conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

15.     HCP committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

16.     BROOKDALE SENIOR LIVING, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

17.     BROOKDALE SENIOR LIVING, INC. is the parent company and operator of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

18.     BROOKDALE SENIOR LIVING, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

19. BROOKDALE SENIOR LIVING, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

20. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

21. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

22. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

23. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

6

24.     AMERICAN RETIREMENT CORPORATION is a Tennessee corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

25.     AMERICAN RETIREMENT CORPORATION conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

26.     AMERICAN RETIREMENT CORPORATION committed tortious acts against DONALD J. JACK in the State of Florida.  Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

27.     AMERICAN RETIREMENT CORPORATION is an entity that operated, managed, controlled and oversaw SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

28.     LIFE CARE SERVICES, LLC is an active Iowa limited liability company, with its principal place of business at 400 Locust Street, Suite 820, Des Moines, Iowa 50309, which is registered to do business in Florida and is doing business in Florida.

29.     LIFE CARE SERVICES, LLC served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

7

30. LIFE CARE SERVICES, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

31. LIFE CARE SERVICES, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

32. CYNTHIA AYALA was at all material times hereto a resident of the State of Florida and the Administrator at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

33. CYNTHIA AYALA conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed herself of the privileges of the State of Florida, through her management of, operation of, control of, and/or consultation with SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

34. CYNTHIA AYALA committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly,

8

pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

## FACTUAL ALLEGATIONS

35.    In December 2019, the government in Wuhan, China, confirmed that health authorities were treating clusters of cases of suspected pneumonia that appeared to be viral in origin.

36.    On or about January 30, 2020, the World Health Organization declared a Public Health Emergency of International Concern after the outbreak of the 2019 coronavirus disease.

37.    On February 11, 2020, the World Health Organization announced an official name for the new disease – coronavirus disease 2019, abbreviated as COVID-19.

38.    COVID-19 is an infectious virus that attacks the respiratory system of its human host. The elderly, medically fragile, and those with compromised immune systems are particularly susceptible to fatality due to COVID-19.

39.    On or about February 29, 2020, the Centers for Disease Control and Prevention ("CDC") released a statement regarding the first confirmed death in the United States from the coronavirus. In addition to the first confirmed death, the CDC reported that the public health officials in the state of Washington had also reported two additional hospitalized patients – two of which were from a long-term care facility where one was a health care worker – who had tested presumptive-positive for the virus that causes COVID-19. In addition, the CDC reported that additional residents and staff of the long-term care facility had not yet been tested but were either ill with respiratory symptoms or hospitalized with pneumonia of unknown cause.

40.    On or about March 1, 2020, in response to positive cases of COVID-19 in Florida, Governor Ron DeSantis issued Executive Order 20-51, directing the Florida Department of Health to declare a Public Health Emergency.

9

41.     On or about March 4, 2020, Defendants, via various websites, represented to the staff, residents, and relatives that Defendants were taking action to address COVID-19 concerns such as:

    a)  Providing consistent updates and communication to those who live and work in the community.

    b)  Following evidence-based precautions that align with guidelines provided by the CDC.

    c)  Reviewing response measures to ensure the community is organized and ready if the virus impacts the community or the surrounding area.

42.     On or about March 9, 2020, the Governor of Florida declared a state of emergency existed in Florida.

43.     On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.

44.     On or about March 13, 2020, the Governor of Florida ordered all Florida nursing home facilities to lock down and implemented a visitation ban in an effort to mitigate the risk to Florida's most vulnerable population to COVID-19, which is Florida's elderly population (i.e. over the age of sixty-five (65)) and particularly those who have underlying medical conditions such as cancer, chronic lung disease, moderate-to-severe asthma, serious heart conditions, immunocompromised status, diabetes, severe obesity, renal failure and liver disease.

45.     On or about March 15, 2020, Defendants, via their shared website, represented to the staff, residents, and relatives that Defendants were continuing to take action to address COVID-19 concerns such as:

    a)  Continuing to follow the guidance from both the CDC and local health authorities.

10

b) Increasing the frequency and rigor of cleaning and sanitizing common community areas.

c) Reviewing emergency preparedness and response program.

d) Coordinating best practices and across their large partner network.

e) Providing all residents and their families with the most up-to-date guidance from the CDC.

f) Staying in communication with local health officials.

46.     Despite Defendants' representations to the staff, residents, and relatives, Defendants failed to adequately take action to address COVID-19 concerns and failed to comply with their own procedures by, among other things:

a) Failing to supply or require staff to wear Personal Protective Equipment ("PPE");

b) Allowing asymptomatic staff who had been exposed to COVID-19 to continue working at the Facility;

c) Failing to provide staff, residents, and their families with consistent updates and communication regarding the risk of COVID-19 and of COVID-19 positive cases at the Facility; and,

d) Failing to implement an adequate emergency preparedness and response program.

47.     On or about April 2, 2020, at the age of seventy-five (75), DONALD J. JACK admitted himself to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES (the "Facility") for short-term rehabilitation for generalized weakness as he merely needed to gain strength to receive chemotherapy for his recent diagnosis of Hodgkin's Lymphoma.

11

48.     Upon admission, Defendants documented that DONALD J. JACK had various diagnoses including, but not limited to, Hodgkin's Lymphoma, Type II diabetes, and abnormality of albumin.

49.     Due to his age and underlying medical conditions, Defendants knew DONALD J. JACK was one of the residents most vulnerable to COVID-19.

50.     Although Defendants were on high-alert for COVID-19 since January 2020 and of the residents' vulnerability, Defendants, consistent with their business practice of placing profits over residents, disregarded the safety of DONALD J. JACK and the other residents by failing to implement adequate protocols to minimize the risk and spread of COVID-19 and by failing to implement adequate care, services and infection control at the Facility.

51.     Defendants' acts and omissions included, but were not limited to:

   a.     Failing to properly use residents' funds;

   b.     Failing to have an adequate emergency preparedness plan in place to keep residents safe from emerging infectious diseases like COVID-19;

   c.     Failing to implement adequate protocols to minimize the risk and spread of COVID-19;

   d.     Failing to implement an adequate system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents and staff;

   e.     Failing to immediately notify the authorities, staff, residents, and relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility;

   f.     Forcing staff to reuse PPE;

12

g.   Failing to supply proper masks and gowns for weeks causing many staff members to resort to providing their own homemade facial coverings not medically graded to protect against the virus;

h.   Failing to follow and/or adhere to the standards and protocols set out by the CDC and other state and local authorities related to infection control and prevention;

i.   Failing to communicate the outbreak to the authorities and avail themselves of the available PPE;

j.   Failing to implement safety protocols, such as disinfecting many common areas, to minimize the spread of the virus;

k.   Failing to provide adequate staff in number and training;

l.   Failing to be forthcoming and adequately share information regarding the outbreak at the Facility with employees, residents and their relatives.

m.   Reducing basic cleaning practices for which the residents paid for;

n.   Permitting widespread safety failures, such as inadequate staff and equipment, increasing the risk of injury or death during an emergency such as the pandemic;

o.   Failing to have adequate management oversight; and,

p.   Permitting asymptomatic staff who had been exposed to COVID-19 to continue to work at the Facility and interact with residents.

52.   As a result of Defendants' acts and omissions and total disregard for the residents, the Facility experienced systemic failure and became the center of the COVID-19 outbreak in Pinellas County.

53.     To date, at least 25 deaths of residents and staff resulting from COVID-19 are linked to this single Facility.

54.     The Facility's first confirmed case of a resident with COVID-19 was a male resident that was hospitalized on April 5, 2020, and tested positive on April 9, 2020, for COVID-19. The resident then died on April 10, 2020.

55.     Although the Facility had its first confirmed case of COVID-19 on April 9, 2020 – approximately seven days after DONALD J. JACK was admitted to the Facility – and first confirmed death on April 10, 2020, Defendants failed to be forthcoming in sharing this information with employees, residents, their relatives, and the public.

56.     Rather, despite having difficulty managing the rapid outbreak, Defendants waited approximately a week to disclose to the public the first confirmed COVID-19 case. Defendants' delay in reporting delayed assistance with the much need PPE available through the county.

57.     Defendants' staff were kept in the dark by Defendants and did not know about the gravity of the outbreak until the media reported the transfer of residents on or about April 15, 2020.

58.     Likewise, family members and advocates have sounded alarms about the delays in residents and the public being informed about the outbreak as families are learning more about the outbreak from the media than from Defendants who are keeping everyone in the dark.

59.     Despite the gravity of the outbreak, Defendants failed for weeks to provide adequate gowns and masks for staff.

60.     Defendants' staff feared for their safety because protocols were not in place to minimize virus spread such as providing proper PPE and disinfecting common areas. As a result, staff began quitting and resident care deteriorated even further as staff quit and supplies shrank.

61.     On or about April 16, 2020, the Facility received laboratory results confirming DONALD J. JACK was positive for COVID-19.

62.     By April 16, 2020, approximately 30 residents and staff members at the community had tested positive for COVID-19 and by April 17, 2020, two additional residents had died.

63.     Defendants were reluctant to transfer residents to hospitals, but began to transfer mass amounts of residents on or about April 16, 2020, when they became overwhelmed by the outbreak.

64.     On or about April 17, 2020, after intervention from the Florida Department of Health and after nearly 60 residents were transferred to area hospitals who had either tested positive (or were presumed positive) for COVID-19, Defendants transferred all remaining residents at the Facility, including DONALD J. JACK, to local hospitals to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff.

65.     In a span of eight days, from the first confirmed diagnoses to the mass evacuation on April 17, 2020, a total of 95 residents were removed from the Facility and three had died.

66.     On April 21, 2020, only five days after being diagnosed, DONALD J. JACK passed away as a result of COVID-19, which he contracted at the Facility due to Defendants' acts and omissions.

67.     Based upon the acts and omissions described above, as well as numerous reports from Defendants' own staff, Defendants, who were focused on their own self-interests and putting profits over the well-being of the Facility's residents in reckless disregard for the residents' safety and well-being, were ill-prepared to protect the residents, including DONALD J. JACK, from emerging infectious diseases like COVID-19.

68.     In fact, Defendants have a history of insufficient infection control practices and have been on notice of this problem since at least February 9, 2018, when the Facility was cited by the Department of Health for failing to have a program in place to prevent the development and transmission of communicable diseases and infections.

69.     The Department of Health cited the Facility again on March 15, 2019, for failing to provide and implement an infection prevention and control program to help prevent the development and transmission of communicable diseases and infections. Notably, the Department of Health found that the staff members failed to use PPE when providing care to a resident on contact isolation precautions.

70.     Defendants' acts and omissions, with knowledge of their history of failing to provide and implement an adequate infection prevention and control program and in the face of the grave danger faced by DONALD J. JACK and the other residents of contracting COVID-19, were so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety or rights of by DONALD J. JACK and the other residents exposed to Defendants' conduct.

## CORPORATE BACKGROUND

71.     BROOKDALE SENIOR LIVING, INC. was formed in June 2005 for the purpose of combining two leading senior living companies, Brookdale Senior Living Communities, Inc. and Alterra Healthcare Corporation. Both companies had been operating independently since the 1980's.

72.     Approximately one year after its formation, BROOKDALE SENIOR LIVING, INC. acquired another senior living community operator, AMERICAN RETIREMENT CORPORATION, which had been independently operating since 1978. The acquisition of

16

AMERICAN RETIREMENT CORPORATION made BROOKDALE SENIOR LIVING, INC. the largest operator of senior living facilities in the United States.

73.     On or about July 20, 2007, BROOKDALE SENIOR LIVING, INC., through AMERICAN RETIREMENT CORPORATION, purchased SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

74.     BROOKDALE SENIOR LIVING, INC. is the parent company and long term care operator of hundreds of various senior living housing and service alternatives including retirement centers, assisted living facilities, skilled nursing facilities and continuing care retirement communities also known as CCRCs throughout the country including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

75.     BROOKDALE SENIOR LIVING, INC. owns, operates, and manages its facilities using the same officers and directors to control and operate all of its agents and subsidiaries. BROOKDALE SENIOR LIVING, INC. operates its facilities by centralizing its management and oversight of operations from a "national platform."

76.     SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is part of a larger CCRC, known as Freedom Square of Seminole ("Freedom Square"), which offers a full continuum of care. The Freedom Square campus includes independent living accommodations, an assisted living facility, and two skilled nursing facilities, one being SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Freedom Square offers both rental and what is known as "Life Care" programs. The rental program operates on a monthly rental fee basis, with no entry fee. The Life Care program is secured with an entry fee purchase to cover the cost of future accommodations and health care services.

77.     BROOKDALE SENIOR LIVING, INC. advertised that the CCRCs allow a resident to "age in place" as it offered a retirement community with opportunities for independent living, assisted living and nursing home care. In theory, a person could spend the rest of his or her life in a CCRC, moving between levels of care as needed. In reality, CCRCs require hefty buy-ins, which could include the price of one's home, potentially committing that individual to the CCRC regardless of the quality care they receive. In 2015, CCRCs were responsible for almost 20% of BROOKDALE SENIOR LIVING, INC.'s total senior living capacity.

78.     In 2014, in an effort to grow revenue, BROOKDALE SENIOR LIVING, INC. entered into an agreement with a real estate investment trust ("REIT"), HCP, to create a new business model for certain preexisting facilities. Together, the companies restructured these facilities with the intent to make a profit by releasing equity, increasing occupancy, increasing monthly service fees, and controlling operating expenses. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES was included in this restructure.

79.     The new business model, in part, involved the restructuring of currently owned facilities by creating new companies for no legitimate purpose other than to avoid liability for shoddy risk management. In effect, Defendants took a legitimately named company; broke it into pieces; saddled it with tremendous liabilities; and sucked out all the cash. This restructuring involved the ostensible separation of the real estate on which the facilities sit from the operator of the facility itself. This model, known as the "Propco-Opco" structure, required the formation of two new entities to take over the pre-existing one: the real estate company, or the so-called landlord ("Propco"), and the facility operator, or the so-called master tenant ("Opco"). At the closing, the "Opco" entity engaged an affiliate of BROOKDALE SENIOR LIVING, INC. to manage the owned and leased community pursuant to a management agreement.

80.     On or about August 29, 2014, at or about the same time that BROOKDALE SENIOR LIVING, INC. and HCP partnered to increase revenues and created the Propco/Opco entities, BROOKDALE SENIOR LIVING, INC. filed a change of ownership application with the State of Florida.

81.     After the change in ownership, a new company, Defendant CCRC OPCO - FREEDOM SQUARE, LLC, the "Opco" or operating entity, was also created. CCRC OPCO - FREEDOM SQUARE, LLC became the new licensee of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the entity saddled with liabilities.

82.     BROOKDALE SENIOR LIVING, INC. and HCP jointly own CCRC OPCO Ventures, LLC, which owns one hundred percent of CCRC OPCO-FREEDOM SQUARE, LLC.

83.     CCRC OPCO-FREEDOM SQUARE, LLC entered into a management agreement with another BROOKDALE SENIOR LIVING, INC. subsidiary, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., to own, operate, manage and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and other nursing home facilities in Florida.

84.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. assumed certain duties and obligations towards residents to manage the day-to-day operations of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. The centralized corporate functions include financing, accounting, human resources, marketing, training, regulatory, affairs, purchasing food and supplies, asset management, extensive policy and procedure manuals and extensive quality control programs.

85.     BROOKDALE SENIOR LIVING, INC.'s and HCP's quality control measures include community inspections conducted by corporate staff on a regular basis. BROOKDALE

19

SENIOR LIVING, INC. and HCP focus on increasing occupancy and increasing revenues to attempt to generate a profit to support the expansion of their brands through the acquisition of additional facilities.

86.     Upon information and belief, on or about January 31, 2020, HCP acquired BROOKDALE SENIOR LIVING, INC.'s interest in SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and transitioned management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to LIFE CARE SERVICES, LLC. However, documents reflecting the change of ownership and/or management have not been filed with and/or made available by the State of Florida.

## CORPORATE CONDUCT AND JOINT VENTURE

87.     Based upon information and belief and the allegations stated above, at all relevant times, CCRC OPCO-FREEDOM SQUARE, LLC, BROOKDALE SENIOR LIVING, INC., AMERICAN RETIREMENT CORPORATION, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., HCP, and LIFE CARE SERVICES, LLC, engaged in a joint venture to own, operate, and manage nursing homes including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Each can bind the other and each has the authority to participate in the other's profits and the obligation to share in each other's losses.

88. Money paid by and on behalf of the nursing home residents was the sole source of revenue for the multiple layers of companies created by Defendants to distribute and share the revenues generated at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the other nursing homes in Florida.

89. Defendants managed themselves, governed and controlled the care and services provided to DONALD J. JACK, and, by virtue of their management and control, each of them,

20

voluntarily and intentionally assumed responsibility for and provided supervisory and custodial services to DONALD J. JACK while he was a resident of the Facility.

90. At all relevant times, Defendants held themselves out as being competent, capable, and qualified to provide necessary services to their residents, including DONALD J. JACK, and to protect and keep all residents, including DONALD J. JACK, safe from harm, including from the spread of infectious diseases.

91. At all relevant times, Defendants owned, operated, and/or managed SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and furthermore participated in, authorized, and/or directed the conduct of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and its respective agents and employees. Defendants are therefore directly liable for their own negligence, recklessness, and other tortious conduct, in the hiring and management of their agents and employees.

92. Defendants, through their managers, directors, presidents, vice-presidents, executive officers, and other agents, directly oversaw, managed, and/or controlled all aspects of the operation and management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, including budgeting, staffing, training, policy and procedures manual(s), licensing, accounts payable, accounts receivable, general accounting, cash management, capitalization, and profit and loss margins.

93. Defendants employed all of those persons who attended to and provided care and services to DONALD J. JACK while he was a resident at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and employed those persons in management and supervisory positions who directed the operations of the Facility, all of whom were acting within the course and scope of their employment.

21

94. Defendants, through their administrators, directors, and managing agents, condoned and ratified all the conduct at the Facility.

95. At all relevant times, Defendants were the knowing agents and/or alter-egos of one another, and are therefore vicariously liable for the acts and/or omissions of each other, their agents and employees, as is more fully alleged herein. Moreover, at all relevant times, Defendants were acting within the course and scope of their employment and/or agency relationship.

96. Defendants' acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result: maximize profits at the Facility, despite the result being that the Facility was underfunded and understaffed.

97. Defendants, by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other.

98. Defendants were responsible for the organization and administration of the Facility, and had duties to, inter alia, ensure the Facility complied with applicable statutes and regulations, and adopt policies and procedures for the Facility.

99. Each Defendant knowingly disregarded their respective duties and obligations owed to DONALD J. JACK and the other residents through both acts and omissions. Those duties to reasonably operate, manage, own and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES included: the duty to ensure the facility had sufficient staff who were trained to meet DONALD J. JACK's needs and the needs of the other residents; the duty to seek out and correct deficiencies or lapses in the care provided to DONALD J. JACK and other residents; the duty to provide a safe environment for DONALD J. JACK and the other residents;

the duty to investigate the cause of preventable incidents that occurred at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES; the duty to sufficiently staff SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to ensure DONALD J. JACK's needs and the needs of the other residents were met; and the duty to not divert funds from the Facility when the funds are intended for the care and maintenance of the residents, including DONALD J. JACK.

100.    Defendants did not meet their duties and obligations. Although investigations and surveys by various agencies found deficiencies in the provision of care provided to the residents of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, each Defendant failed or refused to correct or address these issues addressed in the investigations and surveys.

101.    Defendants required or encouraged the admission of residents with higher acuity levels without providing the staff necessary to care for the residents. The staff was lacking in supervision, number, and skill.

102.    Further, in their efforts to maximize profits, Defendants intentionally and/or recklessly mismanaged staffing levels and supply levels below the levels necessary to provide adequate care and services to the residents and implemented practices in disregard to the safety of the patients.

103.    Defendants each have extensive experience in the nursing home industry. This experience provided each Defendant the knowledge and experience to know that additional staff and more skilled staff were necessary to meet the needs of residents. Even with this knowledge, Defendants failed or refused to ensure that the residents received adequate and appropriate care while in their nursing home.

104. Defendants, pursuant to their scheme to place "profits over residents" at the Facility, ratified the conduct of each Defendant in that they mandated, were aware of, and/or accepted inadequate staffing, inadequate training, inadequate supplies and inadequate practices at the Facility, and were aware that such inadequate staffing, inadequate training, inadequate supplies, and inadequate practices could lead to injuries and damages for the residents.

105. In conceiving of, implementing and carrying out their profits over residents scheme, Defendants willfully, knowingly, recklessly and with conscious disregard for DONALD J. JACK's health, safety and welfare, acted in a manner that was malicious, reckless and oppressive.

106. Further, Defendants implemented and carried out the profits over residents scheme with knowledge that such a scheme was designed to exploit elderly/senior citizens, a class expressly deemed by the Legislature of the State of Florida as a vulnerable segment of the population who require a heightened level of protection.

107. As a result of Defendants' scheme and acts and omissions, DONALD J. JACK was victimized by Defendants and suffered damages as alleged herein.

## COUNT I: BREACH OF FIDUCIARY DUTY
### As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA

108. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

109. This is a claim that presents a theory of recovery based upon the presence of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

110. This is a claim that does not arise out of negligence or a violation of DONALD J. JACK's nursing home resident rights.

24

111.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed DONALD J. JACK a duty to act for or to advise him on matters within the scope of their specialized relationship.

112.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA and DONALD J. JACK had a developed a special relationship of trust and confidence.

113.    That trust and confidence started when DONALD J. JACK was admitted to the Facility because he was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. Specifically, DONALD J. JACK needed assistance with multiple Activities of Daily Living ("ADLs") and twenty-four hour skilled nursing care.

114.    As a result of his varying infirmities and advanced age, at all times material, DONALD J. JACK was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being; and DONALD J. JACK was incapable of dealing with Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on equal terms, and was incapable of engaging in any arm's length relationships with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

115.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA directly solicited DONALD J. JACK's confidence and trust in attempts to convince him to reside and remain at the Facility, and further represented through the words and acts of its employees and agents that it would undertake to provide all of the necessary care and treatment to attain and maintain the highest practicable physical, mental, and psychosocial well-being for DONALD J. JACK.

25

116. Additionally, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA specifically undertook the non-delegable duty of protecting DONALD J. JACK's residents' rights vested in him by virtue of Florida law, including the right to be treated courteously, fairly, and with the fullest measure of dignity and the right to privacy. *See NME Properties, Inc. v. Rudich*, 840 So. 2d 309 (Fla. 4th DCA 2003).

117. As a result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's solicitation of DONALD J. JACK's trust and confidence, DONALD J. JACK placed a special confidence and trust in CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. And DONALD J. JACK relied on CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide such care and services.

118. DONALD J. JACK further placed special confidence and trust in Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to protect and provide for his individual rights as established in section 400.022, Florida Statutes, and to further act as a trustee for all of his personal property that he possessed on the premises of the Facility as well as his personal funds and income, which on information and belief, he placed in an account maintained by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on his behalf and for his benefit.

119. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA undertook to act as trustees to protect and preserve DONALD J. JACK's personal property, including his clothing and other valuable personal property, as well as to maintain and manage his personal funds and income in a trust account for DONALD J. JACK's benefit. Correspondingly

CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed non-delegable duties to provide DONALD J. JACK quarterly accounting of any and all transactions made utilizing funds from his trust account, to maintain and safeguard the funds therein and to only utilize said funds for authorized transactions, and to avoid commingling of his funds with the funds of any other person or those of CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

120.    Furthermore, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knowingly and voluntary entered into a highly confidential relationship with DONALD J. JACK. CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed extensive legal duties to comply with all of the confidentiality requirements enumerated in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regarding DONALD J. JACK, a confidentiality similar in scope and duration to that attendant to attorney-client and doctor-patient relationships.

121.    Moreover, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA assumed duties to protect and preserve DONALD J. JACK's Federal and State privacy rights, including those privacy rights enshrined in Article I, Section 23 of the Florida Constitution.

122.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA accepted the special confidence and trust placed upon them by DONALD J. JACK by admitting him into the Facility and by, among other things: explicitly assuming, through words and actions, the various duties described in the preceding paragraphs regarding protecting his confidentiality, protecting his privacy, protecting his individual liberties, and managing and safeguarding his personal finances; assuming responsibility and control over every aspect of DONALD J. JACK's

day-to-day life; and voluntarily undertaking responsibility for the specific level of care, protection, supplies and services that would be provided to DONALD J. JACK.

123.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA individually and collectively controlled, oversaw and orchestrated every single aspect of DONALD J. JACK's existence, from the mundane (such as the clothing worn) to the vital (such as determining when and how healthcare would be provided, as well as how much food and water DONALD J. JACK could consume).

124.    DONALD J. JACK was solely and particularly dependent upon the employees, officers, directors, and agents of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for his daily care, protection, services, supplies and personal and intimate needs.

125.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA developed a special relationship with DONALD J. JACK by virtue of: the nature of the care and services provided; the trustee-beneficiary relationship they maintained toward him regarding his personal property and finances; the Federal and State confidentiality and privacy laws CCRC OPCO - FREEDOM SQUARE, LLC undertook to comply with DONALD J. JACK; the superior knowledge, skill and abilities of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA; the enormous disparity of power and unequal bargaining Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA enjoyed DONALD J. JACK; and his inability to care for and provide for himself.

126.    This special confidential relationship allowed Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, to occupy a position of confidence toward DONALD J. JACK, which required fidelity, loyalty, good faith, and fair dealing by CCRC OPCO

28

- FREEDOM SQUARE, LLC and CYNTHIA AYALA. Additionally, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA had a duty to refrain from engaging in self-dealing.

127. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA were each a fiduciary of DONALD J. JACK based on the special relationship between the parties.

128. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed fiduciary duties to DONALD J. JACK. *See Greenfield v. Manor Care, Inc.*, 705 So. 2d 926 (Fla. 4th DCA 1997).

129. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted and failed to act in material breach of their fiduciary duties owed to DONALD J. JACK. Instead Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted in ways to promote their own interests and in contravention of the interests of DONALD J. JACK.

130. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA breached and violated its relationship of trust, special confidence, and its fiduciary obligations and duties owed to DONALD J. JACK by:

    a)  Failing to take adequate action to address COVID-19 concerns at the Facility as Defendants represented they would through their various websites as alleged in paragraphs 41 and 45;

    b)  Failing to take adequate action to minimize the risk and spread of COVID-19 and implement adequate care, services, and infection control at the Facility as alleged in paragraphs 46, 50 and 51; and

    c)  Knowingly and recklessly engaging in the profits over residents scheme described herein in an effort to increase the profitability of the Facility, for the

benefit of Defendants and their joint venture, and at the expense of and to the direct detriment of DONALD J. JACK.

131. In violating their fiduciary obligations and duties to DONALD J. JACK, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knew that DONALD J. JACK would suffer harm, including but not limited to the daily injuries resulting from the daily invasion of rights vested in DONALD J. JACK, as well as economic harm.

132. Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK were the legal cause of the loss, injury and damages suffered by DONALD J. JACK. As the direct and proximate result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK, DONALD J. JACK contracted COVID-19 and subsequently died from this infection.

WHEREFORE, Plaintiff demands judgment against Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

### COUNT II: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

133. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 132.

134. This is a claim that presents a theory of recovery based upon the presence and breach of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, aided and abetted by Defendants, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

30

135. As set forth in Count I above, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed and breached fiduciary duties owed to DONALD J. JACK.

136. Defendants are related entities within a single enterprise or joint venture.

137. Defendants had actual knowledge of DONALD J. JACK's fiduciary relationship with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA by virtue of its close corporate relationship to CCRC OPCO - FREEDOM SQUARE, LLC.

138. By reason of their shared and/or common ownership, directors, officers and managers and/or contractual relationships, Defendants knew of the fiduciary duties CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed to DONALD J. JACK and knew of CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of those duties as described in Count I.

139. Defendants knew that the residents at the Facility, including DONALD J. JACK, were incapable of independently providing their own necessary care and were solely and specifically dependent upon the employees, officers, directors, and agents to provide for their basic daily care, protection, services, supplies, and personal and intimate needs.

140. Defendants knowingly participated and provided substantial assistance and encouragement to CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in connection with their breach of fiduciary duties to DONALD J. JACK, as set forth in detail within Count I above.

141. In addition to this knowledge, Defendants aided and abetted Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in their breach of fiduciary duties and rendered substantial assistance and encouragement for the same, by, among other things:

a) Engaging in the conduct set forth in detail within Count I above;

31

b) Exercising dominance and control over CCRC OPCO - FREEDOM SQUARE, LLC's revenues by regularly and repeatedly sweeping virtually all of the Facility's revenues into an account controlled by the joint venture or enterprise, and/or their designee;

c) Knowingly and intentionally taking, creating and accepting inter-company fees and transfers, comprised of revenues obtained from the residents and designed to improperly and unjustly enrich Defendants instead of allowing the Facility to utilize said resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including DONALD J. JACK, as required;

d) Structuring and approving contracts between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC, which Defendants knew or should have known would result in the diversion of Facility revenues necessary to provide the care and services to its residents, DONALD J. JACK;

e) Overseeing and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's acceptance of monies from residents, including DONALD J. JACK, knowing the Facility could not provide full value of the care and services to meet the care and safety needs of the residents;

f) Directly or indirectly misrepresenting the nature of the relationship between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, in which Defendants by virtue of the common owners, officers and managers, controlled the business operations and working

32

capital of the Facility and inappropriately commingled its revenues by making intra-company transfers to related facilities;

g) Structuring the managing and operating business model for the Facility in a way that constrained its ability to provide the level of care and services to residents, including DONALD J. JACK, while simultaneously benefitting Defendants and other upstream corporate entities; and,

h) Influencing, advocating, and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's improper payments to Defendants, which Defendants knew exceeded amounts a prudent and cost conscious buyer would pay, and which Defendants also knew would cause the monies intended for the provision of care and services to the residents, including DONALD J. JACK, to be depleted.

142. The conduct of Defendants as alleged, constitutes aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of fiduciary duties and subjects Defendants to liability for the harm suffered by DONALD J. JACK.

143. In aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in violating fiduciary obligations and duties to DONALD J. JACK as referenced herein, Defendants knew that DONALD J. JACK would suffer harm and injuries, including the daily injuries flowing from the repeated breaches of fiduciary duties in which Defendants aided and abetted.

144. As a result of Defendants' aiding and abetting in the breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, Defendants were improperly and unjustly enriched, the Facility was left without the necessary resources to function

in the residents' best interests, and DONALD J. JACK suffered both the injuries set forth herein as well as economic harm.

145.     Furthermore, as the direct and proximate result of Defendants' aiding and abetting breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, DONALD J. JACK contracted COVID-19 and subsequently died.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

### COUNT III: VIOLATIONS OF FLORIDA STATUTES §415.1111
### As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC

146.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 3, 9, 10, 12, 15, 16, 19, 20, 23, 24, 26, 28, and 31 above.

147.     For the purposes of this count and only this count, it is not alleged that Defendants are a licensee or entity that established, controlled, conducted, managed or operated the Facility.

148.     DONALD J. JACK was at all relevant times a vulnerable adult with a long-term disability. He was seventy-five (75) years of age and was unable to perform the normal activities of daily living or to provide for his own care or protection due to his disability.

149.     Defendants' acts or omissions constitute exploitation of a vulnerable adult in violation of Section 415.1111, Florida Statutes.

150.     Defendants knew or should have known that DONALD J. JACK lacked the capacity to consent, but Defendants obtained or used, or endeavored to obtain or use DONALD J.

34

JACK's funds, assets or property, including Medicare and Medicaid benefits, with the intent to temporarily or permanently deprive DONALD J. JACK of the use, benefit or possession of the funds, assets, or property for the benefit of someone other than DONALD J. JACK.

151.     The compensation Defendants received was derived from the private funds of vulnerable adults, including DONALD J. JACK, or from Medicaid and/or Medicare funds that were beneficiaries' assets, including DONALD J. JACK, which were paid to Defendants for the sole purpose of providing for the support and maintenance of the Facility's residents, including DONALD J. JACK.

152.     Defendants received compensation that they should have known would deprive the Facility of adequate resources to provide for the necessities of DONALD J. JACK's support and maintenance, which should have been used to, inter alia, implement a sufficient infection control program at the Facility and to secure sufficient PPE and supplies to prevent the spread of COVID-19 at the Facility.

153.     Defendants failed or refused to effectively use DONALD J. JACK's income or assets for the necessities required for his support and maintenance.

154.     Defendants' failure or refusal to effectively use DONALD J. JACK's income or assets as set forth herein, was the proximate cause of the losses he suffered including, but not limited to the use, benefit, or possession of the funds, assets or property for his benefit.

155.     As a direct and proximate result of Defendants' acts and omissions, DONALD J. JACK was deprived of the use, benefit or possession of the funds, assets or property.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for

35

disgorgement of profits, consequential damages, attorneys' fees and costs, pre-judgment interest,

trial by jury of all matters so triable, and such other relief this Court deems appropriate.

## COUNT IV: VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, § 501.201 *ET SEQ.*
### As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC; HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC

156.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

157.    Plaintiff brings this Count pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201 *et seq.*, Florida Statutes (hereinafter "FDUTPA").

158.    Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Fla. Stat. § 501.204 (1).

159.    By engaging in the above described conduct and the additional conduct described below, Defendants engaged in unconscionable, unfair and deceptive acts and practices in violation of FDUTPA in connection with their advertising, soliciting, providing, and offering services at the Facility, which acts and practices ultimately victimized DONALD J. JACK, a senior citizen.

160.    At all relevant times, Defendants, their officers, directors, and managers were engaged in trade and commerce in Florida within the meaning of FDUTPA as Defendants advertised, solicited, provided, and offered services to consumers and senior citizens.

161.    At all relevant times, DONALD J. JACK was a "consumer" and "senior citizen" within the meaning FDUTPA as he was an individual over the age of sixty (60).

162.    Defendants, their officers, directors, and managers marketed and advertised service at the Facility directly to senior citizen consumers, including DONALD J. JACK, by disseminating

36

brochures, web sites, videos, advertisements, and other information, which were prepared in part, by the Facility's related corporate entities.

163.    Defendants, their officers, directors, and managers made unfair, deceptive and misleading representations in their advertising materials distributed to senior citizen consumers, including DONALD J. JACK, regarding the level of services they provided to vulnerable senior citizens and nursing home residents.

164.    Defendants, their officers, directors, and managers advertised and offered their nursing facilities by promising to meet residents' needs, to keep them clean, comfortable and safe, and to provide food, water, care, and services as needed. These statements were false, deceptive, and misleading.

165.    Defendants advertising materials omitted information that was material to consumers, including DONALD J. JACK, by failing to disclose that DONALD J. JACK would experience long delays in the delivery of care and services and that he would often be deprived of the care and services he required and bargained for.

166.    Defendants, their officers, directors, and managers engaged in deceptive, misleading, and unfair practices by representing that certain care and services were or would be provided to DONALD J. JACK, as documented in his care plans and assessments, when in fact that care and services were never provided.

167.    Defendants, their officers, directors and managers further promised to provide a clean, safe, and sanitary living environment throughout DONALD J. JACK's residency at their facilities, for which Defendants were handsomely paid.

168.    Defendants affirmatively concealed material facts from DONALD J. JACK regarding the existence and effect of the COVID-19 outbreak at the Facility, and led DONALD J.

JACK to believe that the Facility was a safe environment, when in fact the Facility was contaminated with COVID-19.

169.    Defendants, their officers, directors and managers failed to appropriately manage the real property at the Facility and failed to maintain a clean, safe, and habitable living environment for their residents.

170.    Defendants, their officers, directors and managers, through their deceptive, unconscionable, and unfair acts and omissions, misled DONALD J. JACK into believing that their facilities were properly managed, maintained, and equipped to meet his basic needs, when it was not.

171.    Defendants, their officers, directors and managers failed to provide DONALD J. JACK with a living environment and premises that reciprocated the rents and other charges they were paid for his residency.

172.    Defendants, their officers, directors and managers caused the Facility to enter into a lease agreement so onerous that it left Defendants without the ability to provide an adequate, safe, decent, and clean living environment, despite promising DONALD J. JACK that he would receive the same in exchange for the monies he paid.

173.    Defendants' failure to provide basic care and services to DONALD J. JACK not only violated the FDUTPA, but also degraded DONALD J. JACK, increased his risk of serious negative health consequences, and caused him to suffer medical expenses, serious injury, and death.

174.    In addition to these deceptive, unconscionable, and unfair acts and omissions, Defendants misled consumers, including DONALD J. JACK, by failing to disclose that the Facility's related corporate entities exercised control over the Facility, by among other things: (a)

restricting the ability of the Facility's managers and administrators to increase staffing levels; (b) supervising, and in some case, overriding the personnel decisions of the Facility; (c) creating and implementing company-wide policies and incentive programs; and (d) entering into agreements, including onerous lease and management agreements.

175.     Defendants, their officers, directors and managers failed to provide DONALD J. JACK with the basic care and services he required and bargained for with respect to his use of the Facility's premises.

176.     Defendants' deceptive, unconscionable, and unfair statements and practices were in violation of FDUTPA.

177.     Defendants' deceptive, unconscionable, and unfair representations, omissions, and practices were of the type that would likely mislead Florida consumers acting reasonably in the circumstances, to the consumers' detriment, and were particularly misleading and detrimental to the senior citizens and infirm residents at their Facility, including DONALD J. JACK.

178.     DONALD J. JACK could not have detected the existence and effect of the COVID-19 at the Facility or the existence of the onerous agreements, the corporate entities control over the Facility that led to the lack of care, services, and sanitary living environment at the Facility.

179.     DONALD J. JACK admitted himself to the Facility and had therefore been aggrieved by Defendants unconscionable, unfair and deceptive practices in violation of FDUTPA.

180.     DONALD J. JACK sustained damages as a direct and proximate result of Defendants' violations of FDUTPA.

181.     DONALD J. JACK did not receive the benefit of the bargain, overpaid for the services, and suffered actual damages.

39

182.     The damages suffered by DONALD J. JACK were directly and proximately caused by the unconscionable, deceptive, misleading, and unfair practices of Defendants.

183.     Defendants' violations were willful as Defendants knew or should have known that their conduct was unfair or deceptive or prohibited by FDUTPA.

184.     Defendants' violations are made even more reprehensible because of Defendants' attempt to exploit senior citizens during a global pandemic for profit, while posing a serious and direct threat to the health and safety of senior citizens such as DONALD J. JACK.

WHEREFORE, Plaintiff demands judgment against Defendants for damages pursuant to section 501.211(2), Florida Statutes, in an amount to be proven at trial, pre-judgment interest, post-judgment interest, attorney's fees and court costs as provided in section 501.2105, Florida Statutes, and further demands a trial by jury, together with such other and further relief as this Court deems appropriate.

/s/ Bennie Lazzara, Jr.
**Bennie Lazzara, Jr., Esquire**
Florida Bar No. 119568
Bennie@wilkesmchugh.com
TPABXLStaff@wilkesmchugh.com
fl@wilkesmchugh.com
**James L. Wilkes, II, Esquire**
Florida Bar No. 405337
jimw@wilkesmchugh.com
dthomason@wilkesmchugh.com
**Jason R. Delgado, Esquire**
Florida Bar No. 591122
jdelgado@wilkesmchugh.com
TPAJRDstaff@wilkesmchugh.com
WILKES & MCHUGH, PA
1 N. Dale Mabry Highway, Suite 700
Tampa, FL 33609
Telephone: (813) 873-0026
Facsimile: (813) 286-8820
*Attorneys for the Plaintiff*

# EXHIBIT "A"

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
PROBATE DIVISION

IN RE: ESTATE OF                  Case No. 20-004321-ES
DONALD JOHN JACK
      Deceased.

_____/

### LETTERS OF ADMINISTRATION

TO ALL WHOM IT MAY CONCERN

      WHEREAS, Donald John Jack, a resident of 12542 82nd Terrace N., Seminole, FL 33776, died

on April 21, 2020, owning assets in the State of Florida, and

      WHEREAS, Jessica Gunter has been appointed personal representative of the estate of the

decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

      NOW, THEREFORE, I, the undersigned circuit judge, declare Jessica Gunter duly qualified

under the laws of the State of Florida to act as personal representative of the estate of Donald John Jack,

deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and

receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will

permit and the law directs; and to make distribution of the estate according to law.

      ORDERED in chambers, Pinellas County, Florida.

                               05/15/2020 11:03:20 AM

                               Pamela A. M. Campbell
                               Circuit Judge

 CT Corporation

TO: Edgar Martinez
HEALTHPEAK, INC.
1920 MAIN ST STE 1200
IRVINE, CA 92614-7230

RE: **Process Served in Florida**

FOR: HCP, Inc. of Maryland (Assumed Name) (Domestic State: MD)
Healthpeak Properties, Inc. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | The Estate of Donald J. Jack, etc., Pltf. vs. Ccrc Opco - Freedom Square, LLC., etc., et al., Dfts. // To: Healthpeak Properties, Inc. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # 20002755CI |
| **NATURE OF ACTION:** | Personal Injury - Failure to Maintain Premises in a Safe Condition |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/22/2020 at 15:15 |
| **JURISDICTION SERVED :** | Florida |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/22/2020, Expected Purge Date: 07/22/2020 |
| | Image SOP |
| | Email Notification, JENNIFER ARCE jlarce@healthpeak.com |
| | Email Notification, DIANNE MURAKAMI dmurakami@healthpeak.com |
| | Email Notification, SCOTT GRAZIANO sgraziano@healthpeak.com |
| | Email Notification, FRANK RUSSO frusso@healthpeak.com |
| | Email Notification, Edgar Martinez emartinez@healthpeak.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>208 S La Salle St Ste 814<br>Chicago, IL 60604-1101 |
| **For Questions:** | 866-203-1500<br>DealTeam@wolterskluwer.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



# PROCESS SERVER DELIVERY DETAILS

**Date:**            Mon, Jun 22, 2020

**Server Name:**     Jacqueline Garcia

**Location:**        Sunrise, FL


Entity Served        HCP INC. OF MARYLAND

Agent Name           CORPORATION SERVICE COMPANY

Case Number          20002755CI

Jurisdiction         FL



IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and through
JESSICA GUNTER, Personal Representative,

        Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.; BROOKDALE
SENIOR LIVING, INC.; BKD TWENTY-ONE
MANAGEMENT COMPANY, INC.; AMERICAN
RETIREMENT CORPORATION; LIFE CARE
SERVICES, LLC; and, CYNTHIA AYALA (as to
SEMINOLE PAVILION REHABILITATION AND
NURSING SERVICES),

CASE NO:  20-002755-CI

*JA. #1449*
*6/22/20*
*12:45PM*

        Defendants.

_____

### SUMMONS

THE STATE OF FLORIDA

TO ALL AND SINGULAR SHERIFFS OF SAID STATE:

GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Complaint and Designation of Email
Addresses in the above styled cause upon the defendant(s):

**HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC.**
**c/o CT CORPORATION SYSTEM**
**1200 SOUTH PINE ISLAND ROAD**
**PLANTATION, FL 33324**

Each defendant is hereby required to serve written defenses to said Complaint on plaintiff's attorney, whose name and address is:

**BENNIE LAZZARA JR., ESQUIRE**
**WILKES & McHUGH, P.A.**
**TAMPA COMMONS, SUITE 800**
**ONE NORTH DALE MABRY HIGHWAY**
**TAMPA, FL 33609**
**(813) 873-0026**

within twenty (20) days after service of this summons upon that defendant, exclusive of the day of service, and to file the original
of said written defenses with the clerk of said court either before service on plaintiff's attorney or immediately thereafter. If a
defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

      WITNESS my hand and the seal of said Court on the ____ day of JUN 09 2020_____, 2020.

KEN BURKE CLERK CIRCUIT COURT
315 Court Street
Clearwater, Pinellas County, FL 33756-5165

KEN BURKE, CPA
Clerk of the Circuit Court

BY: Judith Moslow
DEPUTY CLERK



IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and
through     JESSICA     GUNTER,     Personal
Representative,

        Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a          CASE NO.: 20 - 002755 - CI
HEALTHPEAK        PROPERTIES,        INC.;
BROOKDALE SENIOR LIVING, INC.; BKD
TWENTY-ONE MANAGEMENT COMPANY,
INC.;     AMERICAN     RETIREMENT
CORPORATION; LIFE CARE SERVICES, LLC;
and, CYNTHIA AYALA (as to SEMINOLE
PAVILION REHABILITATION AND NURSING
SERVICES),

        Defendants.

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

THE ESTATE OF DONALD J. JACK, by and through JESSICA GUNTER, Personal

Representative, and by and through undersigned counsel, hereby sues Defendants, CCRC OPCO

- FREEDOM SQUARE, LLC; HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a

HEALTHPEAK PROPERTIES, INC.; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-

ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION;

LIFE CARE SERVICES, LLC; and, CYNTHIA AYALA (herein after, the "Defendants"). All of

the allegations contained in this Complaint are based on either known facts or information and

belief. Plaintiff alleges as follows:

## INTRODUCTION

This case concerns the injuries, damages, and untimely death of DONALD J. JACK as a result of Defendants' actions and omissions during his residency at Defendants' skilled nursing facility known as Seminole Pavilion Rehabilitation and Nursing Services (the "Facility"). What was supposed to be merely a short-term rehabilitation admission turned out to be a death sentence for DONALD J. JACK due to Defendants' business practice of placing profits over residents. For years, even before DONALD J. JACK's residency, Defendants chose to place profits over residents and ignore deficiencies in their emergency preparedness plan and in their infection prevention and control program. When Defendants' deficiencies became more pronounced in light of the COVID-19 pandemic, Defendants continued to choose to place profits over residents by refusing to be forthcoming with the authorities, staff, residents, and residents' relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility. Instead, for almost a week after the first COVID-19 death at the Facility, Defendants withheld information regarding the COVID-19 positive death at the Facility and withheld supplies necessary to protect residents and staff. During the time Defendants kept everyone in the dark and withheld necessary supplies, DONALD J. JACK contracted COVID-19. Only after the Facility had become known as the epicenter in Pinellas County for COVID-19 and intervention from the Florida Department of Health, did Defendants transfer all ninety-five (95) residents, including DONALD J. JACK, to local hospitals to get the necessary care and to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff. Unfortunately, by this time DONALD J. JACK had tested positive for COVID-19 and only five days thereafter DONALD J. JACK was dead as a result.

## JURISDICTION, PARTIES AND VENUE ALLEGATIONS

1.     This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00).

2. On or about April 2, 2020, DONALD J. JACK was admitted to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, located at 10800 Temple Terrace, Seminole, Florida 33772 in Pinellas County, where he remained until approximately April 17, 2020.

3. Plaintiff, JESSICA GUNTER, is the Personal Representative of THE ESTATE OF DONALD J. JACK. Letters of Administration, dated May 15, 2020, evidencing JESSICA GUNTER's authority to bring this action on behalf of THE ESTATE OF DONALD J. JACK are attached hereto as Exhibit "A."

4. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is a fictitious name owned by Defendant CCRC OPCO - FREEDOM SQUARE, LLC.

5. CCRC OPCO - FREEDOM SQUARE, LLC is the licensee that operated the Facility during DONALD J. JACK's residency.

6. CCRC OPCO - FREEDOM SQUARE, LLC, is an active Delaware limited liability company, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

7. CCRC OPCO - FREEDOM SQUARE, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing home facilities, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC

OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the courts of the State of Florida.

8.    CCRC OPCO - FREEDOM SQUARE, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the Courts of the State of Florida.

9.    HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC. (hereinafter referred to as "HCP") is the owner of property located at 10800 Temple Terrace, Seminole, Florida 33772, which is the property upon which the SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is situated.

10.    HCP is a Maryland corporation, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

11.    HCP had the authority to and did exercise control over the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

12.    HCP required rents or other compensation from funds it knew were necessary for DONALD J. JACK's support and maintenance. HCP knew that such conduct would deprive the Facility of adequate resources to provide for the wellbeing of the Facility's residents, including DONALD J. JACK.

13.    HCP shared control over the operation of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES through its authority to control the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

4

14.     HCP conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

15.     HCP committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

16.     BROOKDALE SENIOR LIVING, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

17.     BROOKDALE SENIOR LIVING, INC. is the parent company and operator of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

18.     BROOKDALE SENIOR LIVING, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

5

19. BROOKDALE SENIOR LIVING, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

20. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

21. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

22. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

23. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

24.     AMERICAN RETIREMENT CORPORATION is a Tennessee corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

25.     AMERICAN RETIREMENT CORPORATION conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

26.     AMERICAN RETIREMENT CORPORATION committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

27.     AMERICAN RETIREMENT CORPORATION is an entity that operated, managed, controlled and oversaw SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

28.     LIFE CARE SERVICES, LLC is an active Iowa limited liability company, with its principal place of business at 400 Locust Street, Suite 820, Des Moines, Iowa 50309, which is registered to do business in Florida and is doing business in Florida.

29.     LIFE CARE SERVICES, LLC served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

30.     LIFE CARE SERVICES, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

31.     LIFE CARE SERVICES, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

32.     CYNTHIA AYALA was at all material times hereto a resident of the State of Florida and the Administrator at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

33.     CYNTHIA AYALA conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed herself of the privileges of the State of Florida, through her management of, operation of, control of, and/or consultation with SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

34.     CYNTHIA AYALA committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly,

pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

## FACTUAL ALLEGATIONS

35.     In December 2019, the government in Wuhan, China, confirmed that health authorities were treating clusters of cases of suspected pneumonia that appeared to be viral in origin.

36.     On or about January 30, 2020, the World Health Organization declared a Public Health Emergency of International Concern after the outbreak of the 2019 coronavirus disease.

37.     On February 11, 2020, the World Health Organization announced an official name for the new disease – coronavirus disease 2019, abbreviated as COVID-19.

38.     COVID-19 is an infectious virus that attacks the respiratory system of its human host. The elderly, medically fragile, and those with compromised immune systems are particularly susceptible to fatality due to COVID-19.

39.     On or about February 29, 2020, the Centers for Disease Control and Prevention ("CDC") released a statement regarding the first confirmed death in the United States from the coronavirus. In addition to the first confirmed death, the CDC reported that the public health officials in the state of Washington had also reported two additional hospitalized patients – two of which were from a long-term care facility where one was a health care worker – who had tested presumptive-positive for the virus that causes COVID-19. In addition, the CDC reported that additional residents and staff of the long-term care facility had not yet been tested but were either ill with respiratory symptoms or hospitalized with pneumonia of unknown cause.

40.     On or about March 1, 2020, in response to positive cases of COVID-19 in Florida, Governor Ron DeSantis issued Executive Order 20-51, directing the Florida Department of Health to declare a Public Health Emergency.

41. On or about March 4, 2020, Defendants, via various websites, represented to the staff, residents, and relatives that Defendants were taking action to address COVID-19 concerns such as:

   a) Providing consistent updates and communication to those who live and work in the community.

   b) Following evidence-based precautions that align with guidelines provided by the CDC.

   c) Reviewing response measures to ensure the community is organized and ready if the virus impacts the community or the surrounding area.

42. On or about March 9, 2020, the Governor of Florida declared a state of emergency existed in Florida.

43. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.

44. On or about March 13, 2020, the Governor of Florida ordered all Florida nursing home facilities to lock down and implemented a visitation ban in an effort to mitigate the risk to Florida's most vulnerable population to COVID-19, which is Florida's elderly population (i.e. over the age of sixty-five (65)) and particularly those who have underlying medical conditions such as cancer, chronic lung disease, moderate-to-severe asthma, serious heart conditions, immunocompromised status, diabetes, severe obesity, renal failure and liver disease.

45. On or about March 15, 2020, Defendants, via their shared website, represented to the staff, residents, and relatives that Defendants were continuing to take action to address COVID-19 concerns such as:

   a) Continuing to follow the guidance from both the CDC and local health authorities.

b) Increasing the frequency and rigor of cleaning and sanitizing common community areas.

c) Reviewing emergency preparedness and response program.

d) Coordinating best practices and across their large partner network.

e) Providing all residents and their families with the most up-to-date guidance from the CDC.

f) Staying in communication with local health officials.

46. Despite Defendants' representations to the staff, residents, and relatives, Defendants failed to adequately take action to address COVID-19 concerns and failed to comply with their own procedures by, among other things:

a) Failing to supply or require staff to wear Personal Protective Equipment ("PPE");

b) Allowing asymptomatic staff who had been exposed to COVID-19 to continue working at the Facility;

c) Failing to provide staff, residents, and their families with consistent updates and communication regarding the risk of COVID-19 and of COVID-19 positive cases at the Facility; and,

d) Failing to implement an adequate emergency preparedness and response program.

47. On or about April 2, 2020, at the age of seventy-five (75), DONALD J. JACK admitted himself to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES (the "Facility") for short-term rehabilitation for generalized weakness as he merely needed to gain strength to receive chemotherapy for his recent diagnosis of Hodgkin's Lymphoma.

48. Upon admission, Defendants documented that DONALD J. JACK had various diagnoses including, but not limited to, Hodgkin's Lymphoma, Type II diabetes, and abnormality of albumin.

49. Due to his age and underlying medical conditions, Defendants knew DONALD J. JACK was one of the residents most vulnerable to COVID-19.

50. Although Defendants were on high-alert for COVID-19 since January 2020 and of the residents' vulnerability, Defendants, consistent with their business practice of placing profits over residents, disregarded the safety of DONALD J. JACK and the other residents by failing to implement adequate protocols to minimize the risk and spread of COVID-19 and by failing to implement adequate care, services and infection control at the Facility.

51. Defendants' acts and omissions included, but were not limited to:

    a.    Failing to properly use residents' funds;

    b.    Failing to have an adequate emergency preparedness plan in place to keep residents safe from emerging infectious diseases like COVID-19;

    c.    Failing to implement adequate protocols to minimize the risk and spread of COVID-19;

    d.    Failing to implement an adequate system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents and staff;

    e.    Failing to immediately notify the authorities, staff, residents, and relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility;

    f.    Forcing staff to reuse PPE;

g.   Failing to supply proper masks and gowns for weeks causing many staff members to resort to providing their own homemade facial coverings not medically graded to protect against the virus;

h.   Failing to follow and/or adhere to the standards and protocols set out by the CDC and other state and local authorities related to infection control and prevention;

i.   Failing to communicate the outbreak to the authorities and avail themselves of the available PPE;

j.   Failing to implement safety protocols, such as disinfecting many common areas, to minimize the spread of the virus;

k.   Failing to provide adequate staff in number and training;

l.   Failing to be forthcoming and adequately share information regarding the outbreak at the Facility with employees, residents and their relatives.

m.   Reducing basic cleaning practices for which the residents paid for;

n.   Permitting widespread safety failures, such as inadequate staff and equipment, increasing the risk of injury or death during an emergency such as the pandemic;

o.   Failing to have adequate management oversight; and,

p.   Permitting asymptomatic staff who had been exposed to COVID-19 to continue to work at the Facility and interact with residents.

52.   As a result of Defendants' acts and omissions and total disregard for the residents, the Facility experienced systemic failure and became the center of the COVID-19 outbreak in Pinellas County.

53. To date, at least 25 deaths of residents and staff resulting from COVID-19 are linked to this single Facility.

54. The Facility's first confirmed case of a resident with COVID-19 was a male resident that was hospitalized on April 5, 2020, and tested positive on April 9, 2020, for COVID-19. The resident then died on April 10, 2020.

55. Although the Facility had its first confirmed case of COVID-19 on April 9, 2020 – approximately seven days after DONALD J. JACK was admitted to the Facility – and first confirmed death on April 10, 2020, Defendants failed to be forthcoming in sharing this information with employees, residents, their relatives, and the public.

56. Rather, despite having difficulty managing the rapid outbreak, Defendants waited approximately a week to disclose to the public the first confirmed COVID-19 case. Defendants' delay in reporting delayed assistance with the much need PPE available through the county.

57. Defendants' staff were kept in the dark by Defendants and did not know about the gravity of the outbreak until the media reported the transfer of residents on or about April 15, 2020.

58. Likewise, family members and advocates have sounded alarms about the delays in residents and the public being informed about the outbreak as families are learning more about the outbreak from the media than from Defendants who are keeping everyone in the dark.

59. Despite the gravity of the outbreak, Defendants failed for weeks to provide adequate gowns and masks for staff.

60. Defendants' staff feared for their safety because protocols were not in place to minimize virus spread such as providing proper PPE and disinfecting common areas. As a result, staff began quitting and resident care deteriorated even further as staff quit and supplies shrank.

61.     On or about April 16, 2020, the Facility received laboratory results confirming DONALD J. JACK was positive for COVID-19.

62.     By April 16, 2020, approximately 30 residents and staff members at the community had tested positive for COVID-19 and by April 17, 2020, two additional residents had died.

63.     Defendants were reluctant to transfer residents to hospitals, but began to transfer mass amounts of residents on or about April 16, 2020, when they became overwhelmed by the outbreak.

64.     On or about April 17, 2020, after intervention from the Florida Department of Health and after nearly 60 residents were transferred to area hospitals who had either tested positive (or were presumed positive) for COVID-19, Defendants transferred all remaining residents at the Facility, including DONALD J. JACK, to local hospitals to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff.

65.     In a span of eight days, from the first confirmed diagnoses to the mass evacuation on April 17, 2020, a total of 95 residents were removed from the Facility and three had died.

66.     On April 21, 2020, only five days after being diagnosed, DONALD J. JACK passed away as a result of COVID-19, which he contracted at the Facility due to Defendants' acts and omissions.

67.     Based upon the acts and omissions described above, as well as numerous reports from Defendants' own staff, Defendants, who were focused on their own self-interests and putting profits over the well-being of the Facility's residents in reckless disregard for the residents' safety and well-being, were ill-prepared to protect the residents, including DONALD J. JACK, from emerging infectious diseases like COVID-19.

68. In fact, Defendants have a history of insufficient infection control practices and have been on notice of this problem since at least February 9, 2018, when the Facility was cited by the Department of Health for failing to have a program in place to prevent the development and transmission of communicable diseases and infections.

69. The Department of Health cited the Facility again on March 15, 2019, for failing to provide and implement an infection prevention and control program to help prevent the development and transmission of communicable diseases and infections. Notably, the Department of Health found that the staff members failed to use PPE when providing care to a resident on contact isolation precautions.

70. Defendants' acts and omissions, with knowledge of their history of failing to provide and implement an adequate infection prevention and control program and in the face of the grave danger faced by DONALD J. JACK and the other residents of contracting COVID-19, were so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety or rights of by DONALD J. JACK and the other residents exposed to Defendants' conduct.

## CORPORATE BACKGROUND

71. BROOKDALE SENIOR LIVING, INC. was formed in June 2005 for the purpose of combining two leading senior living companies, Brookdale Senior Living Communities, Inc. and Alterra Healthcare Corporation. Both companies had been operating independently since the 1980's.

72. Approximately one year after its formation, BROOKDALE SENIOR LIVING, INC. acquired another senior living community operator, AMERICAN RETIREMENT CORPORATION, which had been independently operating since 1978. The acquisition of

16

AMERICAN RETIREMENT CORPORATION made BROOKDALE SENIOR LIVING, INC. the largest operator of senior living facilities in the United States.

73.    On or about July 20, 2007, BROOKDALE SENIOR LIVING, INC., through AMERICAN RETIREMENT CORPORATION, purchased SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

74.    BROOKDALE SENIOR LIVING, INC. is the parent company and long term care operator of hundreds of various senior living housing and service alternatives including retirement centers, assisted living facilities, skilled nursing facilities and continuing care retirement communities also known as CCRCs throughout the country including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

75.    BROOKDALE SENIOR LIVING, INC. owns, operates, and manages its facilities using the same officers and directors to control and operate all of its agents and subsidiaries. BROOKDALE SENIOR LIVING, INC. operates its facilities by centralizing its management and oversight of operations from a "national platform."

76.    SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is part of a larger CCRC, known as Freedom Square of Seminole ("Freedom Square"), which offers a full continuum of care. The Freedom Square campus includes independent living accommodations, an assisted living facility, and two skilled nursing facilities, one being SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Freedom Square offers both rental and what is known as "Life Care" programs. The rental program operates on a monthly rental fee basis, with no entry fee. The Life Care program is secured with an entry fee purchase to cover the cost of future accommodations and health care services.

77.	BROOKDALE SENIOR LIVING, INC. advertised that the CCRCs allow a resident to "age in place" as it offered a retirement community with opportunities for independent living, assisted living and nursing home care. In theory, a person could spend the rest of his or her life in a CCRC, moving between levels of care as needed. In reality, CCRCs require hefty buy-ins, which could include the price of one's home, potentially committing that individual to the CCRC regardless of the quality care they receive. In 2015, CCRCs were responsible for almost 20% of BROOKDALE SENIOR LIVING, INC.'s total senior living capacity.

78.	In 2014, in an effort to grow revenue, BROOKDALE SENIOR LIVING, INC. entered into an agreement with a real estate investment trust ("REIT"), HCP, to create a new business model for certain preexisting facilities. Together, the companies restructured these facilities with the intent to make a profit by releasing equity, increasing occupancy, increasing monthly service fees, and controlling operating expenses. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES was included in this restructure.

79.	The new business model, in part, involved the restructuring of currently owned facilities by creating new companies for no legitimate purpose other than to avoid liability for shoddy risk management. In effect, Defendants took a legitimately named company, broke it into pieces, saddled it with tremendous liabilities; and sucked out all the cash. This restructuring involved the ostensible separation of the real estate on which the facilities sit from the operator of the facility itself. This model, known as the "Propco-Opco" structure, required the formation of two new entities to take over the pre-existing one: the real estate company, or the so-called landlord ("Propco"), and the facility operator, or the so-called master tenant ("Opco"). At the closing, the "Opco" entity engaged an affiliate of BROOKDALE SENIOR LIVING, INC. to manage the owned and leased community pursuant to a management agreement.

80.     On or about August 29, 2014, at or about the same time that BROOKDALE SENIOR LIVING, INC. and HCP partnered to increase revenues and created the Propco/Opco entities, BROOKDALE SENIOR LIVING, INC. filed a change of ownership application with the State of Florida.

81.     After the change in ownership, a new company, Defendant CCRC OPCO - FREEDOM SQUARE, LLC, the "Opco" or operating entity, was also created. CCRC OPCO - FREEDOM SQUARE, LLC became the new licensee of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the entity saddled with liabilities.

82.     BROOKDALE SENIOR LIVING, INC. and HCP jointly own CCRC OPCO Ventures, LLC, which owns one hundred percent of CCRC OPCO-FREEDOM SQUARE, LLC.

83.     CCRC OPCO-FREEDOM SQUARE, LLC entered into a management agreement with another BROOKDALE SENIOR LIVING, INC. subsidiary, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., to own, operate, manage and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and other nursing home facilities in Florida.

84.     BKD TWENTY-ONE MANAGEMENT COMPANY, INC. assumed certain duties and obligations towards residents to manage the day-to-day operations of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. The centralized corporate functions include financing, accounting, human resources, marketing, training, regulatory, affairs, purchasing food and supplies, asset management, extensive policy and procedure manuals and extensive quality control programs.

85.     BROOKDALE SENIOR LIVING, INC.'s and HCP's quality control measures include community inspections conducted by corporate staff on a regular basis. BROOKDALE

SENIOR LIVING, INC. and HCP focus on increasing occupancy and increasing revenues to attempt to generate a profit to support the expansion of their brands through the acquisition of additional facilities.

86. Upon information and belief, on or about January 31, 2020, HCP acquired BROOKDALE SENIOR LIVING, INC.'s interest in SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and transitioned management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to LIFE CARE SERVICES, LLC. However, documents reflecting the change of ownership and/or management have not been filed with and/or made available by the State of Florida.

## CORPORATE CONDUCT AND JOINT VENTURE

87. Based upon information and belief and the allegations stated above, at all relevant times, CCRC OPCO-FREEDOM SQUARE, LLC, BROOKDALE SENIOR LIVING, INC., AMERICAN RETIREMENT CORPORATION, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., HCP, and LIFE CARE SERVICES, LLC, engaged in a joint venture to own, operate, and manage nursing homes including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Each can bind the other and each has the authority to participate in the other's profits and the obligation to share in each other's losses.

88. Money paid by and on behalf of the nursing home residents was the sole source of revenue for the multiple layers of companies created by Defendants to distribute and share the revenues generated at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the other nursing homes in Florida.

89. Defendants managed themselves, governed and controlled the care and services provided to DONALD J. JACK, and, by virtue of their management and control, each of them,

voluntarily and intentionally assumed responsibility for and provided supervisory and custodial services to DONALD J. JACK while he was a resident of the Facility.

90. At all relevant times, Defendants held themselves out as being competent, capable, and qualified to provide necessary services to their residents, including DONALD J. JACK, and to protect and keep all residents, including DONALD J. JACK, safe from harm, including from the spread of infectious diseases.

91. At all relevant times, Defendants owned, operated, and/or managed SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and furthermore participated in, authorized, and/or directed the conduct of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and its respective agents and employees. Defendants are therefore directly liable for their own negligence, recklessness, and other tortious conduct, in the hiring and management of their agents and employees.

92. Defendants, through their managers, directors, presidents, vice-presidents, executive officers, and other agents, directly oversaw, managed, and/or controlled all aspects of the operation and management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, including budgeting, staffing, training, policy and procedures manual(s), licensing, accounts payable, accounts receivable, general accounting, cash management, capitalization, and profit and loss margins.

93. Defendants employed all of those persons who attended to and provided care and services to DONALD J. JACK while he was a resident at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and employed those persons in management and supervisory positions who directed the operations of the Facility, all of whom were acting within the course and scope of their employment.

94. Defendants, through their administrators, directors, and managing agents, condoned and ratified all the conduct at the Facility.

95. At all relevant times, Defendants were the knowing agents and/or alter-egos of one another, and are therefore vicariously liable for the acts and/or omissions of each other, their agents and employees, as is more fully alleged herein. Moreover, at all relevant times, Defendants were acting within the course and scope of their employment and/or agency relationship.

96. Defendants' acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result: maximize profits at the Facility, despite the result being that the Facility was underfunded and understaffed.

97. Defendants, by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other.

98. Defendants were responsible for the organization and administration of the Facility, and had duties to, inter alia, ensure the Facility complied with applicable statutes and regulations, and adopt policies and procedures for the Facility.

99. Each Defendant knowingly disregarded their respective duties and obligations owed to DONALD J. JACK and the other residents through both acts and omissions. Those duties to reasonably operate, manage, own and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES included: the duty to ensure the facility had sufficient staff who were trained to meet DONALD J. JACK's needs and the needs of the other residents; the duty to seek out and correct deficiencies or lapses in the care provided to DONALD J. JACK and other residents; the duty to provide a safe environment for DONALD J. JACK and the other residents;

the duty to investigate the cause of preventable incidents that occurred at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES; the duty to sufficiently staff SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to ensure DONALD J. JACK's needs and the needs of the other residents were met; and the duty to not divert funds from the Facility when the funds are intended for the care and maintenance of the residents, including DONALD J. JACK.

100. Defendants did not meet their duties and obligations. Although investigations and surveys by various agencies found deficiencies in the provision of care provided to the residents of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, each Defendant failed or refused to correct or address these issues addressed in the investigations and surveys.

101. Defendants required or encouraged the admission of residents with higher acuity levels without providing the staff necessary to care for the residents. The staff was lacking in supervision, number, and skill.

102. Further, in their efforts to maximize profits, Defendants intentionally and/or recklessly mismanaged staffing levels and supply levels below the levels necessary to provide adequate care and services to the residents and implemented practices in disregard to the safety of the patients.

103. Defendants each have extensive experience in the nursing home industry. This experience provided each Defendant the knowledge and experience to know that additional staff and more skilled staff were necessary to meet the needs of residents. Even with this knowledge, Defendants failed or refused to ensure that the residents received adequate and appropriate care while in their nursing home.

104.     Defendants, pursuant to their scheme to place "profits over residents" at the Facility, ratified the conduct of each Defendant in that they mandated, were aware of, and/or accepted inadequate staffing, inadequate training, inadequate supplies and inadequate practices at the Facility, and were aware that such inadequate staffing, inadequate training, inadequate supplies, and inadequate practices could lead to injuries and damages for the residents.

105.     In conceiving of, implementing and carrying out their profits over residents scheme, Defendants willfully, knowingly, recklessly and with conscious disregard for DONALD J. JACK's health, safety and welfare, acted in a manner that was malicious, reckless and oppressive.

106.     Further, Defendants implemented and carried out the profits over residents scheme with knowledge that such a scheme was designed to exploit elderly/senior citizens, a class expressly deemed by the Legislature of the State of Florida as a vulnerable segment of the population who require a heightened level of protection.

107.     As a result of Defendants' scheme and acts and omissions, DONALD J. JACK was victimized by Defendants and suffered damages as alleged herein.

### COUNT I: BREACH OF FIDUCIARY DUTY
**As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA**

108.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

109.     This is a claim that presents a theory of recovery based upon the presence of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

110.     This is a claim that does not arise out of negligence or a violation of DONALD J. JACK's nursing home resident rights.

24

111.  Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed DONALD J. JACK a duty to act for or to advise him on matters within the scope of their specialized relationship.

112.  Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA and DONALD J. JACK had a developed a special relationship of trust and confidence.

113.  That trust and confidence started when DONALD J. JACK was admitted to the Facility because he was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. Specifically, DONALD J. JACK needed assistance with multiple Activities of Daily Living ("ADLs") and twenty-four hour skilled nursing care.

114.  As a result of his varying infirmities and advanced age, at all times material, DONALD J. JACK was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being; and DONALD J. JACK was incapable of dealing with Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on equal terms, and was incapable of engaging in any arm's length relationships with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

115.  Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA directly solicited DONALD J. JACK's confidence and trust in attempts to convince him to reside and remain at the Facility, and further represented through the words and acts of its employees and agents that it would undertake to provide all of the necessary care and treatment to attain and maintain the highest practicable physical, mental, and psychosocial well-being for DONALD J. JACK.

25

116. Additionally, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA specifically undertook the non-delegable duty of protecting DONALD J. JACK's residents' rights vested in him by virtue of Florida law, including the right to be treated courteously, fairly, and with the fullest measure of dignity and the right to privacy. *See NME Properties, Inc. v. Rudich*, 840 So. 2d 309 (Fla. 4th DCA 2003).

117. As a result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's solicitation of DONALD J. JACK's trust and confidence, DONALD J. JACK placed a special confidence and trust in CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. And DONALD J. JACK relied on CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide such care and services.

118. DONALD J. JACK further placed special confidence and trust in Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to protect and provide for his individual rights as established in section 400.022, Florida Statutes, and to further act as a trustee for all of his personal property that he possessed on the premises of the Facility as well as his personal funds and income, which on information and belief, he placed in an account maintained by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on his behalf and for his benefit.

119. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA undertook to act as trustees to protect and preserve DONALD J. JACK's personal property, including his clothing and other valuable personal property, as well as to maintain and manage his personal funds and income in a trust account for DONALD J. JACK's benefit. Correspondingly

CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed non-delegable duties to provide DONALD J. JACK quarterly accounting of any and all transactions made utilizing funds from his trust account, to maintain and safeguard the funds therein and to only utilize said funds for authorized transactions, and to avoid commingling of his funds with the funds of any other person or those of CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

120. Furthermore, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knowingly and voluntary entered into a highly confidential relationship with DONALD J. JACK. CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed extensive legal duties to comply with all of the confidentiality requirements enumerated in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regarding DONALD J. JACK, a confidentiality similar in scope and duration to that attendant to attorney-client and doctor-patient relationships.

121. Moreover, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA assumed duties to protect and preserve DONALD J. JACK's Federal and State privacy rights, including those privacy rights enshrined in Article I, Section 23 of the Florida Constitution.

122. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA accepted the special confidence and trust placed upon them by DONALD J. JACK by admitting him into the Facility and by, among other things: explicitly assuming, through words and actions, the various duties described in the preceding paragraphs regarding protecting his confidentiality, protecting his privacy, protecting his individual liberties, and managing and safeguarding his personal finances; assuming responsibility and control over every aspect of DONALD J. JACK's

day-to-day life; and voluntarily undertaking responsibility for the specific level of care, protection, supplies and services that would be provided to DONALD J. JACK.

123. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA individually and collectively controlled, oversaw and orchestrated every single aspect of DONALD J. JACK's existence, from the mundane (such as the clothing worn) to the vital (such as determining when and how healthcare would be provided, as well as how much food and water DONALD J. JACK could consume).

124. DONALD J. JACK was solely and particularly dependent upon the employees, officers, directors, and agents of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for his daily care, protection, services, supplies and personal and intimate needs.

125. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA developed a special relationship with DONALD J. JACK by virtue of: the nature of the care and services provided; the trustee-beneficiary relationship they maintained toward him regarding his personal property and finances; the Federal and State confidentiality and privacy laws CCRC OPCO - FREEDOM SQUARE, LLC undertook to comply with DONALD J. JACK; the superior knowledge, skill and abilities of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA; the enormous disparity of power and unequal bargaining Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA enjoyed DONALD J. JACK; and his inability to care for and provide for himself.

126. This special confidential relationship allowed Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, to occupy a position of confidence toward DONALD J. JACK, which required fidelity, loyalty, good faith, and fair dealing by CCRC OPCO

- FREEDOM SQUARE, LLC and CYNTHIA AYALA. Additionally, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA had a duty to refrain from engaging in self-dealing.

127. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA were each a fiduciary of DONALD J. JACK based on the special relationship between the parties.

128. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed fiduciary duties to DONALD J. JACK. *See Greenfield v. Manor Care, Inc.*, 705 So. 2d 926 (Fla. 4th DCA 1997).

129. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted and failed to act in material breach of their fiduciary duties owed to DONALD J. JACK. Instead Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted in ways to promote their own interests and in contravention of the interests of DONALD J. JACK.

130. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA breached and violated its relationship of trust, special confidence, and its fiduciary obligations and duties owed to DONALD J. JACK by:

    a) Failing to take adequate action to address COVID-19 concerns at the Facility as Defendants represented they would through their various websites as alleged in paragraphs 41 and 45;

    b) Failing to take adequate action to minimize the risk and spread of COVID-19 and implement adequate care, services, and infection control at the Facility as alleged in paragraphs 46, 50 and 51; and

    c) Knowingly and recklessly engaging in the profits over residents scheme described herein in an effort to increase the profitability of the Facility, for the

benefit of Defendants and their joint venture, and at the expense of and to the direct detriment of DONALD J. JACK.

131. In violating their fiduciary obligations and duties to DONALD J. JACK, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knew that DONALD J. JACK would suffer harm, including but not limited to the daily injuries resulting from the daily invasion of rights vested in DONALD J. JACK, as well as economic harm.

132. Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK were the legal cause of the loss, injury and damages suffered by DONALD J. JACK. As the direct and proximate result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK, DONALD J. JACK contracted COVID-19 and subsequently died from this infection.

WHEREFORE, Plaintiff demands judgment against Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

### COUNT II: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

133. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 132.

134. This is a claim that presents a theory of recovery based upon the presence and breach of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, aided and abetted by Defendants, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

135. As set forth in Count I above, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed and breached fiduciary duties owed to DONALD J. JACK.

136. Defendants are related entities within a single enterprise or joint venture.

137. Defendants had actual knowledge of DONALD J. JACK's fiduciary relationship with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA by virtue of its close corporate relationship to CCRC OPCO - FREEDOM SQUARE, LLC.

138. By reason of their shared and/or common ownership, directors, officers and managers and/or contractual relationships, Defendants knew of the fiduciary duties CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed to DONALD J. JACK and knew of CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of those duties as described in Count I.

139. Defendants knew that the residents at the Facility, including DONALD J. JACK, were incapable of independently providing their own necessary care and were solely and specifically dependent upon the employees, officers, directors, and agents to provide for their basic daily care, protection, services, supplies, and personal and intimate needs.

140. Defendants knowingly participated and provided substantial assistance and encouragement to CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in connection with their breach of fiduciary duties to DONALD J. JACK, as set forth in detail within Count I above.

141. In addition to this knowledge, Defendants aided and abetted Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in their breach of fiduciary duties and rendered substantial assistance and encouragement for the same, by, among other things:

    a) Engaging in the conduct set forth in detail within Count I above;

31

b) Exercising dominance and control over CCRC OPCO - FREEDOM SQUARE, LLC's revenues by regularly and repeatedly sweeping virtually all of the Facility's revenues into an account controlled by the joint venture or enterprise, and/or their designee;

c) Knowingly and intentionally taking, creating and accepting inter-company fees and transfers, comprised of revenues obtained from the residents and designed to improperly and unjustly enrich Defendants instead of allowing the Facility to utilize said resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including DONALD J. JACK, as required;

d) Structuring and approving contracts between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC, which Defendants knew or should have known would result in the diversion of Facility revenues necessary to provide the care and services to its residents, DONALD J. JACK;

e) Overseeing and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's acceptance of monies from residents, including DONALD J. JACK, knowing the Facility could not provide full value of the care and services to meet the care and safety needs of the residents;

f) Directly or indirectly misrepresenting the nature of the relationship between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, in which Defendants by virtue of the common owners, officers and managers, controlled the business operations and working

capital of the Facility and inappropriately commingled its revenues by making intra-company transfers to related facilities;

g) Structuring the managing and operating business model for the Facility in a way that constrained its ability to provide the level of care and services to residents, including DONALD J. JACK, while simultaneously benefitting Defendants and other upstream corporate entities; and,

h) Influencing, advocating, and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's improper payments to Defendants, which Defendants knew exceeded amounts a prudent and cost conscious buyer would pay, and which Defendants also knew would cause the monies intended for the provision of care and services to the residents, including DONALD J. JACK, to be depleted.

142. The conduct of Defendants as alleged, constitutes aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of fiduciary duties and subjects Defendants to liability for the harm suffered by DONALD J. JACK.

143. In aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in violating fiduciary obligations and duties to DONALD J. JACK as referenced herein, Defendants knew that DONALD J. JACK would suffer harm and injuries, including the daily injuries flowing from the repeated breaches of fiduciary duties in which Defendants aided and abetted.

144. As a result of Defendants' aiding and abetting in the breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, Defendants were improperly and unjustly enriched, the Facility was left without the necessary resources to function

in the residents' best interests, and DONALD J. JACK suffered both the injuries set forth herein as well as economic harm.

145. Furthermore, as the direct and proximate result of Defendants' aiding and abetting breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, DONALD J. JACK contracted COVID-19 and subsequently died.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

### COUNT III: VIOLATIONS OF FLORIDA STATUTES §415.1111
**As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

146. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 3, 9, 10, 12, 15, 16, 19, 20, 23, 24, 26, 28, and 31 above.

147. For the purposes of this count and only this count, it is not alleged that Defendants are a licensee or entity that established, controlled, conducted, managed or operated the Facility.

148. DONALD J. JACK was at all relevant times a vulnerable adult with a long-term disability. He was seventy-five (75) years of age and was unable to perform the normal activities of daily living or to provide for his own care or protection due to his disability.

149. Defendants' acts or omissions constitute exploitation of a vulnerable adult in violation of Section 415.1111, Florida Statutes.

150. Defendants knew or should have known that DONALD J. JACK lacked the capacity to consent, but Defendants obtained or used, or endeavored to obtain or use DONALD J.

34

JACK's funds, assets or property, including Medicare and Medicaid benefits, with the intent to temporarily or permanently deprive DONALD J. JACK of the use, benefit or possession of the funds, assets, or property for the benefit of someone other than DONALD J. JACK.

151. The compensation Defendants received was derived from the private funds of vulnerable adults, including DONALD J. JACK, or from Medicaid and/or Medicare funds that were beneficiaries' assets, including DONALD J. JACK, which were paid to Defendants for the sole purpose of providing for the support and maintenance of the Facility's residents, including DONALD J. JACK.

152. Defendants received compensation that they should have known would deprive the Facility of adequate resources to provide for the necessities of DONALD J. JACK's support and maintenance, which should have been used to, inter alia, implement a sufficient infection control program at the Facility and to secure sufficient PPE and supplies to prevent the spread of COVID-19 at the Facility.

153. Defendants failed or refused to effectively use DONALD J. JACK's income or assets for the necessities required for his support and maintenance.

154. Defendants' failure or refusal to effectively use DONALD J. JACK's income or assets as set forth herein, was the proximate cause of the losses he suffered including, but not limited to the use, benefit, or possession of the funds, assets or property for his benefit.

155. As a direct and proximate result of Defendants' acts and omissions, DONALD J. JACK was deprived of the use, benefit or possession of the funds, assets or property.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for

disgorgement of profits, consequential damages, attorneys' fees and costs, pre-judgment interest,

trial by jury of all matters so triable, and such other relief this Court deems appropriate.

**COUNT IV: VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE
PRACTICES ACT, § 501.201 *ET SEQ.***
**As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC; HCP; BROOKDALE
SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.;
AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

156.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107

above.

157.     Plaintiff brings this Count pursuant to the Florida Deceptive and Unfair Trade

Practices Act, section 501.201 *et seq.*, Florida Statutes (hereinafter "FDUTPA").

158.     Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are

unlawful. Fla. Stat. § 501.204 (1).

159.     By engaging in the above described conduct and the additional conduct described

below, Defendants engaged in unconscionable, unfair and deceptive acts and practices in violation

of FDUTPA in connection with their advertising, soliciting, providing, and offering services at the

Facility, which acts and practices ultimately victimized DONALD J. JACK, a senior citizen.

160.     At all relevant times, Defendants, their officers, directors, and managers were

engaged in trade and commerce in Florida within the meaning of FDUTPA as Defendants

advertised, solicited, provided, and offered services to consumers and senior citizens.

161.     At all relevant times, DONALD J. JACK was a "consumer" and "senior citizen"

within the meaning FDUTPA as he was an individual over the age of sixty (60).

162.     Defendants, their officers, directors, and managers marketed and advertised service

at the Facility directly to senior citizen consumers, including DONALD J. JACK, by disseminating

brochures, web sites, videos, advertisements, and other information, which were prepared in part, by the Facility's related corporate entities.

163.     Defendants, their officers, directors, and managers made unfair, deceptive and misleading representations in their advertising materials distributed to senior citizen consumers, including DONALD J. JACK, regarding the level of services they provided to vulnerable senior citizens and nursing home residents.

164.     Defendants, their officers, directors, and managers advertised and offered their nursing facilities by promising to meet residents' needs, to keep them clean, comfortable and safe, and to provide food, water, care, and services as needed. These statements were false, deceptive, and misleading.

165.     Defendants advertising materials omitted information that was material to consumers, including DONALD J. JACK, by failing to disclose that DONALD J. JACK would experience long delays in the delivery of care and services and that he would often be deprived of the care and services he required and bargained for.

166.     Defendants, their officers, directors, and managers engaged in deceptive, misleading, and unfair practices by representing that certain care and services were or would be provided to DONALD J. JACK, as documented in his care plans and assessments, when in fact that care and services were never provided.

167.     Defendants, their officers, directors and managers further promised to provide a clean, safe, and sanitary living environment throughout DONALD J. JACK's residency at their facilities, for which Defendants were handsomely paid.

168.     Defendants affirmatively concealed material facts from DONALD J. JACK regarding the existence and effect of the COVID-19 outbreak at the Facility, and led DONALD J.

JACK to believe that the Facility was a safe environment, when in fact the Facility was contaminated with COVID-19.

169.     Defendants, their officers, directors and managers failed to appropriately manage the real property at the Facility and failed to maintain a clean, safe, and habitable living environment for their residents.

170.     Defendants, their officers, directors and managers, through their deceptive, unconscionable, and unfair acts and omissions, misled DONALD J. JACK into believing that their facilities were properly managed, maintained, and equipped to meet his basic needs, when it was not.

171.     Defendants, their officers, directors and managers failed to provide DONALD J. JACK with a living environment and premises that reciprocated the rents and other charges they were paid for his residency.

172.     Defendants, their officers, directors and managers caused the Facility to enter into a lease agreement so onerous that it left Defendants without the ability to provide an adequate, safe, decent, and clean living environment, despite promising DONALD J. JACK that he would receive the same in exchange for the monies he paid.

173.     Defendants' failure to provide basic care and services to DONALD J. JACK not only violated the FDUTPA, but also degraded DONALD J. JACK, increased his risk of serious negative health consequences, and caused him to suffer medical expenses, serious injury, and death.

174.     In addition to these deceptive, unconscionable, and unfair acts and omissions, Defendants misled consumers, including DONALD J. JACK, by failing to disclose that the Facility's related corporate entities exercised control over the Facility, by among other things: (a)

restricting the ability of the Facility's managers and administrators to increase staffing levels; (b) supervising, and in some case, overriding the personnel decisions of the Facility; (c) creating and implementing company-wide policies and incentive programs; and (d) entering into agreements, including onerous lease and management agreements.

175.    Defendants, their officers, directors and managers failed to provide DONALD J. JACK with the basic care and services he required and bargained for with respect to his use of the Facility's premises.

176.    Defendants' deceptive, unconscionable, and unfair statements and practices were in violation of FDUTPA.

177.    Defendants' deceptive, unconscionable, and unfair representations, omissions, and practices were of the type that would likely mislead Florida consumers acting reasonably in the circumstances, to the consumers' detriment, and were particularly misleading and detrimental to the senior citizens and infirm residents at their Facility, including DONALD J. JACK.

178.    DONALD J. JACK could not have detected the existence and effect of the COVID-19 at the Facility or the existence of the onerous agreements, the corporate entities control over the Facility that led to the lack of care, services, and sanitary living environment at the Facility.

179.    DONALD J. JACK admitted himself to the Facility and had therefore been aggrieved by Defendants unconscionable, unfair and deceptive practices in violation of FDUTPA.

180.    DONALD J. JACK sustained damages as a direct and proximate result of Defendants' violations of FDUTPA.

181.    DONALD J. JACK did not receive the benefit of the bargain, overpaid for the services, and suffered actual damages.

182. The damages suffered by DONALD J. JACK were directly and proximately caused by the unconscionable, deceptive, misleading, and unfair practices of Defendants.

183. Defendants' violations were willful as Defendants knew or should have known that their conduct was unfair or deceptive or prohibited by FDUTPA.

184. Defendants' violations are made even more reprehensible because of Defendants' attempt to exploit senior citizens during a global pandemic for profit, while posing a serious and direct threat to the health and safety of senior citizens such as DONALD J. JACK.

WHEREFORE, Plaintiff demands judgment against Defendants for damages pursuant to section 501.211(2), Florida Statutes, in an amount to be proven at trial, pre-judgment interest, post-judgment interest, attorney's fees and court costs as provided in section 501.2105, Florida Statutes, and further demands a trial by jury, together with such other and further relief as this Court deems appropriate.

/s/ Bennie Lazzara, Jr.

**Bennie Lazzara, Jr., Esquire**
Florida Bar No. 119568
Bennie@wilkesmchugh.com
TPABXLStaff@wilkesmchugh.com
fl@wilkesmchugh.com
**James L. Wilkes, II, Esquire**
Florida Bar No. 405337
jimw@wilkesmchugh.com
dthomason@wilkesmchugh.com
**Jason R. Delgado, Esquire**
Florida Bar No. 591122
jdelgado@wilkesmchugh.com
TPAJRDstaff@wilkesmchugh.com
WILKES & MCHUGH, PA
1 N. Dale Mabry Highway, Suite 700
Tampa, FL 33609
Telephone: (813) 873-0026
Facsimile: (813) 286-8820
*Attorneys for the Plaintiff*

# EXHIBIT "A"

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
PROBATE DIVISION

IN RE: ESTATE OF                                    Case No.  20-004321-ES
DONALD JOHN JACK
.Deceased.

_____/

## LETTERS OF ADMINISTRATION

TO ALL WHOM IT MAY CONCERN

WHEREAS, Donald John Jack, a resident of 12542 82nd Terrace N., Seminole, FL 33776, died

on April 21, 2020, owning assets in the State of Florida, and

WHEREAS, Jessica Gunter has been appointed personal representative of the estate of the

decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

NOW, THEREFORE, I, the undersigned circuit judge, declare Jessica Gunter duly qualified

under the laws of the State of Florida to act as personal representative of the estate of Donald John Jack,

deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and

receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will

permit and the law directs; and to make distribution of the estate according to law.

ORDERED in chambers, Pinellas County, Florida.

05/15/2020 11:03:20 AM

_____
Pamela A. M. Campbell
Circuit Judge

Filing # 108550742 E-Filed 06/08/2020 05:07:14 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and through
JESSICA GUNTER, Personal Representative,

       Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.; BROOKDALE
SENIOR LIVING, INC.; BKD TWENTY-ONE
MANAGEMENT COMPANY, INC.; AMERICAN
RETIREMENT CORPORATION; LIFE CARE
SERVICES, LLC; and, CYNTHIA AYALA (as to
SEMINOLE PAVILION REHABILITATION AND
NURSING SERVICES),

CASE NO:  20-002755-CI

       Defendants.

*MM · MAPS · 00076*
*DATE: 6 / 23 / 2020*
*TIME: 4 :25 A.M.P.*

**SUMMONS**

THE STATE OF FLORIDA

TO ALL AND SINGULAR SHERIFFS OF SAID STATE:

GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Complaint and Designation of Email
Addresses in the above styled cause upon the defendant(s):

**CYNTHIA AYALA
10800 TEMPLE TERRACE
SEMINOLE, FL 33772**

Each defendant is hereby required to serve written defenses to said Complaint on plaintiff's attorney, whose name and address is:

**BENNIE LAZZARA JR., ESQUIRE
WILKES & McHUGH, P.A.
TAMPA COMMONS, SUITE 800
ONE NORTH DALE MABRY HIGHWAY
TAMPA, FL 33609
(813) 873-0026**

within twenty (20) days after service of this summons upon that defendant, exclusive of the day of service, and to file the original
of said written defenses with the clerk of said court either before service on plaintiff's attorney or immediately thereafter. If a
defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

      WITNESS my hand and the seal of said Court on the ____ day of _____ JUN 09 2020 _____, 2020.

KEN BURKE CLERK CIRCUIT COURT
315 Court Street
Clearwater, Pinellas County, FL 33756-5165

KEN BURKE, CPA
Clerk of the Circuit Court

~~Judith Marlow~~
BY: DEPUTY CLERK



IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF DONALD J. JACK, by and
through JESSICA GUNTER, Personal
Representative,

        Plaintiff,

v.

CCRC OPCO - FREEDOM SQUARE, LLC; HCP,
INC. a/k/a HCP INC. OF MARYLAND n/k/a
HEALTHPEAK PROPERTIES, INC.;
BROOKDALE SENIOR LIVING, INC.; BKD
TWENTY-ONE MANAGEMENT COMPANY,
INC.; AMERICAN RETIREMENT
CORPORATION; LIFE CARE SERVICES, LLC;
and, CYNTHIA AYALA (as to SEMINOLE
PAVILION REHABILITATION AND NURSING
SERVICES),

        Defendants.

CASE NO.: 20-002755- CI

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

THE ESTATE OF DONALD J. JACK, by and through JESSICA GUNTER, Personal

Representative, and by and through undersigned counsel, hereby sues Defendants, CCRC OPCO

- FREEDOM SQUARE, LLC; HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a

HEALTHPEAK PROPERTIES, INC.; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-

ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION;

LIFE CARE SERVICES, LLC; and, CYNTHIA AYALA (herein after, the "Defendants"). All of

the allegations contained in this Complaint are based on either known facts or information and

belief. Plaintiff alleges as follows:

## INTRODUCTION

This case concerns the injuries, damages, and untimely death of DONALD J. JACK as a result of Defendants' actions and omissions during his residency at Defendants' skilled nursing facility known as Seminole Pavilion Rehabilitation and Nursing Services (the "Facility"). What was supposed to be merely a short-term rehabilitation admission turned out to be a death sentence for DONALD J. JACK due to Defendants' business practice of placing profits over residents. For years, even before DONALD J. JACK's residency, Defendants chose to place profits over residents and ignore deficiencies in their emergency preparedness plan and in their infection prevention and control program. When Defendants' deficiencies became more pronounced in light of the COVID-19 pandemic, Defendants continued to choose to place profits over residents by refusing to be forthcoming with the authorities, staff, residents, and residents' relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility. Instead, for almost a week after the first COVID-19 death at the Facility, Defendants withheld information regarding the COVID-19 positive death at the Facility and withheld supplies necessary to protect residents and staff. During the time Defendants kept everyone in the dark and withheld necessary supplies, DONALD J. JACK contracted COVID-19. Only after the Facility had become known as the epicenter in Pinellas County for COVID-19 and intervention from the Florida Department of Health, did Defendants transfer all ninety-five (95) residents, including DONALD J. JACK, to local hospitals to get the necessary care and to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff. Unfortunately, by this time DONALD J. JACK had tested positive for COVID-19 and only five days thereafter DONALD J. JACK was dead as a result.

## JURISDICTION, PARTIES AND VENUE ALLEGATIONS

1.      This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00).

2

2.    On or about April 2, 2020, DONALD J. JACK was admitted to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, located at 10800 Temple Terrace, Seminole, Florida 33772 in Pinellas County, where he remained until approximately April 17, 2020.

3.    Plaintiff, JESSICA GUNTER, is the Personal Representative of THE ESTATE OF DONALD J. JACK. Letters of Administration, dated May 15, 2020, evidencing JESSICA GUNTER's authority to bring this action on behalf of THE ESTATE OF DONALD J. JACK are attached hereto as Exhibit "A."

4.    SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is a fictitious name owned by Defendant CCRC OPCO - FREEDOM SQUARE, LLC.

5.    CCRC OPCO - FREEDOM SQUARE, LLC is the licensee that operated the Facility during DONALD J. JACK's residency.

6.    CCRC OPCO - FREEDOM SQUARE, LLC, is an active Delaware limited liability company, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

7.    CCRC OPCO - FREEDOM SQUARE, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing home facilities, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC

3

OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the courts of the State of Florida.

8. CCRC OPCO - FREEDOM SQUARE, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, CCRC OPCO - FREEDOM SQUARE, LLC is subject to the jurisdiction of the Courts of the State of Florida.

9. HCP, INC. a/k/a HCP INC. OF MARYLAND n/k/a HEALTHPEAK PROPERTIES, INC. (hereinafter referred to as "HCP") is the owner of property located at 10800 Temple Terrace, Seminole, Florida 33772, which is the property upon which the SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is situated.

10. HCP is a Maryland corporation, with its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614, which is registered to do business in Florida and is doing business in Florida.

11. HCP had the authority to and did exercise control over the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

12. HCP required rents or other compensation from funds it knew were necessary for DONALD J. JACK's support and maintenance. HCP knew that such conduct would deprive the Facility of adequate resources to provide for the wellbeing of the Facility's residents, including DONALD J. JACK.

13. HCP shared control over the operation of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES through its authority to control the funds available to the Facility for the use and benefit of the residents, including DONALD J. JACK.

4

14.     HCP conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

15.     HCP committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, HCP is subject to the jurisdiction of the courts of the State of Florida.

16.     BROOKDALE SENIOR LIVING, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

17.     BROOKDALE SENIOR LIVING, INC. is the parent company and operator of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

18.     BROOKDALE SENIOR LIVING, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

19. BROOKDALE SENIOR LIVING, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BROOKDALE SENIOR LIVING, INC. is subject to the jurisdiction of the courts of the State of Florida.

20. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is a Delaware corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

21. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

22. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

23. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, BKD TWENTY-ONE MANAGEMENT COMPANY, INC. is subject to the jurisdiction of the courts of the State of Florida.

24. AMERICAN RETIREMENT CORPORATION is a Tennessee corporation, with its principal place of business at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027, which is registered to do business in Florida and is doing business in Florida.

25. AMERICAN RETIREMENT CORPORATION conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

26. AMERICAN RETIREMENT CORPORATION committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, AMERICAN RETIREMENT CORPORATION is subject to the jurisdiction of the courts of the State of Florida.

27. AMERICAN RETIREMENT CORPORATION is an entity that operated, managed, controlled and oversaw SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

28. LIFE CARE SERVICES, LLC is an active Iowa limited liability company, with its principal place of business at 400 Locust Street, Suite 820, Des Moines, Iowa 50309, which is registered to do business in Florida and is doing business in Florida.

29. LIFE CARE SERVICES, LLC served as a management company for SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES during DONALD J. JACK's residency.

7

30. LIFE CARE SERVICES, LLC conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed itself of the privileges of the State of Florida, through its ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

31. LIFE CARE SERVICES, LLC committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly, pursuant to section 48.193, Florida Statutes, LIFE CARE SERVICES, LLC is subject to the jurisdiction of the courts of the State of Florida.

32. CYNTHIA AYALA was at all material times hereto a resident of the State of Florida and the Administrator at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

33. CYNTHIA AYALA conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely availed herself of the privileges of the State of Florida, through her management of, operation of, control of, and/or consultation with SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, within the State of Florida. Accordingly, pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

34. CYNTHIA AYALA committed tortious acts against DONALD J. JACK in the State of Florida. Each tortious act is specifically alleged in the subsequent counts. Accordingly,

pursuant to section 48.193, Florida Statutes, CYNTHIA AYALA is subject to the jurisdiction of the courts of the State of Florida.

## **FACTUAL ALLEGATIONS**

35. In December 2019, the government in Wuhan, China, confirmed that health authorities were treating clusters of cases of suspected pneumonia that appeared to be viral in origin.

36. On or about January 30, 2020, the World Health Organization declared a Public Health Emergency of International Concern after the outbreak of the 2019 coronavirus disease.

37. On February 11, 2020, the World Health Organization announced an official name for the new disease – coronavirus disease 2019, abbreviated as COVID-19.

38. COVID-19 is an infectious virus that attacks the respiratory system of its human host. The elderly, medically fragile, and those with compromised immune systems are particularly susceptible to fatality due to COVID-19.

39. On or about February 29, 2020, the Centers for Disease Control and Prevention ("CDC") released a statement regarding the first confirmed death in the United States from the coronavirus. In addition to the first confirmed death, the CDC reported that the public health officials in the state of Washington had also reported two additional hospitalized patients – two of which were from a long-term care facility where one was a health care worker – who had tested presumptive-positive for the virus that causes COVID-19. In addition, the CDC reported that additional residents and staff of the long-term care facility had not yet been tested but were either ill with respiratory symptoms or hospitalized with pneumonia of unknown cause.

40. On or about March 1, 2020, in response to positive cases of COVID-19 in Florida, Governor Ron DeSantis issued Executive Order 20-51, directing the Florida Department of Health to declare a Public Health Emergency.

41.     On or about March 4, 2020, Defendants, via various websites, represented to the staff, residents, and relatives that Defendants were taking action to address COVID-19 concerns such as:

   a) Providing consistent updates and communication to those who live and work in the community.

   b) Following evidence-based precautions that align with guidelines provided by the CDC.

   c) Reviewing response measures to ensure the community is organized and ready if the virus impacts the community or the surrounding area.

42.     On or about March 9, 2020, the Governor of Florida declared a state of emergency existed in Florida.

43.     On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.

44.     On or about March 13, 2020, the Governor of Florida ordered all Florida nursing home facilities to lock down and implemented a visitation ban in an effort to mitigate the risk to Florida's most vulnerable population to COVID-19, which is Florida's elderly population (i.e. over the age of sixty-five (65)) and particularly those who have underlying medical conditions such as cancer, chronic lung disease, moderate-to-severe asthma, serious heart conditions, immunocompromised status, diabetes, severe obesity, renal failure and liver disease.

45.     On or about March 15, 2020, Defendants, via their shared website, represented to the staff, residents, and relatives that Defendants were continuing to take action to address COVID-19 concerns such as:

   a) Continuing to follow the guidance from both the CDC and local health authorities.

b) Increasing the frequency and rigor of cleaning and sanitizing common community areas.

c) Reviewing emergency preparedness and response program.

d) Coordinating best practices and across their large partner network.

e) Providing all residents and their families with the most up-to-date guidance from the CDC.

f) Staying in communication with local health officials.

46. Despite Defendants' representations to the staff, residents, and relatives, Defendants failed to adequately take action to address COVID-19 concerns and failed to comply with their own procedures by, among other things:

a) Failing to supply or require staff to wear Personal Protective Equipment ("PPE");

b) Allowing asymptomatic staff who had been exposed to COVID-19 to continue working at the Facility;

c) Failing to provide staff, residents, and their families with consistent updates and communication regarding the risk of COVID-19 and of COVID-19 positive cases at the Facility; and,

d) Failing to implement an adequate emergency preparedness and response program.

47. On or about April 2, 2020, at the age of seventy-five (75), DONALD J. JACK admitted himself to SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES (the "Facility") for short-term rehabilitation for generalized weakness as he merely needed to gain strength to receive chemotherapy for his recent diagnosis of Hodgkin's Lymphoma.

48.     Upon admission, Defendants documented that DONALD J. JACK had various diagnoses including, but not limited to, Hodgkin's Lymphoma, Type II diabetes, and abnormality of albumin.

49.     Due to his age and underlying medical conditions, Defendants knew DONALD J. JACK was one of the residents most vulnerable to COVID-19.

50.     Although Defendants were on high-alert for COVID-19 since January 2020 and of the residents' vulnerability, Defendants, consistent with their business practice of placing profits over residents, disregarded the safety of DONALD J. JACK and the other residents by failing to implement adequate protocols to minimize the risk and spread of COVID-19 and by failing to implement adequate care, services and infection control at the Facility.

51.     Defendants' acts and omissions included, but were not limited to:

    a.     Failing to properly use residents' funds;

    b.     Failing to have an adequate emergency preparedness plan in place to keep residents safe from emerging infectious diseases like COVID-19;

    c.     Failing to implement adequate protocols to minimize the risk and spread of COVID-19;

    d.     Failing to implement an adequate system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents and staff;

    e.     Failing to immediately notify the authorities, staff, residents, and relatives of the potential dangers of COVID-19 and of the COVID-19 positive cases at the Facility;

    f.     Forcing staff to reuse PPE;

g.    Failing to supply proper masks and gowns for weeks causing many staff members to resort to providing their own homemade facial coverings not medically graded to protect against the virus;

h.    Failing to follow and/or adhere to the standards and protocols set out by the CDC and other state and local authorities related to infection control and prevention;

i.    Failing to communicate the outbreak to the authorities and avail themselves of the available PPE;

j.    Failing to implement safety protocols, such as disinfecting many common areas, to minimize the spread of the virus;

k.    Failing to provide adequate staff in number and training;

l.    Failing to be forthcoming and adequately share information regarding the outbreak at the Facility with employees, residents and their relatives.

m.    Reducing basic cleaning practices for which the residents paid for;

n.    Permitting widespread safety failures, such as inadequate staff and equipment, increasing the risk of injury or death during an emergency such as the pandemic;

o.    Failing to have adequate management oversight; and,

p.    Permitting asymptomatic staff who had been exposed to COVID-19 to continue to work at the Facility and interact with residents.

52.    As a result of Defendants' acts and omissions and total disregard for the residents, the Facility experienced systemic failure and became the center of the COVID-19 outbreak in Pinellas County.

53. To date, at least 25 deaths of residents and staff resulting from COVID-19 are linked to this single Facility.

54. The Facility's first confirmed case of a resident with COVID-19 was a male resident that was hospitalized on April 5, 2020, and tested positive on April 9, 2020, for COVID-19. The resident then died on April 10, 2020.

55. Although the Facility had its first confirmed case of COVID-19 on April 9, 2020 – approximately seven days after DONALD J. JACK was admitted to the Facility – and first confirmed death on April 10, 2020, Defendants failed to be forthcoming in sharing this information with employees, residents, their relatives, and the public.

56. Rather, despite having difficulty managing the rapid outbreak, Defendants waited approximately a week to disclose to the public the first confirmed COVID-19 case. Defendants' delay in reporting delayed assistance with the much need PPE available through the county.

57. Defendants' staff were kept in the dark by Defendants and did not know about the gravity of the outbreak until the media reported the transfer of residents on or about April 15, 2020.

58. Likewise, family members and advocates have sounded alarms about the delays in residents and the public being informed about the outbreak as families are learning more about the outbreak from the media than from Defendants who are keeping everyone in the dark.

59. Despite the gravity of the outbreak, Defendants failed for weeks to provide adequate gowns and masks for staff.

60. Defendants' staff feared for their safety because protocols were not in place to minimize virus spread such as providing proper PPE and disinfecting common areas. As a result, staff began quitting and resident care deteriorated even further as staff quit and supplies shrank.

61.     On or about April 16, 2020, the Facility received laboratory results confirming DONALD J. JACK was positive for COVID-19.

62.     By April 16, 2020, approximately 30 residents and staff members at the community had tested positive for COVID-19 and by April 17, 2020, two additional residents had died.

63.     Defendants were reluctant to transfer residents to hospitals, but began to transfer mass amounts of residents on or about April 16, 2020, when they became overwhelmed by the outbreak.

64.     On or about April 17, 2020, after intervention from the Florida Department of Health and after nearly 60 residents were transferred to area hospitals who had either tested positive (or were presumed positive) for COVID-19, Defendants transferred all remaining residents at the Facility, including DONALD J. JACK, to local hospitals to allow Defendants and the Florida Department of Health to completely reset the Facility's infection control practices, decontaminate the site, and provide additional training for staff.

65.     In a span of eight days, from the first confirmed diagnoses to the mass evacuation on April 17, 2020, a total of 95 residents were removed from the Facility and three had died.

66.     On April 21, 2020, only five days after being diagnosed, DONALD J. JACK passed away as a result of COVID-19, which he contracted at the Facility due to Defendants' acts and omissions.

67.     Based upon the acts and omissions described above, as well as numerous reports from Defendants' own staff, Defendants, who were focused on their own self-interests and putting profits over the well-being of the Facility's residents in reckless disregard for the residents' safety and well-being, were ill-prepared to protect the residents, including DONALD J. JACK, from emerging infectious diseases like COVID-19.

68.     In fact, Defendants have a history of insufficient infection control practices and have been on notice of this problem since at least February 9, 2018, when the Facility was cited by the Department of Health for failing to have a program in place to prevent the development and transmission of communicable diseases and infections.

69.     The Department of Health cited the Facility again on March 15, 2019, for failing to provide and implement an infection prevention and control program to help prevent the development and transmission of communicable diseases and infections. Notably, the Department of Health found that the staff members failed to use PPE when providing care to a resident on contact isolation precautions.

70.     Defendants' acts and omissions, with knowledge of their history of failing to provide and implement an adequate infection prevention and control program and in the face of the grave danger faced by DONALD J. JACK and the other residents of contracting COVID-19, were so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety or rights of by DONALD J. JACK and the other residents exposed to Defendants' conduct.

## CORPORATE BACKGROUND

71.     BROOKDALE SENIOR LIVING, INC. was formed in June 2005 for the purpose of combining two leading senior living companies, Brookdale Senior Living Communities, Inc. and Alterra Healthcare Corporation. Both companies had been operating independently since the 1980's.

72.     Approximately one year after its formation, BROOKDALE SENIOR LIVING, INC. acquired another senior living community operator, AMERICAN RETIREMENT CORPORATION, which had been independently operating since 1978. The acquisition of

16

AMERICAN RETIREMENT CORPORATION made BROOKDALE SENIOR LIVING, INC. the largest operator of senior living facilities in the United States.

73.    On or about July 20, 2007, BROOKDALE SENIOR LIVING, INC., through AMERICAN RETIREMENT CORPORATION, purchased SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

74.    BROOKDALE SENIOR LIVING, INC. is the parent company and long term care operator of hundreds of various senior living housing and service alternatives including retirement centers, assisted living facilities, skilled nursing facilities and continuing care retirement communities also known as CCRCs throughout the country including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES.

75.    BROOKDALE SENIOR LIVING, INC. owns, operates, and manages its facilities using the same officers and directors to control and operate all of its agents and subsidiaries. BROOKDALE SENIOR LIVING, INC. operates its facilities by centralizing its management and oversight of operations from a "national platform."

76.    SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES is part of a larger CCRC, known as Freedom Square of Seminole ("Freedom Square"), which offers a full continuum of care. The Freedom Square campus includes independent living accommodations, an assisted living facility, and two skilled nursing facilities, one being SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Freedom Square offers both rental and what is known as "Life Care" programs. The rental program operates on a monthly rental fee basis, with no entry fee. The Life Care program is secured with an entry fee purchase to cover the cost of future accommodations and health care services.

77.    BROOKDALE SENIOR LIVING, INC. advertised that the CCRCs allow a resident to "age in place" as it offered a retirement community with opportunities for independent living, assisted living and nursing home care. In theory, a person could spend the rest of his or her life in a CCRC, moving between levels of care as needed. In reality, CCRCs require hefty buy-ins, which could include the price of one's home, potentially committing that individual to the CCRC regardless of the quality care they receive. In 2015, CCRCs were responsible for almost 20% of BROOKDALE SENIOR LIVING, INC.'s total senior living capacity.

78.    In 2014, in an effort to grow revenue, BROOKDALE SENIOR LIVING, INC. entered into an agreement with a real estate investment trust ("REIT"), HCP, to create a new business model for certain preexisting facilities. Together, the companies restructured these facilities with the intent to make a profit by releasing equity, increasing occupancy, increasing monthly service fees, and controlling operating expenses. SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES was included in this restructure.

79.    The new business model, in part, involved the restructuring of currently owned facilities by creating new companies for no legitimate purpose other than to avoid liability for shoddy risk management. In effect, Defendants took a legitimately named company; broke it into pieces; saddled it with tremendous liabilities; and sucked out all the cash. This restructuring involved the ostensible separation of the real estate on which the facilities sit from the operator of the facility itself. This model, known as the "Propco-Opco" structure, required the formation of two new entities to take over the pre-existing one: the real estate company, or the so-called landlord ("Propco"), and the facility operator, or the so-called master tenant ("Opco"). At the closing, the "Opco" entity engaged an affiliate of BROOKDALE SENIOR LIVING, INC. to manage the owned and leased community pursuant to a management agreement.

80. On or about August 29, 2014, at or about the same time that BROOKDALE SENIOR LIVING, INC. and HCP partnered to increase revenues and created the Propco/Opco entities, BROOKDALE SENIOR LIVING, INC. filed a change of ownership application with the State of Florida.

81. After the change in ownership, a new company, Defendant CCRC OPCO - FREEDOM SQUARE, LLC, the "Opco" or operating entity, was also created. CCRC OPCO - FREEDOM SQUARE, LLC became the new licensee of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the entity saddled with liabilities.

82. BROOKDALE SENIOR LIVING, INC. and HCP jointly own CCRC OPCO Ventures, LLC, which owns one hundred percent of CCRC OPCO-FREEDOM SQUARE, LLC.

83. CCRC OPCO-FREEDOM SQUARE, LLC entered into a management agreement with another BROOKDALE SENIOR LIVING, INC. subsidiary, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., to own, operate, manage and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and other nursing home facilities in Florida.

84. BKD TWENTY-ONE MANAGEMENT COMPANY, INC. assumed certain duties and obligations towards residents to manage the day-to-day operations of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. The centralized corporate functions include financing, accounting, human resources, marketing, training, regulatory, affairs, purchasing food and supplies, asset management, extensive policy and procedure manuals and extensive quality control programs.

85. BROOKDALE SENIOR LIVING, INC.'s and HCP's quality control measures include community inspections conducted by corporate staff on a regular basis. BROOKDALE

SENIOR LIVING, INC. and HCP focus on increasing occupancy and increasing revenues to attempt to generate a profit to support the expansion of their brands through the acquisition of additional facilities.

86.     Upon information and belief, on or about January 31, 2020, HCP acquired BROOKDALE SENIOR LIVING, INC.'s interest in SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and transitioned management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to LIFE CARE SERVICES, LLC. However, documents reflecting the change of ownership and/or management have not been filed with and/or made available by the State of Florida.

## CORPORATE CONDUCT AND JOINT VENTURE

87.     Based upon information and belief and the allegations stated above, at all relevant times, CCRC OPCO-FREEDOM SQUARE, LLC, BROOKDALE SENIOR LIVING, INC., AMERICAN RETIREMENT CORPORATION, BKD TWENTY-ONE MANAGEMENT COMPANY, INC., HCP, and LIFE CARE SERVICES, LLC, engaged in a joint venture to own, operate, and manage nursing homes including SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES. Each can bind the other and each has the authority to participate in the other's profits and the obligation to share in each other's losses.

88. Money paid by and on behalf of the nursing home residents was the sole source of revenue for the multiple layers of companies created by Defendants to distribute and share the revenues generated at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and the other nursing homes in Florida.

89. Defendants managed themselves, governed and controlled the care and services provided to DONALD J. JACK, and, by virtue of their management and control, each of them,

voluntarily and intentionally assumed responsibility for and provided supervisory and custodial services to DONALD J. JACK while he was a resident of the Facility.

90. At all relevant times, Defendants held themselves out as being competent, capable, and qualified to provide necessary services to their residents, including DONALD J. JACK, and to protect and keep all residents, including DONALD J. JACK, safe from harm, including from the spread of infectious diseases.

91. At all relevant times, Defendants owned, operated, and/or managed SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and furthermore participated in, authorized, and/or directed the conduct of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES and its respective agents and employees. Defendants are therefore directly liable for their own negligence, recklessness, and other tortious conduct, in the hiring and management of their agents and employees.

92. Defendants, through their managers, directors, presidents, vice-presidents, executive officers, and other agents, directly oversaw, managed, and/or controlled all aspects of the operation and management of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, including budgeting, staffing, training, policy and procedures manual(s), licensing, accounts payable, accounts receivable, general accounting, cash management, capitalization, and profit and loss margins.

93. Defendants employed all of those persons who attended to and provided care and services to DONALD J. JACK while he was a resident at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, and employed those persons in management and supervisory positions who directed the operations of the Facility, all of whom were acting within the course and scope of their employment.

94. Defendants, through their administrators, directors, and managing agents, condoned and ratified all the conduct at the Facility.

95. At all relevant times, Defendants were the knowing agents and/or alter-egos of one another, and are therefore vicariously liable for the acts and/or omissions of each other, their agents and employees, as is more fully alleged herein. Moreover, at all relevant times, Defendants were acting within the course and scope of their employment and/or agency relationship.

96. Defendants' acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result: maximize profits at the Facility, despite the result being that the Facility was underfunded and understaffed.

97. Defendants, by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other.

98. Defendants were responsible for the organization and administration of the Facility, and had duties to, inter alia, ensure the Facility complied with applicable statutes and regulations, and adopt policies and procedures for the Facility.

99. Each Defendant knowingly disregarded their respective duties and obligations owed to DONALD J. JACK and the other residents through both acts and omissions. Those duties to reasonably operate, manage, own and/or control SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES included: the duty to ensure the facility had sufficient staff who were trained to meet DONALD J. JACK's needs and the needs of the other residents; the duty to seek out and correct deficiencies or lapses in the care provided to DONALD J. JACK and other residents; the duty to provide a safe environment for DONALD J. JACK and the other residents;

the duty to investigate the cause of preventable incidents that occurred at SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES; the duty to sufficiently staff SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES to ensure DONALD J. JACK's needs and the needs of the other residents were met; and the duty to not divert funds from the Facility when the funds are intended for the care and maintenance of the residents, including DONALD J. JACK.

100.    Defendants did not meet their duties and obligations. Although investigations and surveys by various agencies found deficiencies in the provision of care provided to the residents of SEMINOLE PAVILION REHABILITATION AND NURSING SERVICES, each Defendant failed or refused to correct or address these issues addressed in the investigations and surveys.

101.    Defendants required or encouraged the admission of residents with higher acuity levels without providing the staff necessary to care for the residents. The staff was lacking in supervision, number, and skill.

102.    Further, in their efforts to maximize profits, Defendants intentionally and/or recklessly mismanaged staffing levels and supply levels below the levels necessary to provide adequate care and services to the residents and implemented practices in disregard to the safety of the patients.

103.    Defendants each have extensive experience in the nursing home industry. This experience provided each Defendant the knowledge and experience to know that additional staff and more skilled staff were necessary to meet the needs of residents. Even with this knowledge, Defendants failed or refused to ensure that the residents received adequate and appropriate care while in their nursing home.

104. Defendants, pursuant to their scheme to place "profits over residents" at the Facility, ratified the conduct of each Defendant in that they mandated, were aware of, and/or accepted inadequate staffing, inadequate training, inadequate supplies and inadequate practices at the Facility, and were aware that such inadequate staffing, inadequate training, inadequate supplies, and inadequate practices could lead to injuries and damages for the residents.

105. In conceiving of, implementing and carrying out their profits over residents scheme, Defendants willfully, knowingly, recklessly and with conscious disregard for DONALD J. JACK's health, safety and welfare, acted in a manner that was malicious, reckless and oppressive.

106. Further, Defendants implemented and carried out the profits over residents scheme with knowledge that such a scheme was designed to exploit elderly/senior citizens, a class expressly deemed by the Legislature of the State of Florida as a vulnerable segment of the population who require a heightened level of protection.

107. As a result of Defendants' scheme and acts and omissions, DONALD J. JACK was victimized by Defendants and suffered damages as alleged herein.

### COUNT I: BREACH OF FIDUCIARY DUTY
**As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA**

108. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

109. This is a claim that presents a theory of recovery based upon the presence of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

110. This is a claim that does not arise out of negligence or a violation of DONALD J. JACK's nursing home resident rights.

24

111. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed DONALD J. JACK a duty to act for or to advise him on matters within the scope of their specialized relationship.

112. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA and DONALD J. JACK had a developed a special relationship of trust and confidence.

113. That trust and confidence started when DONALD J. JACK was admitted to the Facility because he was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. Specifically, DONALD J. JACK needed assistance with multiple Activities of Daily Living ("ADLs") and twenty-four hour skilled nursing care.

114. As a result of his varying infirmities and advanced age, at all times material, DONALD J. JACK was incapable of independently providing for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being; and DONALD J. JACK was incapable of dealing with Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on equal terms, and was incapable of engaging in any arm's length relationships with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

115. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA directly solicited DONALD J. JACK's confidence and trust in attempts to convince him to reside and remain at the Facility, and further represented through the words and acts of its employees and agents that it would undertake to provide all of the necessary care and treatment to attain and maintain the highest practicable physical, mental, and psychosocial well-being for DONALD J. JACK.

116.    Additionally, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA specifically undertook the non-delegable duty of protecting DONALD J. JACK's residents' rights vested in him by virtue of Florida law, including the right to be treated courteously, fairly, and with the fullest measure of dignity and the right to privacy. *See NME Properties, Inc. v. Rudich*, 840 So. 2d 309 (Fla. 4th DCA 2003).

117.    As a result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's solicitation of DONALD J. JACK's trust and confidence, DONALD J. JACK placed a special confidence and trust in CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for all of his necessary care and services to attain and maintain the highest practicable physical, mental, and psychosocial well-being. And DONALD J. JACK relied on CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide such care and services.

118.    DONALD J. JACK further placed special confidence and trust in Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to protect and provide for his individual rights as established in section 400.022, Florida Statutes, and to further act as a trustee for all of his personal property that he possessed on the premises of the Facility as well as his personal funds and income, which on information and belief, he placed in an account maintained by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA on his behalf and for his benefit.

119.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA undertook to act as trustees to protect and preserve DONALD J. JACK's personal property, including his clothing and other valuable personal property, as well as to maintain and manage his personal funds and income in a trust account for DONALD J. JACK's benefit. Correspondingly

CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed non-delegable duties to provide DONALD J. JACK quarterly accounting of any and all transactions made utilizing funds from his trust account, to maintain and safeguard the funds therein and to only utilize said funds for authorized transactions, and to avoid commingling of his funds with the funds of any other person or those of CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA.

120.    Furthermore, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knowingly and voluntary entered into a highly confidential relationship with DONALD J. JACK. CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA voluntarily assumed extensive legal duties to comply with all of the confidentiality requirements enumerated in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regarding DONALD J. JACK, a confidentiality similar in scope and duration to that attendant to attorney-client and doctor-patient relationships.

121.    Moreover, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA assumed duties to protect and preserve DONALD J. JACK's Federal and State privacy rights, including those privacy rights enshrined in Article I, Section 23 of the Florida Constitution.

122.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA accepted the special confidence and trust placed upon them by DONALD J. JACK by admitting him into the Facility and by, among other things: explicitly assuming, through words and actions, the various duties described in the preceding paragraphs regarding protecting his confidentiality, protecting his privacy, protecting his individual liberties, and managing and safeguarding his personal finances; assuming responsibility and control over every aspect of DONALD J. JACK's

day-to-day life; and voluntarily undertaking responsibility for the specific level of care, protection, supplies and services that would be provided to DONALD J. JACK.

123. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA individually and collectively controlled, oversaw and orchestrated every single aspect of DONALD J. JACK's existence, from the mundane (such as the clothing worn) to the vital (such as determining when and how healthcare would be provided, as well as how much food and water DONALD J. JACK could consume).

124. DONALD J. JACK was solely and particularly dependent upon the employees, officers, directors, and agents of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA to provide for his daily care, protection, services, supplies and personal and intimate needs.

125. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA developed a special relationship with DONALD J. JACK by virtue of: the nature of the care and services provided; the trustee-beneficiary relationship they maintained toward him regarding his personal property and finances; the Federal and State confidentiality and privacy laws CCRC OPCO - FREEDOM SQUARE, LLC undertook to comply with DONALD J. JACK; the superior knowledge, skill and abilities of Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA; the enormous disparity of power and unequal bargaining Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA enjoyed DONALD J. JACK; and his inability to care for and provide for himself.

126. This special confidential relationship allowed Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, to occupy a position of confidence toward DONALD J. JACK, which required fidelity, loyalty, good faith, and fair dealing by CCRC OPCO

- FREEDOM SQUARE, LLC and CYNTHIA AYALA. Additionally, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA had a duty to refrain from engaging in self-dealing.

127. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA were each a fiduciary of DONALD J. JACK based on the special relationship between the parties.

128. At all times material to this action, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed fiduciary duties to DONALD J. JACK. *See Greenfield v. Manor Care, Inc.*, 705 So. 2d 926 (Fla. 4th DCA 1997).

129. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted and failed to act in material breach of their fiduciary duties owed to DONALD J. JACK. Instead Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA acted in ways to promote their own interests and in contravention of the interests of DONALD J. JACK.

130. Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA breached and violated its relationship of trust, special confidence, and its fiduciary obligations and duties owed to DONALD J. JACK by:

a) Failing to take adequate action to address COVID-19 concerns at the Facility as Defendants represented they would through their various websites as alleged in paragraphs 41 and 45;

b) Failing to take adequate action to minimize the risk and spread of COVID-19 and implement adequate care, services, and infection control at the Facility as alleged in paragraphs 46, 50 and 51; and

c) Knowingly and recklessly engaging in the profits over residents scheme described herein in an effort to increase the profitability of the Facility, for the

benefit of Defendants and their joint venture, and at the expense of and to the direct detriment of DONALD J. JACK.

131.    In violating their fiduciary obligations and duties to DONALD J. JACK, Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA knew that DONALD J. JACK would suffer harm, including but not limited to the daily injuries resulting from the daily invasion of rights vested in DONALD J. JACK, as well as economic harm.

132.    Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK were the legal cause of the loss, injury and damages suffered by DONALD J. JACK. As the direct and proximate result of Defendants CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breaches of the duties owed to DONALD J. JACK, DONALD J. JACK contracted COVID-19 and subsequently died from this infection.

WHEREFORE, Plaintiff demands judgment against Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

## COUNT II: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC

133.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 132.

134.    This is a claim that presents a theory of recovery based upon the presence and breach of a fiduciary duty owed by Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, aided and abetted by Defendants, exclusive of and in addition to all rights encompassed in negligence or Chapter 400, Fla. Stat.

30

135.    As set forth in Count I above, CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed and breached fiduciary duties owed to DONALD J. JACK.

136.    Defendants are related entities within a single enterprise or joint venture.

137.    Defendants had actual knowledge of DONALD J. JACK's fiduciary relationship with CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA by virtue of its close corporate relationship to CCRC OPCO - FREEDOM SQUARE, LLC.

138.    By reason of their shared and/or common ownership, directors, officers and managers and/or contractual relationships, Defendants knew of the fiduciary duties CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA owed to DONALD J. JACK and knew of CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of those duties as described in Count I.

139.    Defendants knew that the residents at the Facility, including DONALD J. JACK, were incapable of independently providing their own necessary care and were solely and specifically dependent upon the employees, officers, directors, and agents to provide for their basic daily care, protection, services, supplies, and personal and intimate needs.

140.    Defendants knowingly participated and provided substantial assistance and encouragement to CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in connection with their breach of fiduciary duties to DONALD J. JACK, as set forth in detail within Count I above.

141.    In addition to this knowledge, Defendants aided and abetted Defendants CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in their breach of fiduciary duties and rendered substantial assistance and encouragement for the same, by, among other things:

    a)    Engaging in the conduct set forth in detail within Count I above;

31

b) Exercising dominance and control over CCRC OPCO - FREEDOM SQUARE, LLC's revenues by regularly and repeatedly sweeping virtually all of the Facility's revenues into an account controlled by the joint venture or enterprise, and/or their designee;

c) Knowingly and intentionally taking, creating and accepting inter-company fees and transfers, comprised of revenues obtained from the residents and designed to improperly and unjustly enrich Defendants instead of allowing the Facility to utilize said resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including DONALD J. JACK, as required;

d) Structuring and approving contracts between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC, which Defendants knew or should have known would result in the diversion of Facility revenues necessary to provide the care and services to its residents, DONALD J. JACK;

e) Overseeing and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's acceptance of monies from residents, including DONALD J. JACK, knowing the Facility could not provide full value of the care and services to meet the care and safety needs of the residents;

f) Directly or indirectly misrepresenting the nature of the relationship between Defendants and CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, in which Defendants by virtue of the common owners, officers and managers, controlled the business operations and working

capital of the Facility and inappropriately commingled its revenues by making intra-company transfers to related facilities;

g) Structuring the managing and operating business model for the Facility in a way that constrained its ability to provide the level of care and services to residents, including DONALD J. JACK, while simultaneously benefitting Defendants and other upstream corporate entities; and,

h) Influencing, advocating, and approving CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's improper payments to Defendants, which Defendants knew exceeded amounts a prudent and cost conscious buyer would pay, and which Defendants also knew would cause the monies intended for the provision of care and services to the residents, including DONALD J. JACK, to be depleted.

142.    The conduct of Defendants as alleged, constitutes aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC's and CYNTHIA AYALA's breach of fiduciary duties and subjects Defendants to liability for the harm suffered by DONALD J. JACK.

143.    In aiding and abetting CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA in violating fiduciary obligations and duties to DONALD J. JACK as referenced herein, Defendants knew that DONALD J. JACK would suffer harm and injuries, including the daily injuries flowing from the repeated breaches of fiduciary duties in which Defendants aided and abetted.

144.    As a result of Defendants' aiding and abetting in the breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, Defendants were improperly and unjustly enriched, the Facility was left without the necessary resources to function

in the residents' best interests, and DONALD J. JACK suffered both the injuries set forth herein as well as economic harm.

145.    Furthermore, as the direct and proximate result of Defendants' aiding and abetting breaches of fiduciary duties by CCRC OPCO - FREEDOM SQUARE, LLC and CYNTHIA AYALA, DONALD J. JACK contracted COVID-19 and subsequently died.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for damages, unjust enrichment, restitution, disgorgement of profits, consequential damages, and further demands a trial by jury together with such other and further relief as this Court deems appropriate.

### COUNT III: VIOLATIONS OF FLORIDA STATUTES §415.1111
**As to Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

146.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 3, 9, 10, 12, 15, 16, 19, 20, 23, 24, 26, 28, and 31 above.

147.    For the purposes of this count and only this count, it is not alleged that Defendants are a licensee or entity that established, controlled, conducted, managed or operated the Facility.

148.    DONALD J. JACK was at all relevant times a vulnerable adult with a long-term disability.  He was seventy-five (75) years of age and was unable to perform the normal activities of daily living or to provide for his own care or protection due to his disability.

149.    Defendants' acts or omissions constitute exploitation of a vulnerable adult in violation of Section 415.1111, Florida Statutes.

150.    Defendants knew or should have known that DONALD J. JACK lacked the capacity to consent, but Defendants obtained or used, or endeavored to obtain or use DONALD J.

JACK's funds, assets or property, including Medicare and Medicaid benefits, with the intent to temporarily or permanently deprive DONALD J. JACK of the use, benefit or possession of the funds, assets, or property for the benefit of someone other than DONALD J. JACK.

151. The compensation Defendants received was derived from the private funds of vulnerable adults, including DONALD J. JACK, or from Medicaid and/or Medicare funds that were beneficiaries' assets, including DONALD J. JACK, which were paid to Defendants for the sole purpose of providing for the support and maintenance of the Facility's residents, including DONALD J. JACK.

152. Defendants received compensation that they should have known would deprive the Facility of adequate resources to provide for the necessities of DONALD J. JACK's support and maintenance, which should have been used to, inter alia, implement a sufficient infection control program at the Facility and to secure sufficient PPE and supplies to prevent the spread of COVID-19 at the Facility.

153. Defendants failed or refused to effectively use DONALD J. JACK's income or assets for the necessities required for his support and maintenance.

154. Defendants' failure or refusal to effectively use DONALD J. JACK's income or assets as set forth herein, was the proximate cause of the losses he suffered including, but not limited to the use, benefit, or possession of the funds, assets or property for his benefit.

155. As a direct and proximate result of Defendants' acts and omissions, DONALD J. JACK was deprived of the use, benefit or possession of the funds, assets or property.

WHEREFORE, Plaintiff demands judgment against Defendants HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC for

disgorgement of profits, consequential damages, attorneys' fees and costs, pre-judgment interest, trial by jury of all matters so triable, and such other relief this Court deems appropriate.

**COUNT IV: VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, § 501.201 *ET SEQ.***
**As to Defendants CCRC OPCO - FREEDOM SQUARE, LLC; HCP; BROOKDALE SENIOR LIVING, INC.; BKD TWENTY-ONE MANAGEMENT COMPANY, INC.; AMERICAN RETIREMENT CORPORATION; and LIFE CARE SERVICES, LLC**

156.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 107 above.

157.     Plaintiff brings this Count pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201 *et seq.*, Florida Statutes (hereinafter "FDUTPA").

158.     Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Fla. Stat. § 501.204 (1).

159.     By engaging in the above described conduct and the additional conduct described below, Defendants engaged in unconscionable, unfair and deceptive acts and practices in violation of FDUTPA in connection with their advertising, soliciting, providing, and offering services at the Facility, which acts and practices ultimately victimized DONALD J. JACK, a senior citizen.

160.     At all relevant times, Defendants, their officers, directors, and managers were engaged in trade and commerce in Florida within the meaning of FDUTPA as Defendants advertised, solicited, provided, and offered services to consumers and senior citizens.

161.     At all relevant times, DONALD J. JACK was a "consumer" and "senior citizen" within the meaning FDUTPA as he was an individual over the age of sixty (60).

162.     Defendants, their officers, directors, and managers marketed and advertised service at the Facility directly to senior citizen consumers, including DONALD J. JACK, by disseminating

brochures, web sites, videos, advertisements, and other information, which were prepared in part, by the Facility's related corporate entities.

163. Defendants, their officers, directors, and managers made unfair, deceptive and misleading representations in their advertising materials distributed to senior citizen consumers, including DONALD J. JACK, regarding the level of services they provided to vulnerable senior citizens and nursing home residents.

164. Defendants, their officers, directors, and managers advertised and offered their nursing facilities by promising to meet residents' needs, to keep them clean, comfortable and safe, and to provide food, water, care, and services as needed. These statements were false, deceptive, and misleading.

165. Defendants advertising materials omitted information that was material to consumers, including DONALD J. JACK, by failing to disclose that DONALD J. JACK would experience long delays in the delivery of care and services and that he would often be deprived of the care and services he required and bargained for.

166. Defendants, their officers, directors, and managers engaged in deceptive, misleading, and unfair practices by representing that certain care and services were or would be provided to DONALD J. JACK, as documented in his care plans and assessments, when in fact that care and services were never provided.

167. Defendants, their officers, directors and managers further promised to provide a clean, safe, and sanitary living environment throughout DONALD J. JACK's residency at their facilities, for which Defendants were handsomely paid.

168. Defendants affirmatively concealed material facts from DONALD J. JACK regarding the existence and effect of the COVID-19 outbreak at the Facility, and led DONALD J.

JACK to believe that the Facility was a safe environment, when in fact the Facility was contaminated with COVID-19.

169. Defendants, their officers, directors and managers failed to appropriately manage the real property at the Facility and failed to maintain a clean, safe, and habitable living environment for their residents.

170. Defendants, their officers, directors and managers, through their deceptive, unconscionable, and unfair acts and omissions, misled DONALD J. JACK into believing that their facilities were properly managed, maintained, and equipped to meet his basic needs, when it was not.

171. Defendants, their officers, directors and managers failed to provide DONALD J. JACK with a living environment and premises that reciprocated the rents and other charges they were paid for his residency.

172. Defendants, their officers, directors and managers caused the Facility to enter into a lease agreement so onerous that it left Defendants without the ability to provide an adequate, safe, decent, and clean living environment, despite promising DONALD J. JACK that he would receive the same in exchange for the monies he paid.

173. Defendants' failure to provide basic care and services to DONALD J. JACK not only violated the FDUTPA, but also degraded DONALD J. JACK, increased his risk of serious negative health consequences, and caused him to suffer medical expenses, serious injury, and death.

174. In addition to these deceptive, unconscionable, and unfair acts and omissions, Defendants misled consumers, including DONALD J. JACK, by failing to disclose that the Facility's related corporate entities exercised control over the Facility, by among other things: (a)

restricting the ability of the Facility's managers and administrators to increase staffing levels; (b) supervising, and in some case, overriding the personnel decisions of the Facility; (c) creating and implementing company-wide policies and incentive programs; and (d) entering into agreements, including onerous lease and management agreements.

175. Defendants, their officers, directors and managers failed to provide DONALD J. JACK with the basic care and services he required and bargained for with respect to his use of the Facility's premises.

176. Defendants' deceptive, unconscionable, and unfair statements and practices were in violation of FDUTPA.

177. Defendants' deceptive, unconscionable, and unfair representations, omissions, and practices were of the type that would likely mislead Florida consumers acting reasonably in the circumstances, to the consumers' detriment, and were particularly misleading and detrimental to the senior citizens and infirm residents at their Facility, including DONALD J. JACK.

178. DONALD J. JACK could not have detected the existence and effect of the COVID-19 at the Facility or the existence of the onerous agreements, the corporate entities control over the Facility that led to the lack of care, services, and sanitary living environment at the Facility.

179. DONALD J. JACK admitted himself to the Facility and had therefore been aggrieved by Defendants unconscionable, unfair and deceptive practices in violation of FDUTPA.

180. DONALD J. JACK sustained damages as a direct and proximate result of Defendants' violations of FDUTPA.

181. DONALD J. JACK did not receive the benefit of the bargain, overpaid for the services, and suffered actual damages.

182.     The damages suffered by DONALD J. JACK were directly and proximately caused by the unconscionable, deceptive, misleading, and unfair practices of Defendants.

183.     Defendants' violations were willful as Defendants knew or should have known that their conduct was unfair or deceptive or prohibited by FDUTPA.

184.     Defendants' violations are made even more reprehensible because of Defendants' attempt to exploit senior citizens during a global pandemic for profit, while posing a serious and direct threat to the health and safety of senior citizens such as DONALD J. JACK.

WHEREFORE, Plaintiff demands judgment against Defendants for damages pursuant to section 501.211(2), Florida Statutes, in an amount to be proven at trial, pre-judgment interest, post-judgment interest, attorney's fees and court costs as provided in section 501.2105, Florida Statutes, and further demands a trial by jury, together with such other and further relief as this Court deems appropriate.

/s/ Bennie Lazzara, Jr.
**Bennie Lazzara, Jr., Esquire**
Florida Bar No. 119568
Bennie@wilkesmchugh.com
TPABXLStaff@wilkesmchugh.com
fl@wilkesmchugh.com
**James L. Wilkes, II, Esquire**
Florida Bar No. 405337
jimw@wilkesmchugh.com
dthomason@wilkesmchugh.com
**Jason R. Delgado, Esquire**
Florida Bar No. 591122
jdelgado@wilkesmchugh.com
TPAJRDstaff@wilkesmchugh.com
WILKES & MCHUGH, PA
1 N. Dale Mabry Highway, Suite 700
Tampa, FL 33609
Telephone: (813) 873-0026
Facsimile: (813) 286-8820
*Attorneys for the Plaintiff*

# EXHIBIT "A"

Filing # 107269380 E-Filed 05/08/2020 09:44:17 PM

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
PROBATE DIVISION

IN RE: ESTATE OF                                  Case No. 20-004321-ES
DONALD JOHN JACK
      Deceased.

_____/

## LETTERS OF ADMINISTRATION

TO ALL WHOM IT MAY CONCERN

    WHEREAS, Donald John Jack, a resident of 12542 82nd Terrace N., Seminole, FL 33776, died

on April 21, 2020, owning assets in the State of Florida, and

    WHEREAS, Jessica Gunter has been appointed personal representative of the estate of the

decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

    NOW, THEREFORE, I, the undersigned circuit judge, declare Jessica Gunter duly qualified

under the laws of the State of Florida to act as personal representative of the estate of Donald John Jack,

deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and

receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will

permit and the law directs; and to make distribution of the estate according to law.

    ORDERED in chambers, Pinellas County, Florida.

                             05/15/2020 11:03:20 AM

                             Pamela A. M. Campbell
                             Circuit Judge

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
INAND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION**

THE ESTATE OF DONALD
J. JACK, by and through JESSICA
GUNTER, Personal Representative,

              Plaintiff,

v.

CCRC OPCO- FREEDOM SQUARE,
LLC;   HCP, INC. a/k/a HCP INC. OF
MARYLAND n/k/a HEALTHPEAK
PROPERTIES, INC.; BROOKDALE
SENIOR LIVING, INC; BKD
TWENTY-ONE MANAGEMENT
COMPANY, INC.; AMERICAN
RETIREMENT CORPORATION;
LIFE CARE SERVICES, LLC; and,
CYNTHIA AYALA (as to SEMINOLE
PAVILION REHABILITATION AND
NURSING SERVICES),

              Defendants.

**Civil Action File Number:
20-002755-CI**

---

**NOTICE OF FILING OF NOTICE OF REMOVAL**

---

COME NOW, Defendants CCRC OPCO-Freedom Square, LLC; HCP, Inc. a/k/a

HCP, Inc. of Maryland n/k/a Healthpeak Properties, Inc.; Brookdale Senior Living, Inc.;

BKD Twenty-One Management Company, Inc.; American Retirement Corporation; Life

Care Services, LLC; and Cynthia Ayala, by and through their undersigned counsel, and

hereby gives notice that it has this day filed a Notice of Removal of this action to the

United States District Court for the Middle District of Florida, Tampa Division. By virtue

of the Notice of Removal, this action has been removed from the State Court of Pinellas County, Florida to the United States District Court for the Middle District of Florida, Tampa Division. A copy of the Notice of Removal, exclusive of attachments, is attached hereto as Exhibit A.

**WHEREFORE**, the State Court of Pinellas County shall proceed no further in this action unless and until the case is remanded.

Respectfully submitted this 7th day of July, 2020.

*QUINTAIROS, PRIETO, WOOD & BOYER, P.A.*

/s/ Robin N. Khanal_____
ROBIN N. KHANAL, ESQUIRE
Florida Bar No.: 0571032
CHRISTOPHER E. BROWN, ESQUIRE
Florida Bar No.: 0071568
255 S. Orange Avenue, Suite 900
Orlando, Florida 32801
Tel: (407) 872-6011
Fax: (407) 872-6012
RNK.pleadings@qpwblaw.com
*Attorneys for Defendants*

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
INAND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION**

THE ESTATE OF DONALD
J. JACK, by and through JESSICA
GUNTER, Personal Representative,

        Plaintiff,

v.

CCRC OPCO- FREEDOM SQUARE,
LLC;   HCP, INC. a/k/a HCP INC. OF
MARYLAND n/k/a HEALTHPEAK
PROPERTIES, INC.; BROOKDALE
SENIOR LIVING, INC; BKD
TWENTY-ONE MANAGEMENT
COMPANY, INC.; AMERICAN
RETIREMENT CORPORATION;
LIFE CARE SERVICES, LLC; and,
CYNTHIA AYALA (as to SEMINOLE
PAVILION REHABILITATION AND
NURSING SERVICES),

        Defendants.

**Civil Action File Number:
20-002755-CI**

---

**CERTIFICATE OF SERVICE**

---

I hereby certify that I have this day served a copy of the within and foregoing

NOTICE OF FILING **NOTICE OF REMOVAL** with the Clerk of Court, which will

automatically send email notification of such filing to the following parties of record

below and by depositing a true copy of the same in the U.S. Mail, with adequate postage

affixed thereon, addressed as follows:

        Bennie Lazzara, Jr.
        James L. Wilkes, II

Jason R. Delgado
Wilkes & McHugh, P.A.
1 N. Dale Mabry Highway, Suite 700
Tampa, Florida 33609

Respectfully submitted this 7th day of July, 2020.

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**

/s/ Robin N. Khanal
ROBIN N. KHANAL, ESQUIRE
Florida Bar No.: 0571032
CHRISTOPHER E. BROWN, ESQUIRE
Florida Bar No.: 0071568
255 S. Orange Avenue, Suite 900
Orlando, Florida 32801
Tel: (407) 872-6011
Fax: (407) 872-6012
RNK.pleadings@qpwblaw.com
*Attorneys for Defendants*